# FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT is made and entered into this 24 day of January, 2006, between **Private Label Sourcing, LLC**, a limited liability company formed in Delaware, having its principal place of business at 597 Broadway, New York, NY 10012-3211 ("Client"), and **Branch Banking and Trust Company**, a North Carolina corporation having its principal place of business at Market Street Tower, 317 West High Street, High Point, North Carolina 27260 ("BB&T").

## 1. Definitions and Rules of Construction.

a.   As used in this Factoring and Security Agreement, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural, and vice versa):

"Account" shall have the meaning given to "account" in the UCC and shall include any right of Client to payment for Goods sold or leased or for services rendered which is not evidenced by an Instrument or Chattel Paper, whether or not it has been earned by performance.

"Account Debtor" shall mean any Person who is or becomes indebted to Client for Goods sold or services rendered.

"Advance" shall have the meaning ascribed to it in paragraph 5.

"Affiliate" shall mean a Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, a Person; which beneficially owns or holds 10% or more of any class of the capital stock or other equity securities of such Person; or 10% or more of the capital stock or other equity securities of which is beneficially owned or held by such Person or a subsidiary of such Person.

"Bank" shall mean Branch Banking and Trust Company and its successors and assigns.

"Business Day" shall mean a day that is not a Saturday, Sunday, legal holiday under the laws of the State of North Carolina or a day on which banking institutions located in such state are authorized or required to be closed.

"Client Risk Account" shall mean an Account in respect of which BB&T does not assume or bear the risk of loss, as provided in paragraph 3.

"Client's Regular Credit Terms" shall mean payment terms of   net 60 on each Account.

"Collateral" shall have the meaning ascribed to it in paragraph 9.

"Contract Year" shall mean a period commencing each calendar year on the same month and day as the date of this Factoring and Security Agreement and ending on the same month and day in the immediately succeeding calendar year, with the first such period (*i.e.*, the first Contract Year) to commence on the date of this Factoring and Security Agreement.

"Credit Approval" shall mean an approval that is given by BB&T in writing (including by way of Electronic Transmission), prior to a sale of Goods or rendition of services by Client, of the Account Debtor, the terms and conditions of the Client's sale of Goods or rendition of services to the Account Debtor, and the method of payment.

"Dollars" and the sign "$" shall mean lawful money of the United States of America.

"Electronic Transmission" shall mean the transmission of information through electronic data interchange acceptable to BB&T or through any proprietary system of BB&T.

"Event of Default" shall mean the occurrence of any event or condition described in paragraph 12.

"Funds Employed" shall have the meaning ascribed to it in paragraph 11.

"GAAP" shall mean, as of any date of determination, accounting principles referenced as "generally accepted" in then currently effective Statements of the Auditing Standards Board of the American Institute of Certified Public Accountants, or if such Statements are not then in effect, accounting principles that are then approved by a significant segment of the accounting profession in the United States of America. The term "consistently applied," as used in connection therewith, means that the accounting principles are consistent in all material respects with those applied at prior dates or for prior periods.

"Goods" shall mean all items of Inventory that are held for sale by Client in the Ordinary Course of Business, including all merchandise, supplies, materials and wares manufactured by Client or held by Client for sale to others.

"Ledger Debt" shall mean any and all amounts now or hereafter owing by Client on any accounts factored or financed by BB&T for other clients.

"Letter-of-Credit Right" shall mean a right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"Lien" shall mean any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based upon common law, statute, or contract.

"Net Amount of the Account" shall mean, for any Account, the gross amount of such Account less the sum of (i) all returns, discounts, deductions, credits, and

{44995.14}

allowances of any nature at any time issued, owing, granted or outstanding; (ii) any portion of such Account that represents sales,    excise or other taxes; and (iii) any portion of such Account that represents interest, finance charges or late payment fees.

"Obligations" shall mean all loans, indebtedness, liabilities, debit balances, covenants, and duties at any time owed by Client to BB&T or to an Affiliate of BB&T (whether or not evidenced by any note or other Instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, joint or several, now existing or hereafter arising, whether arising under this Agreement, or otherwise, including all Ledger Debt; all interest, commissions, fees, charges, expenses and attorneys' fees for which Client is or hereafter becomes liable to pay or reimburse to BB&T under this Agreement or any other agreement or by law; and any liability Client may at any time have to BB&T as guarantor or surety of the debts of any other Person.

"Ordinary Course of Business" shall mean, with respect to Client, the ordinary course of Client's business as presently conducted on the date of this Factoring and Security Agreement.

"Permitted Liens" shall mean (a) Liens at any time granted in favor of BB&T; (b) statutory liens arising in the Ordinary Course of Business of Client, but only if and for so long as (i) payment in respect of any such Lien is not at the time required or the indebtedness secured by such Lien is being actively contested by Client in good faith and by appropriate and lawful proceedings, (ii) such Liens do not materially detract from the value of the property of Client and do not materially impair the use thereof in the operation of Client's business and (iii) such Liens are at all times subordinate in priority to any Liens in favor of BB&T with respect to the same property; and (c) Liens consented to in writing by BB&T in its discretion, but only to the extent and on the conditions expressly set forth in such writing.

"Person" shall mean an individual, partnership, corporation, limited liability company, joint stock company, trust, unincorporated organization, or a government or a department, agency, or political subdivision thereof.

"Prime Rate" shall mean the per annum rate of interest from time to time publicly announced or quoted by Bank as its prime rate of interest, which rate may or may not be the lowest per annum rate of interest charged by Bank.    If Bank should cease to exist or to publish or quote a prime rate, then the variable index rate subsequently published or quoted by it in lieu of a prime rate, by whatever name called, shall be used for purposes of defining the Prime Rate hereunder, or, at its sole option, BB&T may select a variable index rate published or quoted by any financial institution having an office in the State of North Carolina for purposes hereof.

"Qualified Jurisdiction" shall mean the United States, Canada and any other jurisdiction hereafter approved in writing by BB&T in its discretion.

"Reserve Account" shall have the meaning ascribed to it in paragraph 4.

"Rider" shall mean a Rider at any time executed by Client and BB&T with reference to this Factoring and Security Agreement.

"Supporting Obligation" shall mean a Letter-of-Credit Right or secondary obligation that supports payment of an Account, Chattel Paper, a Document, a General Intangible, an Instrument, or Investment Property.

"UCC" shall mean the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of North Carolina or, when the laws of any other state or jurisdiction govern the method or manner of the creation or perfection of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) as adopted and in force in such state or jurisdiction.

"Warranted Account" shall mean an Account which satisfies all of the following criteria on the date that it arises and which thereafter continues to meet such criteria until it is paid in full:     (a) it is due and payable in Dollars in accordance with Client's Regular Credit Terms and is not past due; (b) it is a valid and legally enforceable indebtedness of the Account Debtor and arose from a *bona fide* outright sale of Goods by Client or from the rendition of services by Client, in each case in the Ordinary Course of Business, and, if the Account arises from the sale of Goods, Client has possession of or has delivered to BB&T shipping receipts evidencing the shipment of the Goods, and, if the Account arises from the rendition of services, the services have been fully performed in full compliance with any agreement between Client and the Account Debtor; (c) it is not subject to any dispute or claim by the Account Debtor as to price, terms, quality, quantity, delay in shipment, material, workmanship or performance or any other defense of any kind or character, regardless of whether any such dispute,    claim or defense is or ultimately proves to be valid or without merit; (d) the Account Debtor has not made any claim (real or imaginary) with respect to such Account for a credit, setoff, allowance, adjustment, counterclaim, contra account or to any special terms of payment which are not shown on the face of the invoice evidencing such Account, and the Account Debtor has not returned, rejected or refused to accept or retain any of the Goods from the sale from which the Account arose, nor has any partial payment been made thereon; (e) it   is not subject to any assignment, claim or Lien of any character, except the security interest in favor of BB&T, and Client has neither made any other sale or assignment thereof nor created or suffered any further Lien therein nor permitted Client's rights therein to be reached by attachment, levy, garnishment or other judicial process; (f) Client has not received any notice of the death, dissolution, termination of existence, appointment of a receiver or other custodian for any part of the property of, assignment for the benefit of creditors by, failure or inability to pay debts as they mature by, or commencement of a case under any bankruptcy or insolvency law by or against the Account Debtor (but upon Client's receipt of any such notice, it will immediately give BB&T written advice thereof); (g) it does not represent a sale or delivery of Goods upon consignment, "guaranteed sale," "sale or return," "payment on reorder," "pack, bill and hold," or similar terms; (h) the invoice for the Account accurately reflects the types and quantities of Goods sold or services rendered and terms of payment of the Account; (i) it is not evidenced by any Document, Instrument, or Chattel Paper and has not been reduced to judgment; (j) it is owing by an Account Debtor located in a Qualified Jurisdiction; and (k) it has received BB&T's    Credit Approval and such Credit Approval has not been withdrawn, as provided in paragraph 2.

{44995.14}

b.    The terms "Chattel Paper," "Instrument," "General Intangible," "Document," "Inventory," "Investment Property," and "Deposit Account" shall have the meaning ascribed to those terms in the UCC.

c.    The words "this Agreement" shall mean this Factoring and Security Agreement and each Rider.    The terms "herein," "hereof," and "hereunder" and other words of similar import refer to this Factoring and Security Agreement as a whole and not to any particular paragraph or subdivision.    Any pronoun used shall be deemed to cover all genders. All references in this Agreement to (i) state or federal statutes and related regulations shall include any amendments of same after the date hereof and any successor statutes and regulations; (ii) any instrument or agreement (including this Agreement) shall include all amendments thereto and all restatements, extensions or renewals thereof; (iii) any Person shall mean and include the heirs, successors and permitted assigns of such Person; (iv) BB&T's   "discretion" shall mean its sole and absolute discretion; (v) "including" and "include" shall be understood to mean "including, without limitation" and "include, without limitation," respectively; or (vi) "final payment" of the Obligations or any Account shall be understood to mean the full and final payment of the Obligations or such Account, in Dollars, by transfer of cash or immediately available funds or by check or other item of payment that is duly honored by the drawee bank. An Event of Default shall be deemed to exist at all times during the period commencing on the date that such Event of Default occurs to the date on which such Event of Default is waived in writing by BB&T in its discretion or cured to the satisfaction of BB&T.    An Account Debtor shall be deemed to be "located" in a Qualified Jurisdiction only if such Account Debtor has its principal office, principal assets, residence and place of organization in such Qualified Jurisdiction.

2.    **Appointment of BB&T as Factor; Purchase of Accounts**. Client hereby appoints BB&T as its sole factor with respect to all sales of Goods and rendition of services by Client to Account Debtors located in a Qualified Jurisdiction, and hereby agrees to sell and assign only to BB&T, as absolute owner, all Accounts arising from such sales and services. The sale and assignment of Accounts to BB&T shall vest in BB&T all of Client's rights, securities and guaranties with respect to each Account, including all Supporting Obligations, all rights of stoppage in transit, replevin, reclamation, and all other rights and interests in any Goods sold.    All orders for such sales or services shall be submitted by Client to BB&T for Credit Approval prior to shipment of the Goods or rendition of the services so ordered.    Any Credit Approval once granted may be withdrawn by BB&T (orally or by written communication to Client) for any reason and at any time prior to receipt of the Goods by the customer or rendition of the services.    Any Credit Approval shall be deemed to have been automatically withdrawn if such delivery of the Goods or completion of performance of the services is not made within 30 days after the date specified for such delivery or performance in the terms of sale submitted to BB&T for approval, or, if no delivery or performance date has been specified, within 30 days after the date of the approval of the order.    Any Account or portion thereof for freight, samples, or a miscellaneous sale (including the sale of Goods or quantities not regularly sold by Client in the Ordinary Course of Business) shall be at Client's risk, regardless of any Credit Approval. After BB&T's purchase of an Account, Client will not issue or grant any discounts, credits, or allowances to the Account Debtor in respect of such Account.    If, in connection with any proposed sale of Goods by Client, BB&T approves such sale, but for an amount less than the total purchase price involved, then any partial payments made by the Account Debtor on the Account arising from such sale may be applied by BB&T first to the extent of the amount of its approval, and Client shall bear the entire risk of loss for any unpaid balance of the Account

above BB&T's   Credit Approval, which unpaid balance BB&T shall be entitled to charge back to the Reserve Account.   BB&T shall not in any way be liable to Client or any other Person for refusing to give or for withdrawing its Credit Approval as to any order for the sale of Goods or the rendition of services by Client, and may give or withhold any Credit Approval in its discretion.

     3.    **Services of Factor; Risk of Loss**.   BB&T agrees to act as Client's factor and, in such capacity, will render to Client the services of investigating and indicating BB&T's approval or disapproval, as the case may be, of the credit of Client's customers, present and prospective, and of the amount, terms and conditions of and the method of payment for sales or services ordered by such customers from Client.   Provided that BB&T shall have given its Credit Approval in accordance with paragraph 2, BB&T shall bear the risk of loss on each Warranted Account if the Account Debtor, after receiving and accepting delivery of the Goods or performance of the services, fails to pay such Warranted Account   solely because of its financial inability to pay.   BB&T shall not bear or assume the risk of loss and shall have full recourse against Client with respect to any Account purchased by BB&T that (i) is not a Warranted Account at the time of purchase or ceases to be a Warranted Account at any time after purchase, (ii) arose from an order which did not receive BB&T's   Credit Approval or with respect to which such Credit Approval is withdrawn, (iii) is not paid when due for any reason other than the Account Debtor's financial inability to pay, or (iv) is owing by an Account Debtor to whom Client makes any sale of Goods or renders any services, whether for cash or on credit, after the date on which BB&T notifies Client that BB&T no longer is willing to accept the credit risk on sales or services to such Account Debtor.   Client shall promptly notify BB&T if any Account ceases to qualify as a Warranted Account, whether by reason of any dispute or claim or otherwise, and BB&T shall have the right to charge the Reserve Account for the full amount of any such Account at any time.   Client acknowledges and agrees that BB&T shall have the right to settle, compromise or litigate disputes and claims directly with the Account Debtor at Client's expense and upon terms as BB&T may deem advisable in its discretion.   Notwithstanding any charge of the amount of any Account to the Reserve Account, BB&T shall retain the Account and any Supporting Obligations or other security therefor as collateral for the Obligations.

     4.    **Client's Reserve Account; Application of Payments**.   BB&T shall establish an account or accounts ("Reserve Account") on its books in Client's name, which BB&T shall credit with the gross amount of each Account purchased by it from Client and which BB&T may debit with all Advances; BB&T's factoring commission; all credits, deductions and discounts allowed to Account Debtors; all sales or other taxes reflected in the invoices for such Account; the amount of each Client Risk Account that is not paid when due; and any or all of the Obligations, including any Ledger Debt (whether or not then due or payable) and any interest, commissions, fees, or charges payable to BB&T hereunder.   BB&T may at any time charge back to Client's Reserve Account the purchase price of any Client Risk Account, but any such chargeback shall not be deemed in and of itself to be a reassignment thereof, and Client shall not have the right to demand a reassignment of any such Client Risk Account until final payment of all Obligations.   Client shall pay to BB&T any debit balance in the Reserve Account **on demand**.   If monies shall be at any time due and owing from an Account Debtor for both Warranted Accounts and Client Risk Accounts, all payments received thereon may be applied by BB&T first in reduction of all Warranted Accounts.   Any payments received on account of the Obligations, from whatever source, may be credited by BB&T to such of the Obligations as BB&T in its discretion from time to time elects.

**5.** **Purchase Price of Accounts: Advances**.   The purchase price of each Account purchased by BB&T shall be the Net Amount of the Account calculated on the most favorable terms given to the Account Debtor.    With respect to Accounts that are and remain Warranted Accounts and that arise from the sale of Goods or rendition of services for which Credit Approval has been granted and not withdrawn, the purchase price for each such Account shall be paid by BB&T to Client at Client's request, but in no event shall BB&T be required to pay the purchase price sooner than BB&T's   actual receipt   of final payment in the full amount of such Account or ___120___ days after the maturity date shown on the invoice for such Account, whichever is the first to occur.    With respect to any other Account, BB&T shall not be required to pay the purchase price thereof unless and until BB&T receives final payment from the Account Debtor of the full amount of such Account.   In no event, however, shall BB&T be required to pay the purchase price of any Account if, at the time such payment would otherwise be due, an Event of Default exists under this Agreement or the Reserve Account does not have a credit balance equal to or greater than the purchase price of such Account; and BB&T is authorized, in its discretion, to deduct and withhold from any amount due Client hereunder the amount that BB&T is entitled to debit to the Reserve Account.    Prior to the date on which payment of the purchase price is due hereunder, BB&T may in its discretion, at Client's request, make an advance to Client (an "Advance") against the purchase price in an amount up to the balance outstanding to Client's credit in the Reserve Account *less* a reserve equal to One-Hundere percent (100%) of all unpaid Accounts purchased by BB&T.   BB&T shall have the right to increase said reserve at any time and from time to time if in the discretion of BB&T it is necessary to protect BB&T with regard to any of the Obligations or to protect BB&T against possible loss resulting from Accounts that are or may become Client Risk Accounts.   For any Advances made by BB&T to Client hereunder, Client shall pay to BB&T interest at the per annum rate set forth in and computed in accordance with paragraph 11.   In making Advances to Client, BB&T shall be entitled to rely upon Client's continuing warranty and representation that no Advance will be requested if Client contemplates filing any petition for relief under the Bankruptcy Code or any other insolvency law.

**6.** **Factoring Commission**.   BB&T shall be entitled to charge the Reserve Account with a factoring commission for each Account (whether a Warranted Account or a Client Risk Account), which shall be chargeable on the date that the Account is purchased by BB&T hereunder and which shall be in an amount equal to   (a) three-tenths of one percent (0.30%) of the Net Amount of the Account as of the date of purchase for Account Debtors located in the United States; (b) one percent (1.0%) of the Net Amount of the Account as of the date of purchase for Account Debtors located in Canada; and (c) such percentage of the Net Amount of the Account as may be mutually agreed upon in writing by BB&T and Client for Account Debtors located in any other country hereafter approved by BB&T in its discretion as being a Qualified Jurisdiction.   In no event shall Client be entitled to any reduction, credit or offset to the factoring commission payable in respect of any Account purchased by reason of any credit memo issued by Client or other action resulting in any reduction in the Net Amount of the Account or by reason of any chargeback of the Account to Client's Reserve Account.   If Client's Regular Credit Terms shall be extended, whether with or without BB&T's   approval, then the rate of BB&T's   factoring commission shall be adjusted to include an additional rate of one-quarter of one percent (.25%) for each extension of 30 days or portion thereof.   Client agrees that all charges computed under this paragraph will be at least zero Dollars ($0.00) per Contract Year during the term of this Agreement and that Client will pay any deficiency **on demand,** but in no event shall the amount charged hereunder exceed the maximum amount that may be charged under applicable law.

{44995.14}

7.    **Representations, Covenants and Warranties of Client**.    To induce BB&T to serve as Client's factor, Client hereby represents, covenants and warrants that:   (a) Client is and shall remain located at the address first above written, and Client will promptly notify BB&T in writing (including by way of Electronic Transmission) at least 30 days prior to any change of address; (b) Client is able to pay, does pay and will continue to pay its debts as they mature in the Ordinary Course of Business; (c) the financial statement last provided BB&T accurately states Client's financial condition and there has not been any material adverse change in the financial condition or business prospects of Client since the date of such financial statement; (d) Client has never carried on business under or used any name other than (if none, so state):
_____; (e) there are no actions, suits or legal proceedings of any kind or nature (whether civil or criminal) now pending (or, to Client's knowledge, threatened) against Client, the adverse result of which would in any material respect affect the property   or financial condition, or threaten the continued operations, of Client; (f) Client shall not create or suffer to exist any Lien, other than a Permitted Lien, upon any of the Collateral or any of its Inventory, whether or not constituting Collateral; (g) Client shall immediately notify BB&T of any disputes or claims concerning any Account and of any returns, repossessions or rejections of Goods sold by Client; (h) Client shall not reroute or reconsign any Goods covered by any Account nor demand the return of any such Goods, nor impede the delivery of such Goods or stop same in transit; (i) Client shall set aside, mark as the property of BB&T and hold in trust for the benefit of BB&T any returned, repossessed or rejected Goods, and shall at its own cost and expense handle, store, repair, repack, resell and reship any or all of such Goods as BB&T in its discretion shall elect and direct;   (j) if Client shall sell any Goods to or perform any services for any Account Debtor, whether for cash or on credit terms, who is obligated to BB&T with respect to a Warranted Account that is past due and payable in whole or in part and BB&T has withdrawn Credit Approval for future sales to such Account Debtor, BB&T shall be authorized to treat such Warranted Account as a Client Risk Account that may be charged back to Client's Reserve Account; (k) Client shall comply with all applicable laws in the conduct of its business and in the use, ownership and maintenance of its properties, including all environmental laws and regulations; (l) Client shall qualify to do business and maintain its good standing in the state of its formation and in each other state in which the ownership of its assets or the conduct of its business requires it to be qualified to do business; (m) Client shall not dissolve or cease doing business, or merge or consolidate with any other Person, or acquire all or substantially all of the assets of any other business; and (n) Client shall execute such instruments, agreements and other documents that BB&T may deem necessary or desirable from time to time to perfect or continue the perfection of any security interest of BB&T in any of the Collateral or to give effect to the terms and conditions of this Agreement.   Each of the foregoing representations, covenants and warranties shall be deemed continuing and to be reaffirmed on each date that Client assigns any Accounts to BB&T.

8.    **Remittances**.   If any remittance is made directly to Client in payment of an Account, then Client, as trustee of an express trust created for BB&T's benefit, shall hold such remittances as the property of BB&T, without commingling any such remittance with any funds or property of Client, and shall immediately turn over to BB&T the identical checks, monies, notes, money orders, drafts, acceptances or other forms of remittance received.

9.    **Collateral; Offset Rights**.   As security for the prompt payment and performance of all Obligations, Client hereby grants to BB&T continuing security interest in all of the following types and items of property of Client, whether now owned or existing or

hereafter created or acquired, and wherever located, and in all cash and non-cash proceeds and products of such property (collectively, the "Collateral"):    all Accounts, regardless of how such Accounts shall arise or be acquired; all Documents, Instruments, Chattel Paper, General Intangibles (including tax refund claims, patents, trademarks, copyrights, software,    and other intellectual property and rights to receive any payment or other distribution from BB&T pursuant to this or any other agreement), Deposit Accounts, Investment Property, Letter-of-Credit Rights, and Supporting Obligations; all returned, rejected or repossessed Goods the sale of which by Client gave rise to an Account; all reserves, funds, monies, sums or other like property at any time in the possession of BB&T in which Client has or obtains any interest whatsoever; all unpaid seller's and lienor's rights, including all rights of stoppage in transit, replevin, reclamation, and claims of Lien; all Liens held by Client on personal property as a mechanic, contractor, subcontractor, repairman, materialman, landlord, artisan, or similar Person; all monies and other property of Client at any time in the possession of BB&T; any and all property of Client in which a security interest is at any time granted by Client pursuant to any present or future Rider to this Factoring and Security Agreement; and all of the following described property (if none, so state):    none.    Any and all sums at any time owed by BB&T to Client or deposited with BB&T by Client shall at all times constitute security for all of the Obligations, and BB&T may apply or set off such sums against any of the Obligations, whether or not such Obligations are then due or payable.    In no event shall recourse to any Collateral be required, and Client shall at all times remain liable for the payment, **on demand**, of all debits to the Reserve Account.    Client shall cause all tangible items of the Collateral to be fully insured against loss, damage or theft on such terms and with such insurers as shall be acceptable to BB&T, and each such policy of insurance shall name BB&T as sole loss payee pursuant to a loss payable endorsement satisfactory to BB&T.    Nothing herein shall be deemed to vary the intent of the parties that all Accounts sold and assigned to BB&T under this Agreement are sold and assigned to BB&T as absolute owner in a transaction constituting a true sale.

     **10.**    **Invoicing and Assignment**.    Client shall provide BB&T with an assignment satisfactory to BB&T of each Account purchased by BB&T, together with copies of each invoice in respect of all sales or services and evidence of shipment and such other documents and proof of delivery as BB&T shall at any time require.    In lieu of a specific assignment of Accounts, Client may transmit to BB&T by Electronic Transmission information concerning the Accounts in a format acceptable to BB&T and, if so requested by BB&T, deliver to BB&T copies of invoices, acceptable evidence of shipment and such other documents and proof of delivery as BB&T may require relating to the Accounts so transmitted.    Client need not deliver an assignment in connection with Electronic Transmissions (unless otherwise specifically requested to do so by BB&T), but Client acknowledges and agrees that every invoice transmitted to BB&T by Electronic Transmission will be deemed to have been assigned pursuant to BB&T's standard form of assignment.    Each invoice to an Account Debtor shall state plainly on the face thereof that the Account represented by such invoice has been assigned and sold to, is owned by and is payable to BB&T only.    BB&T reserves the right to mail original invoices to Account Debtors; but the issuance of such invoices by whomsoever done shall in and of itself operate as an assignment to BB&T of the Accounts represented thereby, whether or not Client executes any other specific instrument of assignment.

     **11.**    **Interest; Expenses**.    Client agrees to pay BB&T interest upon the actual daily sum of Funds Employed at the close of business each day at a variable rate per annum equal to the Prime Rate in effect at the close of business on such day plus one percent (1.0%).    The Prime Rate in effect on the date hereof is 7.25 percent (7.25%).    As used herein, the term

"Funds Employed" shall mean the gross amount of all Accounts outstanding on the books of BB&T less any Reserve Account balance outstanding to the credit of Client.   Interest shall be computed on a daily basis (calculated on the actual number of days elapsed in a year of 360 days), commencing on the date hereof, and shall be payable monthly on the last day of each month, commencing on the last day of the month subsequent to the date of this Agreement.   In computing interest hereunder, all checks received by BB&T in payment of Accounts or any of the Obligations shall be credited after allowing 2 Business Days for collection from the date of deposit.   Notwithstanding anything to the contrary set forth in this Agreement, in no event shall the rate or amount of interest (including any fees, commissions, and other charges that, under applicable law, may be deemed interest) charged or collected under this Agreement exceed the maximum rate or amount chargeable under applicable law (it being the intent hereof that BB&T not contract for or receive interest in excess of the maximum authorized by applicable law); and, if a court of competent jurisdiction determines that BB&T has charged or collected interest in excess of the highest lawful rate, BB&T shall promptly refund such excess to Client and shall not otherwise be penalized.   All interest shall be payable by Client without presentation of a bill and BB&T is authorized to charge same against the Reserve Account. From and after the occurrence of any Event of Default, interest shall accrue on the actual daily sum of Funds Employed at the close of business each day at a variable rate per annum that is equal to the Prime Rate in effect on the close of business on such day plus 1.0%.   Interest shall be credited to the Reserve Account, at a variable rate per annum equal to four percent (4%) per annum below the Prime Rate in effect from time to time, on the amount by which the actual daily credit balance, if any, in the Reserve Account for such month exceeds the actual daily Net Amount of the Accounts which have been purchased by BB&T and which remain unpaid during such month.   Client shall reimburse BB&T for any expense that BB&T may incur in the performance of this Agreement or may pay on Client's behalf, including legal fees in the administration or enforcement of this Agreement, expenses of mailing and envelopes in sending any invoices to Account Debtors, insurance premiums with respect to any Collateral, amounts paid to discharge any Liens upon the Collateral, wire transfer charges, bank analysis charges or charges for returned items, and any taxes or other governmental   charges assessed against any Collateral or payable by Client in connection with any Account; but in no event shall BB&T be obligated to incur or pay any amounts on behalf of Client.

  **12.   Events of Default.**   An Event of Default shall be deemed to have occurred under this Agreement, and BB&T shall be entitled to take such action as is elsewhere provided herein, if any one or more of the following events or conditions exist or occur: (a) Client shall fail to pay any of the Obligations when due and payable; (b) there shall occur any breach, violation or default in the performance of any covenant, warranty or undertaking in this Agreement or in any other agreement between BB&T and Client (whether or not such breach, violation or default is caused or occasioned by Client, an Account Debtor or others); (c) any representation made by Client in this Agreement or in any instrument, assignment, or other document delivered to BB&T pursuant to the terms hereof shall be false or misleading in any material respect when made; (d) any petition for an order for relief shall be filed by or against Client or any guarantor of the Obligations under any chapter or provision of the federal bankruptcy laws; (e) Client shall suspend its business, make an assignment for the benefit of its creditors or make an offer of settlement, extension or composition to its creditors generally; (f) any receiver, trustee or other custodian shall be appointed for Client or any of its property; (g) any guarantor of the Obligations shall die, dissolve or cease to have legal existence or shall attempt to revoke such guarantor's guarantee unless, in the case of the death of guarantor, Client furnishes to BB&T a satisfactory substitute guarantor or other security suitable to BB&T, in its

discretion, within 30 days following such death; (h) any judgment shall be entered against Client, and the amount thereof shall not be paid within 10 days thereafter or a stay of execution in respect of such judgment shall not be in effect; (i) any of the Collateral, or any other property of Client that is material to its operations in the Ordinary Course of Business, shall be the subject of any attachment, levy, or garnishment; (j)   Client shall be in default in the payment or performance of any liability or obligation now or hereunder due or owing from time to time by Client to Bank or to any Affiliate of Bank; (k) an event of default shall occur or exist under any factoring or security agreement between BB&T and any Person who is an Affiliate of Client; or (l) BB&T shall for any other reason deem itself insecure or the Collateral impaired.   All rights and remedies hereunder are cumulative and not alternative or mutually exclusive.

**13.   Remedies Upon Default.**   Upon and after the occurrence of any Event of Default, (a) BB&T may, at its option and without notice or demand of any kind (all of which are hereby expressly waived by Client), declare all of the Obligations to be, and the same shall thereupon become, immediately due and payable (provided that the Obligations shall automatically become due and payable upon the occurrence of an Event of Default described in paragraph 12(d)), (b) BB&T shall be authorized to terminate further performance by it under this Agreement, and (c) BB&T shall have and may exercise from time to time all remedies provided for under this Agreement and all rights and remedies afforded to a secured party under the UCC or otherwise available to BB&T under any other applicable law.   Without limiting the generality of the foregoing, BB&T may enforce its security interest in any or all of the Collateral in accordance with the UCC and any other applicable law and/or sue Client and/or any guarantor for the payment of the Obligations.   BB&T is hereby granted a perpetual non-exclusive license or other right to use, without charge, Client's labels, patents, copyrights, software, name, trade secrets, trade names, trademarks, packaging materials, brochures, and advertising matter, or any similar property, in completing the production of, advertising or selling any Collateral, and Client's rights under all licenses and all franchise agreements shall inure to BB&T's   benefit for such purposes.   All remedies available at any time to BB&T shall be cumulative and may be exercised concurrently or on separate occasions.   Time is of the essence of this Agreement.   All costs and expenses, including attorneys' fees, incurred by BB&T in exercising any right, remedy, power, or privilege under this Agreement or in prosecuting or defending any action, suit or proceeding arising out of or in connection with this Agreement or relating to any Collateral shall become a part of the principal amount of the Obligations and shall be repayable **on demand.**

**14.   Power of Attorney.**   Client hereby irrevocably makes, constitutes and appoints any officer or agent of BB&T as Client's true and lawful attorney-in-fact, with full power of substitution, in the name of Client or in the name of BB&T, for the use and benefit of BB&T, without notice to Client or any of its representatives, to do or perform at any time, and from time to time, in its discretion any or all of the following:   (a) to receive, open and dispose of all mail addressed to Client and, at any time that an Event of Default exists, to cause all mail to be diverted from any post office box of Client to a post office box or other address designated by BB&T; (b) to endorse Client's name on any notes, acceptances, checks, drafts, money orders and other forms of payment may come into BB&T's   possession with respect to any Accounts, Instruments, Chattel Paper, or other Collateral and to deposit same and apply them to such of the Obligations as BB&T elects in its discretion; (c) to demand, sue for, collect, and receive monies due or to become due on any and all Accounts, Instruments, Chattel Paper, or other Collateral and to settle, compound, compromise, or extend the time of payment of any Account or other Collateral upon such terms and conditions as BB&T in its discretion deems advisable without in

(44995.14)

any way affecting or releasing any liability of Client to BB&T; (d) to execute, on behalf of Client, any UCC-1 financing statement naming Client as debtor and BB&T as secured party to perfect any security interest at any time granted by Client in favor of BB&T and any schedules, assignments, documents, and financing statements which Client is obligated to give BB&T hereunder or which are necessary to perfect, preserve or exercise any right or remedy of BB&T under this Agreement; and (e) to do such other and further acts and deeds in the name of Client which BB&T may deem necessary and desirable to enforce any of the terms of this Agreement or to collect any Account or other Collateral.   This power, being coupled with an interest, is irrevocable so long as any of the Obligations shall remain unpaid.   Client hereby ratifies and approves any and all acts of BB&T taken pursuant to the foregoing power and hereby agrees that neither the exercise by BB&T nor the failure of BB&T to exercise any of the foregoing powers shall in any way affect Client's liability to BB&T hereunder.

15.    **Statement of Account**.    At least once each month BB&T shall render to Client a statement of account in the form of a "Client Ledger," which statement shall be deemed correct and accepted by Client and conclusively binding upon Client unless Client takes exception to the statement and so notifies BB&T in writing within 30 days after the date on which BB&T deposits said statement in the United States Mail for delivery to Client.

16.    **Examination of Financial Records and Inventory**.    BB&T shall have the right at any time or times, during normal business hours and at Client's premises, to inspect, audit, examine, verify and check any or all tangible items of the Collateral and any or all of Client's books, files, records, accounts, original correspondence, shipping documents, and all other papers that BB&T deems relevant to Client's obligations under this Agreement. BB&T shall have the right to make copies of or extracts from any such documents or papers, and Client shall, promptly after BB&T's request therefore, make such documents or papers available to BB&T for such purposes.    Client shall annually, at its own expense, furnish BB&T with financial and operating statements prepared in accordance with GAAP and in a manner satisfactory to BB&T.    Client authorizes BB&T, in its discretion, to dispose of any documents, schedules, invoices, assignments or other papers delivered to BB&T in connection with this Agreement at any time after 6 months following the date on which they are delivered to BB&T. Client shall reimburse BB&T for all out of pocket expenses incurred by BB&T from time to time in connection with all audits, field examinations, and collateral examinations conducted by BB&T or its agents.

17.    **Indemnity**.    Client hereby agrees to indemnify and defend BB&T and to hold BB&T harmless from and against any claim, demand, loss, action, cause of action or damages (including legal fees and court costs) ever suffered or incurred by BB&T arising out of or related to this Agreement, the performance by BB&T of its duties or the exercise by it of its rights or remedies under this Agreement, or Client's failure to observe, perform or discharge any of Client's duties under this Agreement.    If any taxes (excluding taxes imposed upon or measured solely by the net income of BB&T, but including any intangibles tax, stamp tax, recording tax or franchise tax) shall be payable by BB&T on account of the execution, delivery, or performance of this Agreement, or the execution, delivery, issuance or recording of any other document (including any UCC-1 financing statement) or the creation or repayment of any Obligations, Client will pay (or will promptly reimburse BB&T for the payment of) all such taxes, including any interest and penalties thereon.    If BB&T for any reason ceases to act as Client's factor, Client shall furnish BB&T with indemnity satisfactory to BB&T against any items or claims that could be charged to Client under the terms of this Agreement, and until Client has furnished such

indemnity BB&T shall retain its security interest in any and all Collateral and any balance standing to Client's credit may be held by BB&T without interest until a final accounting is rendered.    The foregoing indemnities shall survive any termination of this Agreement and final payment of the Obligations.

   **18.    No Contract Assumption**.    Notwithstanding anything to the contrary contained herein, BB&T is not assuming any obligations of Client under any contract from which any Account arises and shall have no duty to perform any obligation of Client under nor any liability with respect to any contract to which Client is a party, the performance of each of which contracts shall remain the sole responsibility of Client.

   **19.    Term and Termination**.    This Factoring and Security Agreement shall take effect on the date it is signed by BB&T, shall continue in effect for a period ending on the same day in the following year and shall automatically renew itself from year to year thereafter unless terminated by either party hereto as provided below.    Client may terminate this Agreement effective on (but not prior to) the first Contract Year by giving BB&T not less than 60 days prior written notice, and Client may terminate this Agreement after the first Contract Year at any time upon 60 days prior written notice to BB&T.    BB&T may terminate this Agreement at any time by giving Client not less than 60 days prior written notice; provided, however, that BB&T may terminate this Agreement forthwith and without notice upon or after the occurrence of any Event of Default, and this Agreement shall automatically terminate upon the commencement by or against Client of any petition for relief under any chapter of the federal bankruptcy laws. Any notice of termination shall be sent in accordance with paragraph 20, but shall not be deemed to have been given or received until actually presented at the noticed party's address.    All of the Obligations shall become immediately due and payable upon the effective date of any termination hereof.    Until final payment of the Obligations, termination of this Agreement shall not release or abrogate BB&T's   security interest in any of the Collateral, and the duties, covenants and liabilities of Client and the rights and remedies of BB&T under this Agreement shall survive any such termination and shall continue to be fully operative.    If, after termination of this Agreement, BB&T is or becomes legally obligated to repay to any Account Debtor or such Account Debtor's legal representatives, successors or assigns any sum of money paid by such Account Debtor to BB&T prior to such termination with respect to an Account which at any time constituted a Client Risk Account, then, notwithstanding termination of this Agreement, Client shall immediately **on demand** reimburse BB&T for the full amount of such repayment by BB&T as well as for all costs and expenses (including attorneys' fees) incurred by BB&T in connection with such repayment.

   **20.    Notices**.    All notices, requests and demands to or upon a party hereto shall be in writing and shall be sent by certified or registered mail, return receipt requested, personal delivery against receipt or by telecopier or other facsimile transmission and (except as otherwise provided in paragraph 19) shall be deemed to be have been validly served, given or delivered when delivered against receipt or 3 Business Days after deposit in the U.S. mail, certified mail with postage prepaid, or, in the case of facsimile transmission or email, when received (if on a Business Day and, if not received on a Business Day, then on the next Business Day after receipt) at the office where the noticed party's telecopier is located, in each case addressed to the noticed party as set forth below:

          (a)     If to Client:     Private Label Sourcing, LLC
                                    597 Broadway

New York, NY 10012-3211
Attention: Keith Chan
Facsimile No.: (212) 768-7267
E-mail: hayato@hgcbroadband.com

(b)    If to BB&T:    BB&T Factors Corporation
317 West High Street
High Point, North Carolina 27260
Attention:   International Group
Facsimile No.:   (336) 889-9917

Any addressee may alter the address to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this paragraph for the giving of notice.   Any written notice, request or demand that is not sent in conformity with the provisions of this paragraph shall nevertheless be effective on the date that such notice is actually received by the noticed party.

    **21.**    **Financial Reporting**.   Client shall keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP, reflecting all of its financial transactions.   Client shall cause to be prepared and furnished to BB&T the following (all to be prepared in accordance with GAAP consistently applied):

    a.    as soon as available, and in any event within 120 days after the close of each fiscal year of Client, unqualified audited financial statements of Client and its Subsidiaries as of the end of such fiscal year, on a consolidated and consolidating basis, certified without material qualification by a firm of independent certified public accountants of recognized standing selected by Client but reasonably acceptable to BB&T; and

    b.    as soon as available, and in any event within 30 days after the end of each month hereafter (but within 120 days after the last month in a fiscal year), including the last month of Client's fiscal year, unaudited interim financial statements of Client and its Subsidiaries as of the end of such month and of the portion of Client's fiscal year then elapsed, on a consolidated and consolidating basis, certified by the principal financial officer of Client as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operation of Client and its Subsidiaries for such month, subject only to changes from audit and year-end adjustments.

    **22.**    **Sharing Information**.   Client authorizes BB&T to share with Bank or any of Bank's Affiliates any information about Client, and authorizes Bank and any of Bank's Affiliates to share with BB&T any information about Client, whether or not in either case such information would otherwise be deemed confidential.

    **23.**    **Indulgences Not Waivers**.   Neither the failure nor any delay on the part of BB&T to exercise any right, remedy, power or privilege hereunder shall operate as a waiver thereof or give rise to any estoppel, nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.   No waiver by a party hereunder shall be effective unless it is in

{44995.14}

writing and signed by the party making such waiver, and then only to the extent specifically stated in such writing.

24.    **Entire Agreement; Amendments; Riders**.    This Agreement, together with any exhibits or supplements hereto and all assignment schedules executed in connection herewith, constitutes and expresses the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements and conditions, whether express or implied, oral or written.    The express terms of this Agreement control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.    Neither this Agreement nor any portion or provision hereof may be changed, altered, waived, canceled, terminated or amended orally or in any manner other than by an agreement in writing signed by the parties hereto.    If any Rider is executed by the parties hereto with reference to this Agreement, such Rider shall be deemed incorporated into and made a part of this Agreement, unless the terms of such Rider expressly otherwise provide.

25.    **Applicable Law**. This Factoring and Security Agreement shall not become effective until accepted by BB&T in High Point, North Carolina.    All acts, transactions, rights, and liabilities under this Agreement shall be governed in all respects by, and construed in accordance with, the internal laws of the State of North Carolina.

26.    **Severability**. The provisions of this Agreement are independent of and separate from each other.    If any provision hereof shall for any reason be held invalid or unenforceable, it is the intent of the parties that such invalidity or unenforceability shall not affect the validity or unenforceability of any other provision hereof and that this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

27.    **Successors and Assigns**. The rights, remedies, powers and privileges of BB&T hereunder shall inure to the benefit of the successors and assigns of BB&T, and the duties and Obligations of Client hereunder shall be binding upon the successors and assigns of Client, provided that Client may not delegate its duties or assign its rights hereunder without the prior written consent of BB&T.

28.    **Consent to Forum**.    Client hereby consents and agrees that the state or federal courts located in High Point or Greensboro, North Carolina, shall have jurisdiction to hear and determine any claims or disputes between BB&T and Client pertaining to this Agreement or to any matter arising out of or related to this Agreement, and Client expressly submits and consents in advance to such venue and    jurisdiction in any action or suit commenced in any such court, hereby waiving any objection Client may have based upon lack of personal jurisdiction, improper venue or inconvenient forum.    **Notwithstanding the foregoing consent to venue and jurisdiction, BB&T shall be authorized to commence any action, suit or other proceeding in any other forum for the purpose of, whether to enforce a judgment obtained in another forum, enforce BB&T's    security interest in any of the Collateral, or otherwise sue upon or recover any of the Obligations.**

29.    **Waivers**.    **To the fullest extent permitted by applicable law, Client hereby knowingly, intelligently and expressly waives demand, protest, notice of protest, notice of default or dishonor, notice of payment or nonpayment, and notice of default, release, compromise, settlement, extension, or renewal of any instruments or guaranties held by**

{44995.14}

BB&T on which Client may in any way be liable; trial by jury and the right to trial by jury
on any issue in any way pertaining to this Agreement or any transactions or occurrences
arising hereunder or governed hereby (which right BB&T likewise waives); and notice of
BB&T's   acceptance of this Agreement.


     IN WITNESS WHEREOF, Client has signed, sealed and delivered this Factoring and
Security Agreement on the date first written above.

ATTEST:                                          Private Label Sourcing, LLC
                                                 ("Client")

_____            By:   _Christine A. Dente_____
                                                 Chrsitine Dente
                                          Title:   President


Accepted in High Point, North Carolina, this 24th day of January, 2006.

                                                 Branch Banking and Trust Company
                                                 ("BB&T")


                                          By:   _____
                                                 Neal Harm
                                          Title:   VP, Int'l. Portfolio Manager


{44995.14}

## CERTIFICATE OF MEMBERS AS TO ORGANIZATION, PROCEEDINGS, RESOLUTIONS AND OTHER MATTERS

The undersigned certify to **BRANCH BANKING AND TRUST COMPANY** ("Lender") that they are all of the members of **Private Label Sourcing, LLC**, a Delaware limited liability company (the "Company"), and that, as such, they are authorized to execute and deliver this certificate on behalf of the Company, and further certify as follows:

1.    The Company is duly organized, validly existing and in good standing under the laws of the State of Delaware and has paid all franchise taxes due and payable in that State.

2.    Attached hereto as **Exhibit A** is a true, correct and complete copy of the operating agreement of the Company as in effect on the date hereof.

3.    Attached hereto as **Exhibit B** is a true, correct and complete copy of the Certificate of Formation of the Company as in effect on the date hereof. The Company is manager-managed.

4.    Neither the operating agreement nor the Certificate of Formation of the Company has been modified or amended, except as shown in Exhibit A or Exhibit B, respectively, or terminated, and each remains in full force and effect.

5.    No proceeding or other action has been taken for the amendment of the Company's Certificate of Formation, or for the merger, consolidation, sale of assets or business, liquidation or dissolution of the Company, and no such proceeding is pending.

6.    The resolutions attached to and incorporated in this Certification as **Exhibit C** (the "Resolutions") (a) were duly approved and adopted by all of the members of the Company in accordance with the Company's Certificate of Formation and operating agreement and the laws of the State of the Company's organization; (b) are not inconsistent with the Company's Certificate of Formation or operating agreement; and (c) have not been amended or rescinded and are in full force and effect as of the date of this Certification.

7.    The signatures appearing below are the signatures of the individuals named in the Resolutions as Authorized Representatives; and those individuals are authorized to act on behalf of the Company in the manner set forth in the Resolutions:

| Authorized Representatives | Title (if any) | Signatures |
| --- | --- | --- |
| Jocky Cheung | Member | |
| Christine Dente | President | |

8.    The Company has, and at the time of adoption of the Resolutions had, full power and lawful authority to adopt the Resolutions and to confer the powers granted in them to the persons named in them as Authorized Representatives; and those persons have full power and lawful authority to exercise those powers.  No other action or consent of any other person or entity is necessary in order for this Certificate or the Resolutions to be effective.

9.    This Certification shall remain in full force and effect, and Lender shall be fully protected in relying on it until Lender has received written notice of a change or revocation from the Company and all of its managers and has had due opportunity to act on the notice, but no change or revocation shall affect the validity or legality of any action taken by or on behalf of the Company pursuant to the Resolutions prior to Lender's actual receipt of such written notice and opportunity to act thereon.

WITNESS the signature of all of the members of the Company effective this 24th day of January, 2006.

**For and on behalf of**
**JETWELL GARMENTS LIMITED**
駿威製衣有限公司

Name: Jocky Cheung, Director    Authorized Signature(s)
Member: Jetwell Garments Limited

Christine Dente
Member

Name: _____
Member

Name: _____
Member

Name: _____
Member

Name: _____
Member

**EXHIBIT A**

Operating Agreement of the Company

**EXHIBIT B**

Certificate of Formation of the Company

**EXHIBIT C**

RESOLVED:  That any Member of the Company or any of the other persons named below (each Member of the Company and each other such person being referred to herein as an "Authorized Representative" of this Company), by the signature of any one or more of them, be and each of them individually is hereby duly authorized and empowered to negotiate, make, execute and deliver in the name of this Company any factoring agreement, security agreement or other agreement with **BRANCH BANKING AND TRUST COMPANY** ("BB&T") with respect to factoring, financial or other credit accommodations to this Company or others, which agreement or agreements (and any and all amendments thereto and renewals and extensions thereof) may contain any terms and provisions whatsoever which any of the Authorized Representatives may deem appropriate, including, but not limited to, provisions for this Company to (i) sell and assign to BB&T, or otherwise factor with BB&T, any or all of this Company's accounts, contract rights, general intangibles, chattel paper, instruments, and other rights to the payment of money, on such terms as may be mutually agreed to from time to time between BB&T and any of Authorized Representatives of this Company, (ii) borrow monies from BB&T on a secured basis in such amounts as may be mutually agreed to from time to time between BB&T and any of Authorized Representatives of this Company, (iii) grant to BB&T a lien upon all or any portion of the real and personal assets held, owned or controlled by this Company as security for any indebtedness at any time owing to BB&T, (iv) waive its right to trial by jury and other rights it may have as deemed appropriate by any of Authorized Representatives and (v) execute in favor of BB&T guaranties or other undertakings on behalf of this Company; and it was further

RESOLVED:  That each Member of the Company and each of the following other persons shall be an Authorized Representative for purposes of these resolutions:



RESOLVED:  That any one of Authorized Representatives, or any person or persons hereafter and from time to time designated by any of them to act for this Company, hereby is duly authorized and empowered to deal in any way whatsoever with BB&T pursuant to any agreements or undertakings entered into with BB&T, including, without limitation, to pledge, mortgage, grant a security interest in, assign, endorse, negotiate, deliver or otherwise hypothecate or transfer to BB&T any and all assets now or hereafter held, owned or controlled by this Company, and for that purpose to execute and deliver to BB&T any and all factoring agreements, loan agreements, security agreements, promissory notes, mortgages, deeds of trust, security deeds, assignments, subordinations, schedules, designations, transfers, endorsements, contracts, instruments of pledge, guaranties, agreements, financial statements, or other instruments or communications whatsoever; to make remittances and payments by checks, drafts or otherwise; to withdraw funds or other property; and to do and perform all other acts and things deemed by such officer or agent to be necessary, convenient or proper to carry out any such agreements or undertakings; and it was further

BB&T LLC Certificate of Members (NC Version) (WEHW #285216)

RESOLVED: That any one of Authorized Representatives, or any person or persons hereafter from time to time designated by any of them to act for this Company, is hereby authorized and empowered to endorse the name of this Company to any and all checks, drafts and other instruments or orders for the payment of money, payable to this Company or its order for the purpose of depositing same in any account or accounts of BB&T with any bank, banker, or trust company or any of the branches of any said bank, and to deal with any and all such checks, drafts, and other instruments or orders for the payment of money and the proceeds thereof as the property of BB&T; and it was further

RESOLVED: That any bank, banker or trust company be, and it hereby is, authorized and requested to receive for deposit to the credit of BB&T, without further inquiry, all such checks, drafts and other orders or instruments for the payment of money, payable to this Company or its order, and that said bank shall be under no liability to this Company for the disposition which BB&T may or shall make of the said instruments or the proceeds thereof; and it was further

RESOLVED: That any such Member or other Authorized Representative has done or may do in pursuance of any of said agreements or to facilitate transactions thereunder is hereby ratified and approved; and it was further

RESOLVED: That the powers and authorization hereby conferred by the Company's Members be binding upon the Company until such time when notice of any changes, modifications or rescissions thereof have been duly communicated to BB&T and accepted by BB&T in writing; and it was further

RESOLVED: That any Member of this Company be and hereby is duly authorized and empowered to attest any of the foregoing instruments or agreements on behalf of this Company and to certify to the passage of the foregoing resolutions.

BB&T LLC Certificate of Members (NC Version) (WEHW #285216)

## ASSIGNMENT OF FACTORING PROCEEDS
## AND INTERCREDITOR AGREEMENT

THIS AGREEMENT (this "Agreement") is made as of the 24th day of January, 2006, by and among **Private Label Sourcing, LLC**, a Limited Liability Company formed under the laws of the State of Delaware ("Client"), **Jetwell Garments Limited**, a company incorporated in Hong Kong ("Borrower"), **Branch Banking and Trust Company** ("BB&T") and **DBS Bank (Hong Kong) Limited** ("Lender").

### Recitals:

Client has entered into a Factoring and Security Agreement with BB&T executed by Client on January 24, 2006 (the "Factoring Agreement"), and accepted by BB&T on January 24, 2006. Pursuant to the Factoring Agreement, BB&T has agreed to purchase from Client, and assume certain credit risk in respect of, accounts receivable arising from the sale of goods and services by Client.

Borrower (parent of Client) and Lender have entered into one or more agreements under which Lender has agreed to provide certain financing and extensions of credit to Borrower, with the consent of Client. At the request of Lender, Client has agreed to assign to Lender, as security for all of Borrower's indebtedness and obligations to Lender, all amounts due and to become due to Client under the Factoring Agreement and to establish a procedure for the repayment of such obligations. BB&T and Lender desire to establish the relative priorities of their respective security interests in Client's accounts and other assets on the terms set forth below.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt of which is hereby ackn

owledged, the parties hereto hereby agree as follows:

1.      **Factoring Agreement**. Client and BB&T represent to Lender that attached hereto as <u>Exhibit A</u> is a true and correct copy of the Factoring Agreement, as in effect on the date hereof.

2.      **Security Assignment**. As security for any and all existing and future loans or other financial accommodations made or to be made to Borrower by Lender, Client hereby assigns, transfers and sets over unto Lender and hereby grants a security interest to Lender in and to all of Client's right, title and interest in and to all monies and claims for monies due or to become due to Client under the Factoring Agreement.

3.      **Collection of Accounts; Notification of Account Debtors**. All Account invoices shall be mailed or otherwise transmitted by Client with a copy to BB&T or, at BB&T's option, shall be sent to BB&T ready to be mailed or otherwise transmitted to the customers, in which event the postage will be paid by Client. Each invoice shall state in a manner satisfactory to BB&T that the receivable is payable only to BB&T. Client will keep all shipping and delivery receipts and copies of all invoices at its offices available for BB&T's inspection, and will promptly deliver to BB&T

consents to any and all liens on and security interests now existing or hereafter created or arising in favor of Lender in any or all of Client's existing or future receivables, accounts, contract rights, general intangibles, inventory or other tangible or intangible property (real or personal), and BB&T agrees that neither the existence nor creation of any such lien or security interest shall constitute or result in a breach or violation of, or a default or event of default under, the Factoring Agreement.

7. **Monthly Statements**. BB&T agrees to send to Lender a monthly statement of Client's accounts with BB&T covering transactions under the Factoring Agreement after the close of each month concurrently with the sending of such statement to Client. In the event Client disputes any monthly statement, Client shall provide to Lender a copy of any notice given by Client to BB&T with respect to the dispute.

8. **Priority of Security Interests**. In connection with the Factoring Agreement, Client has granted to BB&T a continuing lien on and security interest in, all of the following property of Client, whether now owned or existing or hereafter created or acquired, together with all cash and non-cash proceeds thereof: all Accounts (as defined below) purchased by or assigned to BB&T, regardless of how such Accounts shall arise or be acquired; all goods at any time sold by Client that are the subject of a "Warranted Account", including without limitation all returned, rejected or repossessed goods, and certain other rights and interests of Client as more particularly described in Paragraph 9 of the Factoring Agreement (the "Collateral"). "Accounts" means any and all of Client's accounts, general intangibles, chattel paper, contracts, instruments, documents, acceptances, notes, bills and all other forms of obligations at any time owing to Client, including all cash and non-cash proceeds thereof, whether now owed or hereafter created or acquired by Client.

Client has granted or will grant Lender a security interest in or lien upon the Collateral, or a part thereof, and in order to clarify and establish the relative priority of the security interests of BB&T and Lender, if any, in the Collateral, BB&T and Lender agree, notwithstanding any contrary provision contained in the Factoring Agreement, that:

(a) The security interests of BB&T in the Collateral are and shall be prior and superior to the security interests of Lender in the Collateral or any part thereof; and

(b) The security interests of Lender in all of Client's assets except the Collateral shall be prior and superior to the security interests of BB&T in such assets; and

(c) Except as herein specifically provided, the rights and priority between Lender and BB&T shall be determined under applicable law; and

(d) The provisions of this Paragraph with respect to the priorities of the security interest and rights concerning collateral of Lender and BB&T are solely for the benefit of such parties and their respective successors and assigns and no other persons shall have any right, benefit or priority under or because of such provisions.

The subordinations and priorities specified hereinabove are expressly conditioned upon the

valid and shall apply notwithstanding any nonavoidability and perfection of the security interest to which another security interest is subordinated and, if the security interest to which another security interest is subordinated is not perfected or is avoidable, for any reason, then the subordinations and relative priority agreements provided for herein shall still be effective as to the particular collateral which is the subject of the unperfected or avoidable security interest.

9.    **Controlling Provisions**.  To the extent that any provision of this Agreement is inconsistent with any provision of the Factoring Agreement, each such provision in the Factoring Agreement shall be deemed to be amended by, and as provided in, this Agreement.  Except as specifically modified by this Agreement, the Factoring Agreement shall remain in full force and effect.

10.    **Notices**.  Except as otherwise provided herein, any notices or consents required or permitted by this Agreement shall be in writing and shall be deemed delivered if delivered in person or if sent by certified mail, postage prepaid, return receipt requested, addressed to the party to be notified as follows:

(a)    If to Client:
Private Label Sourcing, LLC
597 Broadway
New York, NY 10012
Attn:  Christine Dente

(b)    If to Borrower:
Jetwell Garments Limited
Unit C, 10/F., Garment Centre,
576-586 Castle Peak Road, Hong Kong
Attn:  Jocky Cheung

(b)    If to Lender:
DBS BANK (HONG KONG) LIMITED
16/F, The Centre, 99 Queen's Road Central
Hong Kong
Attn: Amanda Chiu, Enterprise Banking - Factoring

(c)    If to BB&T:
Branch Banking and Trust Company
317 West High Street
11th Floor, Market Square Tower
High Point, North Carolina 27261
Attn:  International Department

or such other address as any party may designate for itself by like notice.

11.    **Termination**.  This Agreement is to continue in effect until written notice of termination is delivered by any one of the parties hereto to the others; provided, however, that such

# EXHIBIT "A"

[Attach copy of the Factoring Agreement]

# AGREEMENT I

It is agreed between    1.    a) Jetwell Garments Limited
Unit C, 10th Floor, Garment Centre
No. 576-586 Castle Peak Road
Cheung Sha Wan, Kowloon

b) Well Success Textile (HK) Co Ltd
Unit F & G 11/F
Garment Centre
576-586 Castle Peak Road
Cheung Sha Wan, Kowloon

- hereinafter called "seller" -

2.    Private Label Sourcing, LLC
597 Broadway, New York, NY 10012-3211

- hereinafter called "buyer" -

3.    Banking and Trust Company
Market Street Tower, 317 West High Street, High Point,
North Carolina 27260

- hereinafter called "BB&T" -

that the seller will deliver goods to the buyer. It is known that the buyer is in a factoring relationship with BB&T and all rights in the receivables for such goods have been/will be assigned to BB&T.

The seller herewith confirms that he will have no further claims on the goods or the receivables once they are assigned to BB&T.

This agreement is governed by US law. Place of jurisdiction is the State of North Carolina. BB&T, however, is entitled to claim at the location of the seller or the buyer.

Jetwell Garments Limited

By: ...........................................

Date: ........................................

Well Success Textile (HK) Co Ltd

By: ...........................................

Date: ........................................

Banking and Trust Company

By: ...........................................

Date: ........................................

Private Label Sourcing, LLC

By: *Chris A. Dente*

Date: ...... 1/17/06 ..........

星展銀行☒DBS

Date: 13 December 2005

Our ref: P/KIRP/20241/05

Jetwell Garments Limited
Unit C, 10th Floor, Garment Centre
No. 576-586 Castle Peak Road
Cheung Sha Wan, Kowloon

Dear Sirs,

### BANKING FACILITIES

DBS Bank (Hong Kong) Limited (the "Bank", which expression shall include its successors and assigns) is pleased to advise that it is prepared to consider making available or continuing to make available the banking facilities detailed below (the "Facilities") to the Borrower described below, subject to the provisions of this facility letter, the attached "Terms and Conditions Governing Banking Facilities and Services" and the "Terms and Conditions Governing Back-to-Back Factoring Facilities and Services".

**A.  BORROWER:**

Jetwell Garments Limited

**B.  FACILITY LIMITS:**

| Type(s) of Facility | | Facility Limit(s) |
|---|---|---|
| 1. | Factoring | USD2,000,000.- |

**C.  PRICING AND CONDITIONS:**

Unless otherwise provided herein, interest and commission(s) on the Facilities will be charged at the Bank's standard rate that may be varied from time to time at the Bank's discretion.

| Factoring | Terms and conditions are stipulated in "Terms and Conditions Governing Back-to-Back Factoring Facilities and Services" attached to this letter and in the Factoring Agreement. In case of inconsistency between the Factoring Agreement and this letter, the latter shall prevail. |
|---|---|

| Handling Fee of Facilities: | HKD20,000.-. |
|---|---|

**D.  SECURITY AND CONDITIONS PRECEDENT:**

The Facilities will be made available or continue to be made available to the Borrower provided that the Bank has received each of the following, in a form and substance satisfactory to the Bank:

1.  This letter duly executed by the Borrower.

2.  General Commercial Agreement duly executed by the Borrower.

DBS Bank (Hong Kong) Limited 星展銀行(香港)有限公司
Enterprise Banking 企業銀行業務
16th Floor, The Center 香港中環
99 Queen's Road Central 皇后大道中99號
Central, Hong Kong 中環中心16樓

Tel 電話 852.2218 8598
Fax 傳真 852.2285 3628
www.dbs.com



星展銀行 ⊠ DBS

**Jetwell Garments Limited**                                               Our Ref: P/KIRP/20241/05

3.  Guarantee and Indemnity for an unlimited amount duly executed by Cheung Kin On Jocky.

4.  Guarantee and Indemnity for an unlimited amount duly executed by Well Success Textile (H.K.) Company Limited.

5.  Guarantee and Indemnity for an unlimited amount duly executed by Kei Fung (Yarn) Company Limited.

6.  Factoring Agreement duly executed by the Borrower.

7.  Original or Certified copies of all necessary consents, approvals and other authorizations (including but not limited to those required by relevant governing authorities and/or the resolutions of the directors and shareholders of the Borrower and/or any security provider(s)) in connection with the execution, delivery, performance and enforcement of this letter and all other documents mentioned above, if applicable.

8.  Original or Certified copies of all necessary registrations and filings as may be required by relevant governing authorities in connection with the execution, delivery, performance and enforcement of this letter and all other documents mentioned above, if applicable.

9.  Such other documents, items or evidence that the Bank may request from time to time.

## E. COVENANTS AND UNDERTAKINGS:

The Borrower undertakes to the Bank that it will:

- ensure that all consents, licences, approvals, registrations and filings (as appropriate) in connection with the Facilities, guarantee or securities as may be provided in relation to the Facilities granted hereunder are duly obtained, completed and will remain in full effect throughout the period when there is outstanding under the Facilities.

- promptly submit to the Bank:
    a)  a certified copy of the audited (and, as appropriate, consolidated) financial statements of the Borrower and all corporate security provider(s), if applicable, as soon as they are available, but in any event within 10 months after the end of the financial year end and at any other time requested by the Bank;
    b)  with reasonable promptness, details of any litigation, arbitration or administrative proceeding current or, to its knowledge, threatened or commenced against it; and
    c)  other information that the Bank may request from time to time.

- immediately inform the Bank of:
    a)  any change of the Borrower's directors or beneficial shareholders (except where the Borrower is a listed company) or amendment to its memorandum or articles of association or equivalent constitutional documents.
    b)  any substantial change to the general nature of the Borrower's existing business.
    c)  any factor which may inhibit, impair or delay performance by the Borrower or the security provider(s), if any, of the obligations under any loan and security documents to which they are a party.
    d)  the failure to continue to obtain consents, licences, approvals, registrations and filings (as appropriate) in connection with the granting of the Facilities and/or the provision of securities (including without limitation guarantee(s)) in relation to the Facilities granted hereunder throughout the period when there is outstanding under the Facilities.

星展銀行 ☒ DBS

**Jetwell Garments Limited**                                      Our Ref: P/KIRP/20241/05

We hereby confirm our understanding and acceptance of all the terms and conditions set out in (i) this letter, (ii) the "Terms and Conditions Governing Banking Facilities and Services" and (iii) the "Terms and Conditions Governing Back-to-Back Factoring Facilities and Services" attached to this letter and our agreement to be bound by all of them.

Signed for and on behalf of
Jetwell Garments Limited

For and on behalf of
JETWELL GARMENTS LIMITED
駿 威 製 衣 有 限 公 司

.................................................
Authorized Signature(s)

Authorized signor(s)

4

星展銀行 ⊠ DBS

Jetwell Garments Limited                                                    Our Ref: P/KIRP/20241/05

_____

## F. OTHER TERMS AND CONDITIONS

The Facilities are available at the sole discretion of the Bank and are in all respects uncommitted. The Bank may at any time immediately modify, terminate, cancel or suspend the Facilities or any part of it, or otherwise vary the Facilities or any part of it, without the consent of the Borrower or any other person.

Notwithstanding any provisions stated in this letter, the Facilities are repayable on demand by the Bank. The Bank has the overriding right at any time to require immediate payment of all principal, interest, fees and other amounts outstanding under this letter or any part thereof and/or to require cash collateralisation of all or any sums actually or contingently owing to it under the Facilities.

The "Terms and Conditions Governing Banking Facilities and Services" and the "Terms and Conditions Governing Back-to-Back Factoring Facilities and Services" attached and/or referred to in this letter form an integral part of this letter and the Borrower agrees to observe and be bound by them.

This letter and the Facilities shall be governed by the laws of the Hong Kong Special Administrative Region and the parties hereto hereby submit to the non-exclusive jurisdiction of the Hong Kong Courts.

Please signify your understanding and acceptance of this offer by signing and returning to us the duplicate copy of this letter and provide each of the items under the section headed "Security And Conditions Precedent" above, for the attention of Ms Peony Wong ("Designated Relationship Manager"), within one month from the date of this letter, otherwise the offer will lapse at the discretion of the Bank.

We enclose a set of documents which should also be completed and returned to us. If you have any queries, please contact the Designated Relationship Manager at telephone number 3122-7718.

We are pleased to be of service to you.

Yours faithfully,
For and on behalf of
**DBS Bank (Hong Kong) Limited**

_____
Authorized Signatories
Documentation Services
Enterprise Banking

SY/fl
Encl.

星展銀行 ☒ DBS

**Jetwell Garments Limited**                                            Our Ref: P/KIRP/20241/05

**Survey Report on Receivables:**  A survey of the Eligible Distributor's receivables shall be conducted by the Bank or the Credit Underwriter prior to the activation of the Factoring Facilities and these terms and conditions and those stipulated in the Facility Letter issued by the Bank to the Borrower from time to time, may be revised based on the survey findings.  The Bank may also carry out subsequent periodic surveys. All costs of the surveys are to be borne by the Borrower. The Bank reserves the right to withdraw the Factoring Facilities if any of the survey findings are unsatisfactory to the Bank.

<u>Other Terms & Conditions of the Factoring Facilities</u>

♦   The purchase of debts for this Factoring Facilities under Clause 2(6) of the Factoring Agreement between the Borrower and the Bank shall include assignment of debts due from the Eligible Distributors to the Borrower. The Borrower also agrees that the Eligible Distributor shall promptly deliver the assignment of debts to the Credit Underwriter with a copy to the Bank.

♦   For Eligible Distributors: Recourse Collection Only Factoring Agreement is to be signed by the Eligible Distributors with the Credit Underwriter together with the related agreement or assignment of the factoring proceeds in favour of the Bank plus any other documentations required by the Bank or the Credit Underwriter from time to time.

♦   UCC filing of the Eligible Distributor's factored receivables in favour of the Credit Underwriter shall be arranged.

♦   Consignment and returnable sales with debtors are not eligible for advance payment.

6

星展銀行 ☒ DBS

Jetwell Garments Limited                                                                 Our Ref: P/KIRP/20241/05

**Terms and Conditions Governing Back-to Back Factoring Facilities and Services**

The following terms and conditions shall apply for the Factoring Facilities:-

| Nature of the Factoring Facilities | Disclosed<br>Non-recourse |
|---|---|
| Prepayment Limit | USD2,000,000.- |
| Prepayment Percentage | 85% (calculated based on the approved receivables of the Eligible Distributors purchased by the Credit Underwriter) |
| Maximum Financing Period | Up to 90 days from date of invoice billed by the Eligible Distributors to the debtors approved by the Credit underwriter. |
| Legal Fee | USD1,000.- |
| Service Charge | 0.2% on gross value of the Eligible Distributors' invoiced amount. (excluding service charge of the Credit Underwriter) |
| Discounting Charge | Charged at (i) Standard Bills Rate quoted by the Bank from time to time for advance in foreign currency and (ii) 1% per annum below the Standard Bills Rate quoted by the Bank from time to time for advance in Hong Kong Dollars. |
| Interest on demand for amount due and unpaid | 2% per month. |

**Prepayment:** Prepayment under the Factoring Facilities is available to the Borrower on debts qualifying for withdrawals before the payment dates at the entire discretion of the Bank.

**Collection and Receivables Management:** The Bank's receivable management services include management of the Borrower's sales ledger, the issue of monthly statements to its debtors and collection of the receivables from its debtors.

**Eligible Distributors:** Private Label Sourcing LLC

**Credit Risk Cover Applied:** With debtor's credit risk cover upto 100% of the credit limit or debts outstanding (created after goods are acknowledged by the Eligible Distributors' end buyers), whichever is lower, for the approved debtors.

**Debtor Subject to Approval:** The Eligible Distributor's debtor(s) and each of its individual limit is granted subject to satisfactory evaluation of the debtor by the Bank and the approval of credit risk cover by the Credit Underwriter. The Bank reserves the right from time to time to review and vary the limit or not to make any prepayment at all at its absolute discretion.

**Notice to Debtor:** All approved debtors shall be notified of factoring arrangement and to pay direct to the Credit Underwriter.

**Prepayment Instruction:** All prepayments made to the Borrower under the Factoring Facilities shall be effected upon its prepayment instruction by fax to its account with the Bank. The Bank shall not be held responsible for any delay, loss or damage in complying with the fax instruction or through delay, illegibility or non-receipt of the fax instruction.

星辰银行 ⊠DBS

## Terms and Conditions Governing Banking Facilities and Services

These Terms and Conditions form an integral part of the banking facility letter ("Banking Facility Letter") from DBS Bank (Hong Kong) Limited to the Borrower to which they are attached.

**1.  Definitions and Interpretation**

1.1  The terms below used in these Terms and Conditions shall have the corresponding meanings:

**"Agreement"** the Banking Facility Letter together with these Terms and Conditions (including any supplement) and any other terms and conditions and/or agreement referred to in the Banking Facility Letter.

**"assets"** includes present and future properties, revenues and rights of every description.

**"Bank"** DBS Bank (Hong Kong) Limited which includes all its branches and offices wherever situated and its successors, assigns and any other person with which the Bank merges or consolidates.

**"Banking Facility Letter"** the banking facility letter(s) (including all its attachments, schedules, appendices, amendments and supplements) issued by the Bank in relation to Facilities extended by the Bank to the Borrower, to which these Terms and Conditions are attached.

**"Bank's Cost of Funds"** the cost of funding of the Bank as may be determined by the Bank from time to time.

**"Borrower"** the Borrower specified in the Banking Facility Letter, and where there is more than one Borrower, all references to the "Borrower" shall mean all such persons or any one or more of them.

**"Business Day"** a day on which commercial banks in Hong Kong and, if applicable, the principal financial center of the relevant currency, are open for business (other than a Saturday).

**"Exchange Rate"** the rate for converting one currency into another currency that the Bank determines to be prevailing in the relevant foreign exchange market at the relevant time, such determination to be conclusive and binding on the Borrower.

**"Facilities"** the banking facilities (or any part of it) specified in the Banking Facility Letter and such other facilities, loans, overdrafts, advances, etc. from time to time made available by the Bank.

**"Fixed Deposit Rate"** the deposit interest rate for fixed deposits pledged to the Bank as security for its corresponding Banking Facility.

**"HIBOR"** the Hong Kong Interbank Offered Rate quoted by the Bank for the relevant period.

**"LIBOR"** the London Interbank Offered Rate quoted by the Bank for the relevant period.

**"Prime Rate"** the rate which the Bank announces or applies from time to time as its prime rates for lending Hong Kong Dollars, or where applicable, for lending United States Dollars.

**"Services"** any banking services provided by the Bank.

1.2  Unless a contrary indication appears, a reference in the Agreement to :-

a)  a person includes an individual, a company, sole proprietorship, partnership or body unincorporated and its successors and assigns;

b)  any document includes a reference to that document as amended, varied, supplemented, replaced or restated from time to time; and

c)  a provision of law is a reference to that provisions as amended or re-enacted

1.3  Unless the context otherwise requires, words importing the singular include the plural and vice versa and the neuter gender includes the other genders.

1.4  Any matter required to be done on a particular date which is not a Business Day shall be done on the next following Business Day.

1.5  Headings are for convenience only and are to be ignored in construing these Terms and Conditions.

**2.  Application**

2.1  These Terms and Conditions shall apply to any Facilities and Services which the Bank in its sole discretion, may agree to make available and provide to such extent and in such manner as the Bank thinks fit.

2.2  These Terms and Conditions shall be subject to such other terms and conditions which may be specified by the Bank from time to time in the Banking Facility Letter, other documents, agreements or applications.

2.3  In the event of any conflict or inconsistency between these Terms and Conditions and the provisions of the Banking Facility Letter, the latter shall prevail.

**3.  Payments**

3.1  Unless otherwise agreed in writing by the Bank, all payments made under the Agreement shall be made in immediately available funds to the Bank before noon on the due date.

3.2  All payments by the Borrower to the Bank shall be made without any set-off, counterclaim, deduction, withholding or condition of any kind. If the Borrower is compelled by law to make any withholding or deduction, the sum payable by the Borrower shall be increased so that the amount actually received by the Bank is the amount it would have received if there had been no such withholding or deduction.

3.3  Payment by the Borrower to the Bank shall be in the currency of the relevant liability or, if the Bank so agrees in writing, in a different currency, in which case the conversion to that different currency shall be made at the Exchange Rate. The Borrower shall be liable for any shortfall if the converted currency is less than the outstanding liability.

3.4  Any monies paid to the Bank in respect of the Borrower's obligations may be applied in or towards satisfaction of the same or placed to the credit of a suspense account with a view to preserving the Bank's rights to prove for the whole of the Borrower's outstanding obligations.

3.5  If any payments paid to the Bank in respect of the Borrower's obligations are required to be repaid by virtue of any law relating to insolvency, bankruptcy or liquidation or for any other reason, the Bank shall be entitled to recover such sums from the Borrower as if such monies had not been paid.

**4.  Drawings Against Uncleared Amounts**

In the event the Bank permits the Borrower to draw against funds to be collected or transferred from any account(s), the Borrower shall on demand reimburse the Bank in full the amount so drawn if the Bank does not receive the funds in full at the time the Bank ought to have received the same or if, after the Bank has accepted the transfer, the Bank is prevented from collecting or freely dealing with the funds in accordance with its usual banking practice.

**5.  Letter of Credit**

For Facility relating to Letters of credit calling for cargo receipt, if so agreed to be granted by the Bank, the beneficiaries or each of their individual limits are subject to the Bank's approval on a case-by-case basis. The Bank may from time to time carry out at the Borrower's expense updated searches of the said beneficiaries and all related costs and fees may be debited to the Borrower's account.

**6.  Account Payable Financing**

Payment under the Facility shall be made directly to the relevant supplier. The suppliers and each of the individual facility limits are subject to the Bank's approval on a case-by-case basis. The Bank may from time to time carry out at the Borrower's expense updated searches of the said suppliers and all related costs and fees may be debited to the Borrower's account.

**7.  Negotiation under Documentary Credit**

If a discrepancy is found in the underlying letter of credit documents, then notwithstanding anything contained in the Agreement, the Bank may at its absolute discretion refuse to negotiate any such documentary credit and/or bill(s).

**8.  Documents against Acceptance Bills Purchased and Documents against Payment Bills Purchased with Insurance Cover**

8.1  The Bank has or may from time to time take out and do all things as appropriate or necessary to effect and maintain an insurance policy with such reputable insurance company or companies on such terms and in such value to cover such risk(s) related to the Facility as the Bank may deem fit, and the Borrower agrees to reimburse the Bank, without deduction, for all monies expended including but not limited to insurance premium in relation thereon.

8.2  The Borrower is required to comply with all the terms and conditions of such policies as shall from time to time be entered into between the Bank and any insurance company as the Bank may deem fit, and the Borrower undertakes and warrants not to do or omit to do or permit or cause or suffer to be done any act, matter or thing whatsoever whereby any such policy of insurance may be rendered void or voidable or whereby any premium may be increased.

8.3  Such arrangement shall not extinguish the Borrower's obligations under the Facility, and the Borrower agrees to render such co-operation and assistance as the Bank may require in connection with any claim or other matter arising in connection with any such insurance policy.

**9.  Treasury Facilities**

9.1  For any foreign exchange, options, futures, swaps or other structured or derivative products, applications will only be considered by the Bank subject to its receipt of the documentation that the Bank may require from time to time. Any treasury related contract will be entered into by the Borrower at the rate(s) quoted by the Bank at its absolute discretion.

9.2  The terms included or referred to in the relevant confirmation issued by the Bank shall apply to all treasury related transactions between the Borrower and the Bank.

9.3  The Borrower warrants that it will enter into any transaction with the Bank solely in reliance upon its own judgement and at its own risk, and the Bank shall not be responsible for any loss or other consequences suffered or incurred by the Borrower, whether or not acting on advice received from the Bank.

9.4  The treasury related contract amounts shall be subject to the relevant facility limit(s) (if any) stipulated in the Banking Facility Letter and the risk exposure limit(s) set (either advised or otherwise) by the Bank from time to time.

9.5  The Bank may from time to time mark the Borrower's outstanding treasury related contracts to market by reference to the prevailing market rate or quotation in order to calculate the Borrower's gain or loss under the contracts. If the Bank determines that the Borrower has incurred a loss under any such contracts by the then prevailing mark-to-market calculation, the Borrower shall forthwith pay such sum or deliver such collateral as required by the Bank to cover such loss.

9.6  The Bank has the right to close out and/or terminate any or all outstanding treasury related contracts of the Borrower if:

a)  the Borrower fails to perform any terms of the Agreement including its default in payment;

b)  the outstanding contracts amounts exceed the facility limit(s) (if any) or the Bank's risk exposure limit(s);

c)  the Borrower shall become insolvent or suspends payment of any debt when due or subject to any bankruptcy or winding-up petition; or

d)  any circumstances have arisen or continued which, in the Bank's opinion, might adversely affect the Bank's position under the relevant contracts.

Upon closing-out or termination of the treasury related contracts, the Borrower shall pay to the Bank any loss incurred under those contracts. Such loss shall be determined by the Bank (acting in good faith) based on the replacement market value of the contracts so closed-out or terminated, which determination shall be binding and conclusive on the Borrower.

**10.  Application of Proceeds**

10.1  The Bank may apply the net proceeds of any sale, disposition or dealing of the security of the Borrower towards discharge of the Borrower's obligations to the Bank in whatever priority that the Bank may determine.

10.2  The Borrower shall, upon demand by the Bank:

a)  provide such further security in form and value as may be required in the opinion of the Bank sufficient to secure any of the Borrower's obligations to the Bank; and

b)  execute and deliver to the Bank any documents in form and substance satisfactory to the Bank over any of the Borrower's assets as the Bank specifies in any such demand.

10.3  Save for gross negligence or wilful default, the Bank shall not be liable for any loss or damages or depreciation in value of any security granted in favour of the Bank due to the Bank's exercise of any of its rights over any security.

**11.  Interest**

11.1  The Bank shall charge interest on any sum(s) outstanding or owing by the Borrower from time to time. Unless otherwise specified, interest will accrue on a daily basis and shall be calculated, compounded and payable on such basis and in such manner as the Bank may determine at its absolute discretion.

11.2  Save as otherwise specified, interest will be calculated by reference to the actual number of days elapsed and a 365-day year (if the Facility is in HK Dollars, Pounds Sterling, Singapore Dollars or Malaysia Ringgit) or a 360-day year (if the Facility is in any other approved foreign currencies).

11.3  If the interest rate in respect of any Facility is expressed to be a margin over the Prime Rate, the Bank shall be entitled, in its reasonable discretion, at any time to substitute the Bank's Cost of Funds in place of the Prime Rate in calculating the interest payable under such Facility. If the interest rate in respect of any Facility is expressed to be a percentage less than the Prime Rate, the Bank shall be entitled, in its reasonable discretion, at any time to replace such interest rate by the Bank's Cost of Funds as the applicable interest rate in respect of such Facility.

11.4  If any amount under the Banking Facility Letter is unpaid on due date or exceeds the permitted facility limit, such overdue or excess sum will be subject to the Bank's then prevailing overdue or over limit interest rate, and may be compounded monthly or at such other intervals as the Bank may determine. The Bank may, without prejudice to its other rights, increase the interest rate on the entire amount outstanding under the Banking Facility Letter if any amount becomes overdue.

DBS Bank (Hong Kong) Limited



How It Works — Back-to-Back Factoring

Disclaimer: The information contained in this document is intended only for use during the presentation and should not be disseminated or distributed to parties outside the presentation. DBS Bank accepts no liability whatsoever with respect to the use of this document or its contents.