ATA 05 29 08

1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ----------------------------------x

4    ATATEKS FOREIGN TRADE LTD., JORDAN
     and ATATEKS DIS TICARET A.S.,
5
                                Plaintiffs,
6
                 v.                        Index No:
7                                          07 Civ 6665 (HB)
     PRIVATE LABEL SOURCING, LLC and
8    SECOND SKIN, LLC,

9                                Defendants.
     ----------------------------------x
10

11                                  May 29, 2008
                                    10:02 a.m.
12

13

14              Deposition of CHRISTINE ANN DENTE,

15    taken by plaintiffs, held at the offices of Eric

16    J. Grannis, Esq., 620 Fifth Avenue, New York, New

17    York 10020, before Maureen McCormick, a Notary

18    Public of the State of New York.

19

20

21

22

23

24

25


                        PIROZZI & HILLMAN
                        212-213-5858

                                                    2

1                       Page 1

ATA 05 29 08

2      APPEARANCES:

3

4      ERIC J. GRANNIS, ESQ.

5           Attorney for Plaintiffs

6           620 Fifth Avenue

7           New York, NY 10020

8

9

10     NESENOFF & MILTENBERG, LLP

11          Attorneys for Defendants

12          363 Seventh Avenue, Fifth Floor

13          New York, New York 10001-3904

14     BY:   PHILIP A. BYLER, ESQ.

15

16

17     ALSO PRESENT:

18     DAVID CONNELLY

19     ALP DUMAN

20

21

22

23

24

25

PIROZZI & HILLMAN
212-213-5858

                                                            3

1

2                        STIPULATIONS

3

ATA 05 29 08

4      IT IS HEREBY STIPULATED AND AGREED,

5   by and between counsel for the respective parties

6   hereto, that all objections, except as to form,

7   are reserved to the time of trial.

8           IT IS FURTHER STIPULATED AND AGREED

9   that the deposition may be signed and sworn to

10   before any officer authorized to administer an

11   oath.

12           IT IS FURTHER STIPULATED AND AGREED

13   that the sealing and filing of the deposition be

14   waived.

15

16

17

18

19

20

21

22

23

24

25

PIROZZI & HILLMAN
212-213-5858

4

1               C. Dente

2   CHRISTINE ANN DENTE,

3       called as a witness, having been duly sworn,

4       testified as follows:

5   EXAMINATION

6   BY MR. GRANNIS:

Page 3

ATA 05 29 08

7        Q.    What is your name?

8        A.    Christine Ann Dente.

9        Q.    Where do you reside?

10        A.    935 Sedgewick Court, Westfield, New

11    Jersey 07090.

12        Q.    Hello, Ms. Dente.  Welcome.

13        A.    Thank you.

14        Q.    If any of my questions are unclear,

15    just ask me to rephrase them.

16        A.    Okay.

17        Q.    Just also remember a couple of things

18    that are just useful in depositions, which is

19    that, you know, in normal conversation, we

20    sometimes will nod our head or say uh-huh, but

21    it's better in a deposition to say yes or no so

22    the court reporter can hear it.

23        A.    Okay.

24        Q.    And the other point is that sometimes

25    in conversation people will understand a question

PIROZZI & HILLMAN
212-213-5858

5

1                    C. Dente

2    halfway through and will begin answering it

3    because they know where the question is going,

4    but in a deposition it's better to let me finish

5    the question, even if you know where the question

6    is going so that the court reporter can get it

7    clearly down before she takes down your answer.

8        A.    Absolutely.  No problem.

Page 4

ATA 05 29 08

```
 9        Q.    Ms. Dente, did you go to college?

10        A.    Yes, I did.

11        Q.    Where did you go to college?

12        A.    Fashion Institute of Technology in

13   Manhattan.

14        Q.    Did you graduate?

15        A.    I did.

16        Q.    When did you graduate?

17        A.    1985.

18        Q.    Can you give me a very brief overview

19   of your career in fashion or business prior to

20   founding Private Label?

21        A.    Would you like exact companies and

22   dates?

23        Q.    How many of them would there be,

24   approximately?

25        A.    About five.
```

PIROZZI & HILLMAN
212-213-5858

6

```
 1                  C. Dente

 2        Q.    Yes, let's do that.

 3        A.    Okay.  So I can reference my --

 4        Q.    Absolutely.

 5        A.    The first company I worked for out of

 6   college was the Joseph & Friss & Company, and

 7   that was from 1985 to 1989; and then I worked for

 8   a company Faddalley, Inc., from 1989 to 1992.

 9        Q.    How do you spell Faddalley?

10        A.    F-A-D-D-A-L-L-E-Y.

11              And then from there I worked for a
```

Page 5

ATA 05 29 08

12    company called Tropic Tex from 1992 to 1994; and

13    then from there I worked at a company called

14    Danielle Caron from 1994 to 1995; then I worked

15    for Miss Julie Apparel, from 1995 to 1996; and

16    then Boulevard Apparel Group from 1996 to 2001;

17    and then finally Private Label Sourcing, which

18    was formed in 2001.

19        Q.    What did you do at Boulevard Apparel?

20        A.    Sales, merchandising, and production.

21        Q.    Tell me more about the business of

22    Boulevard Apparel.

23        A.    It serviced the mass market group of

24    retailers.  We were strictly Private Label, so

25    everything was cut to order.  We would work with

7

1                    C. Dente

2    the retailer, develop the product, and then

3    ultimately ship it with the retailer's label in

4    the product.

5        Q.    Where were goods manufactured for

6    Boulevard Apparel?

7        A.    Worldwide.

8        Q.    When you founded Private Label in 2001,

9    did you found it with anybody else?

10        A.    Yes, Mr. Bruce Allen.

11        Q.    What did Mr. Allen contribute in 2001

12    to the founding?

13        A.    He handled the financial side of the

ATA 05 29 08

14    business, and I handled the sales, merchandising,

15    and production side.

16        Q.    How did you come to know Mr. Allen?

17        A.    We worked together both at Danielle

18    Caron and also at Boulevard Apparel Group.

19        Q.    Tell me about the business of Private

20    Label in the first couple of years.

21            What did it sell?

22        A.    What type of product did it sell?

23        Q.    Yes.

24        A.    Ladies apparel.

25        Q.    Which manufacturers did it work with at

PIROZZI & HILLMAN
212-213-5858

8

1                    C. Dente

2    that time?

3        A.    Again, worldwide.  We worked with

4    factories all around the world.

5        Q.    Who did you sell to in those first

6    couple of years?

7        A.    We sold to Target.  We sold to

8    Wal-Mart.  We did some business with Kmart.

9        Q.    Were you 50-50 partners with Mr. Allen?

10        A.    Yes, we were.

11            MR. GRANNIS:  Off the record.

12            (Discussion off the record.)

13        Q.    At a certain point in time, did Mr.

14    Allen come to sell his ownership in Private

15    Label?

16        A.    Yes, he did.

ATA 05 29 08

17    Q.    When was that?

18    A.    In January of 2006.

19    Q.    How did that come about?

20    A.    I'm not sure I know.  I'm not sure I

21  understand the question.

22    Q.    Did Mr. Allen tell you why he was

23  selling his interest?

24    A.    The year prior to 2006, Mr. Allen had a

25  lot of health issues.  He did not come to the

PIROZZI & HILLMAN
212-213-5858

9

1                   C. Dente

2  office very often.  I would say within the year

3  of 2005, he was there maybe collectively one

4  month, and I think just the stress of the

5  business.  His health issues led him to make a

6  decision to pursue other interests.

7    Q.    Is that what he told you about the

8  reason he was doing that?

9    A.    Yes.

10    Q.    Am I right that Jetwell Garments came

11  to own 50 percent of Private Label?

12    A.    They purchased 50 percent of Mr.

13  Allen's shares, yes.

14    Q.    Just to be clear, did they purchase all

15  of Mr. Allen's shares?

16    A.    Yes, they did.

17    Q.    Who owns Jetwell Garments?

18    A.    Jockey Cheung.

ATA 05 29 08

19    Q.    Where does Mr. Cheung live?

20    A.    Hong Kong.

21    Q.    How did Mr. Allen become acquainted

22    with Mr. Cheung as a potential buyer?

23    A.    We were doing business with a factory

24    based in Hong Kong called Well Success, and

25    Jockey was owners or partners.  I'm not a hundred

PIROZZI & HILLMAN
212-213-5858

10

1    C. Dente

2    percent sure, because we didn't get involved in

3    the ownership of Well Success, but was a partner

4    in Well Success -- I don't know what percentage

5    -- and that's how we met him.

6    Q.    Have you ever drawn a salary from

7    Private Label?

8    A.    I'm paid by Private Label, yes.

9    Q.    As an owner of Private Label, you have

10    received at times distributions arising from your

11    ownership interest; is that correct?

12    A.    I drew a salary from Private Label.

13    Q.    You drew a salary, and did you also

14    receive distributions from Private Label?

15    A.    Which was considered part of our

16    salary.

17    Q.    Did you ever receive a W-2 from Private

18    Label?

19    A.    Yes, so all income was on the W-2.

20    Q.    Is Private Label commercially active

21    today?

Page 9

ATA 05 29 08

22      A.      Yes, it is.

23      Q.      What approximately are the sales for

24  Private Label so far this year?

25      A.      I would have to check on that for you.


PIROZZI & HILLMAN
212-213-5858

11

1                          C. Dente

2  I don't know a full number.

3      Q.      Could you say whether it was less or

4  more than a million dollars?

5      A.      I would have to check for you.

6      Q.      Do you know whether it's less or more

7  than $5 million?

8      A.      I would have to check for you.

9      Q.      Do you know if it's less or more than

10  $10 million?

11      A.      I would have to check for you.

12      Q.      Do you know if it's less or more than

13  $100 million?

14      A.      I would have to check for you.

15      Q.      Do you know if it's less or more than a

16  billion dollars?

17      A.      I would have to check for you.

18      Q.      Just so I understand, your testimony

19  today is that you are unsure as to whether or not

20  you had more than a billion dollars of sales?

21      A.      I'm unsure as to what the year-to-date

22  sales are.

23      Q.      And you are unsure as whether or not

Page 10

ATA 05 29 08
24    they're more or less than a billion dollars?

25        A.    I'm just answering your question that I

PIROZZI & HILLMAN
212-213-5858

12

1                        C. Dente

2    would have to check for you as to what the total

3    sales were to date.

4        Q.    My question was:  Were they more or

5    less than a billion dollars?  And you can't

6    answer that?

7        A.    Less.

8        Q.    Are they more or less than a hundred

9    million?

10        A.    Less.

11        Q.    Are they more or less than 10 million?

12        A.    I would have to check for you.

13        Q.    Are they more or less than a million?

14        A.    I would have to check for you.

15        Q.    So you couldn't state for certain that

16    they have had at least a million dollars in sales

17    so far this year?

18        A.    I would have to check.

19        Q.    What goods are you selling at Private

20    Label now?

21        A.    Ladies' apparel.

22        Q.    Where did you get those goods from?

23        A.    Worldwide.

24        Q.    Approximately how many manufacturers do

25    you have?

ATA 05 29 08

PIROZZI & HILLMAN
212-213-5858

13

1                          C. Dente

2        A.    We have a factory matrix of more than a

3    hundred factories.  Whether we use all of them,

4    it depends.  From time to time, depends on the

5    product.

6        Q.    Can you name five among your top

7    manufacturers today?

8        A.    For Private Label?

9        Q.    Yes.

10       A.    Well Success.

11       Q.    Any others?

12       A.    Well Success is the largest.

13       Q.    Can you tell me others that are among

14   your top five?

15       A.    Basul.

16       Q.    Any others?

17       A.    That's it.

18       Q.    When you say that's it, what do you

19   mean?  Because you mentioned before you had a

20   hundred factories that you could draw upon.

21       A.    And I believe that you asked me who I

22   was doing the largest amount of business with

23   currently, so I...

24       Q.    What would be after Well Success and

25   Basul?

ATA 05 29 08

14

1                          C. Dente

2        A.    I would really have to check for you.

3    That's where our business is concentrated right

4    now.

5        Q.    How much of your business would --

6    would you think it would represent more than half

7    of your business, those two companies?

8        A.    Yes.

9        Q.    What do you buy through Basul?

10       A.    Ladies' apparel.

11       Q.    Where is that ladies' apparel produced?

12       A.    In Turkey.

13       Q.    What companies produce that ladies'

14   apparel for Basul?

15       A.    Are you asking me for specific factory

16   names?

17       Q.    If you have them.

18       A.    There's multiple factories.  I would

19   have to -- there's multiple factories.

20       Q.    How many employees does Private Label

21   have today?

22       A.    Approximately nine.

23       Q.    Can you tell me the names of those nine

24   employees of Private Label?

25       A.    David Tally.

PIROZZI & HILLMAN
212-213-5858

15

1                          C. Dente

2        Q.    Would you spell Tally, please?

Page 13

ATA 05 29 08

```
 3      A.    T-A-L-L-Y.  Mabel Kwan.

 4      Q.    Could you spell Kwan?

 5      A.    K-W-A-N.  Shanny Guzman.

 6      Q.    How do you spell Shanny?

 7      A.    S-H-A-N-N-Y.

 8      Q.    Others?

 9      A.    George Montalbano, Stanley Waldon, Lisa

10   Burke, and that's it.

11      Q.    I count six.  You had mentioned nine.

12   Were there others?

13      A.    Myself.  I believe I said approximately

14   nine.

15      Q.    So on further reflection, does it

16   appear there's seven, because you have given me

17   seven names?

18      A.    Let me go through in my mind.  Lisa

19   Burke, Shanny, David, Mabel, Stanley, George.

20   Yes.

21      Q.    Do you know whether these are all

22   technically employees?

23            Do you know that there's a difference

24   between an employee and an independent

25   contractor?
```

16

```
 1                    C. Dente

 2      A.    I'm not sure.  Are you asking me from a

 3   tax purpose from the way an employee is paid?

 4      Q.    Correct.  Do you understand that?
```

ATA 05 29 08

5          Do you understand that there's a

6    difference between an employee and an independent

7    contractor in terms of the way that's reported

8    for tax purposes?

9          A.    I believe so.

10          Q.    Do you happen to know whether or not

11    you report these individuals as being employees

12    of Private Label?

13          A.    Yes.

14          Q.    Or independent contractors?

15          A.    Yes, we do.

16          Q.    As employees?

17          A.    Yes.

18          Q.    How long has Mr. Tally been employed by

19    Private Label?

20          A.    I would have to check the dates for all

21    the employees for you.  I don't know that

22    information off the top of my head.

23    MR. GRANNIS:  I'll ask that that information be

24    provided to us, since the witness does not have

25    it.

PIROZZI & HILLMAN
212-213-5858

17

1                    C. Dente

2          THE WITNESS:  I prefer not to guess.

3    If you're asking me for exact dates, I would

4    prefer to give you exact information.  I

5    think it's important.

6          MR. GRANNIS:  That's fine.  I'm

7    amenable to that.

Page 15

ATA 05 29 08

8      Q.     But these are current employees,

9   correct?

10     A.     That's correct.

11     Q.     Where are the offices of Private Label?

12     A.     597 Broadway.

13     Q.     When was the company Second Skin

14   founded?

15     A.     July of 2005.

16     Q.     Who owns Second Skin?

17     A.     Christine Dente.

18     Q.     And that's you?

19     A.     100 percent.  Yes, I do.

20     Q.     What was it founded to do?

21     A.     Specifically it didn't have one

22   specific purpose.  At the time when it was

23   formed, I was consulting.

24     Q.     Can you explain that?

25     A.     Joining retailers with factories,

18

1                 C. Dente

2   helping them place production as a liaison.

3      Q.     Is Second Skin still active?

4      A.     Yes, it is.

5      Q.     What does Second Skin do today?

6      A.     The same.

7      Q.     Does Second Skin have any employees?

8      A.     Yes.  One besides myself.  Excuse me,

9   besides myself.

ATA 05 29 08

10      Q.    Who is that?

11      A.    Nilda Corchado.

12      Q.    You are also an employee of Second

13    Skin?

14      A.    Yes, I am.

15      Q.    What are some of the manufacturers that

16    Second Skin works with?

17      A.    Synko, out of Korea.

18      Q.    How do you spell that, please?

19      A.    S-Y-N-K-O.

20            At one time it did work with Basul

21    through Atateks.

22      Q.    Any others that it has worked with?

23      A.    No.

24      Q.    Just those two?

25      A.    Yes.


PIROZZI & HILLMAN
212-213-5858


19

1                     C. Dente

2      Q.    Who was Second Skin paid by?

3      A.    I'm not sure what the question is.

4      Q.    Did Second Skin receive revenue?

5      A.    Yes.

6      Q.    You received money?

7      A.    Yes.

8      Q.    Who did you receive money from?

9      A.    I'm still not clear about the question.

10      Q.    Did you receive money from Synko?

11      A.    What time period are we talking about?

12    I think the question's very general.

Page 17

ATA 05 29 08

13          Q.    If I ask for all the money that -- all

14    the people that have ever paid money to Second

15    Skin, is that going to be a lot of entities?

16                MR. BYLER:  Money for whatever reason?

17                MR. GRANNIS:  Yes.  I just wanted to

18          know the source of the revenue.

19          Q.    Its sounds like you worked with two

20    companies, Synko and Basul.  Maybe the answer is

21    you received your revenues from Synko and Basul

22    by providing services to them.

23                MR. BYLER:  Just objection to form.

24          Revenues could have a narrow meaning or a

25          broad meaning, revenues in terms of the sale

PIROZZI & HILLMAN
212-213-5858

20

1                      C. Dente

2        of product, revenues in the sense of any

3        kind of income that might include

4        commissions.

5              So you may want to clarify your

6        question.

7          Q.    I would like to know in the broadest

8    sense possible where the money came from that

9    went into Second Skin.

10          A.    Again, I would ask -- are we speaking

11    about commissions?

12          Q.    I'm speaking about any type of money.

13          A.    What time period are we talking about?

14          Q.    From the beginning of the company to

Page 18

ATA 05 29 08

15    the present.

16        MR. BYLER:  If you want to, you know,

17    answer in terms of time frame, go ahead, if

18    that helps you answer a general question

19    posed.

20    A.    Okay.  Communications were received

21    from Basul, or actually Atateks through Basul and

22    from Synko.

23    Q.    Did Second Skin receive money from

24    anybody else?

25    A.    Specific to commissions, that's who I

PIROZZI & HILLMAN
212-213-5858

21

C. Dente

2    received money from.

3    Q.    Not specific to commissions.

4        Did Second Skin receive money from

5    anybody else?

6    A.    I'm not -- again, you would have to

7    clarify the time frame that you're talking about.

8    Q.    I can be clear.  From the beginning --

9    A.    Okay.

10    Q.    -- when the company was formed to

11    today.  In other words, to use a simple term --

12    A.    Yes.

13    Q.    -- ever.  Is that clear now?

14    A.    Yes, it's clear.

15    Q.    Can you answer the question now?

16        MR. BYLER:  Objection to form. Go

17    ahead.

Page 19

ATA 05 29 08

18      A.      I also received money from Target.

19      Q.      When you say I, you mean Second Skin?

20      A.      Correct.  That's what you did ask that

21  question, correct?

22      Q.      What did Target pay that money for?

23      A.      Goods.

24      Q.      Goods manufactured by whom?

25      A.      Again, multiple factories.


PIROZZI & HILLMAN
212-213-5858

22

1                       C. Dente

2       Q.      Can you name a few?

3       A.      Through Synko.

4       Q.      Did Second Skin receive any money for

5  goods manufactured by Atateks?

6       A.      Say the question one more time, please?

7       Q.      Did Second Skin receive --

8       A.      No.

9       Q.      Receive any money?

10      A.      No.

11      Q.      Let me finish.

12      A.      Okay.

13      Q.      Did Second Skin receive any money from

14  Target in any way related to goods manufactured

15  by Atateks?

16      A.      Absolutely not.

17              The time I was doing business with

18  Atateks from 2002 through 2006 Second Skin was

19  not actively doing any business with Target

ATA 05 29 08
20   manufacturing any goods.

21        Q.    What time frame was it that Second Skin

22   received money from Target?

23        A.    Not until starting 2007.

24        Q.    Did Private Label do business with

25   Synko in 2007?


PIROZZI & HILLMAN
212-213-5858


                                                23
1                    C. Dente

2        A.    Yes, under different product

3   categories.

4        Q.    Can you explain to me what you mean by

5   different product categories?

6        A.    Different items.

7              Are you asking for crossover between

8   Private Label and Second Skin?

9        Q.    Yes.

10       A.    No, totally different product

11   categories.

12       Q.    Let me ask you this:  Was there any

13   reason why this consulting work that -- phrase it

14   differently.

15             Was there any reason why the business

16   that Second Skin was doing would not have been

17   done by Private Label?

18       A.    It was different product categories.

19   It was different businesses that I was pursuing.

20       Q.    Can you explain what you mean by

21   different product categories?

22       A.    Well, I guess two.  I am the business.
                        Page 21

ATA 05 29 08

23    My business relationships really generate the

24    business, and what I was pursuing in Second Skin

25    was different than what was being done in Private

PIROZZI & HILLMAN
212-213-5858

24

1                    C. Dente

2    Label.

3        Q.    How was it different?

4        A.    Different product categories, different

5    types of product, different fabrics, different

6    styles.

7        Q.    The commissions that you earned from

8    Atateks were with respect to the same goods that

9    were being sold to Private Label, right?

10        A.    I'm sorry.  Say the question again?

11        Q.    The commission that you say you earned

12    from Atateks were from the same goods that

13    Atateks was selling to Private Label, right?

14        A.    Atateks supplied us with seamless

15    product, which is a very specialized product

16    that's made on Santoni machines.  That business

17    was never done with Second Skin.

18        Second Skin never bought from Atateks,

19    never sold to Target any type of seamless

20    product.

21        Q.    You referred earlier, you recall, to

22    earning certain commissions paid by Basul where

23    the money was originally received from Atateks,

24    right?

ATA 05 29 08

25      A.      Correct.

PIROZZI & HILLMAN
212-213-5858

25

1                           C. Dente

2       Q.      Let me put it more simply.

3               You received certain commissions from

4    Atateks through Basul?

5       A.      That's correct.

6       Q.      What were those commissions for?

7       A.      Seamless product.

8       Q.      That seamless product you're referring

9    to, wasn't that the same seamless product that

10   Private Label was purchasing?

11      A.      It was not purchased by Second Skin.

12   It was purchased by Private Label.  Second Skin

13   was acting as a consultant.

14      Q.      I understand that Private Label was

15   buying the merchandise, and Second Skin was not,

16   but when you refer to commissions earned on

17   seamless garments that Second Skin was earning,

18   these were the same seamless garments that

19   Private Label was buying, right?

20      A.      Commission was only paid on product

21   that was shipped, sold and shipped, so

22   commissions were -- were satisfied.

23              I'm not sure where you're going with

24   the question, but one company was buying product,

25   Private Label, and the other company was acting

ATA 05 29 08
212-213-5858

26

1                          C. Dente

2    as a consultant, as a liaison.

3         Q.    But it was consulting with respect to

4    the same product?

5         A.    With seamless product.

6              MR. BYLER:  Objection to the form of

7         the question.  It was a little confusing.

8         Try to rephrase it.

9         Q.    Second Skin was earning certain

10   commissions with respect to consulting done in

11   relationship to certain seamless products; is

12   that fair?

13        A.    Correct.

14        Q.    Those seamless products were the same

15   products that Private Label was buying, correct?

16        A.    I'm going to answer the question this

17   way, because you have asked it several different

18   ways.

19              There was no product ever purchased by

20   Second Skin.  There are no purchase orders.  What

21   was paid to Second Skin by Atateks was payments

22   for commissions.

23              MR. GRANNIS:  Could we go off the

24        record for a second.

25              (Discussion off the record.)

PIROZZI & HILLMAN
212-213-5858

27

ATA 05 29 08

1                            C. Dente

2          Q.    When did Second Skin earn commissions

3    from Atateks?  What year?

4          A.    Well, Second Skin wasn't formed until

5    July of 2005, so between the year of 2005 when it

6    was formed through 2006.

7          Q.    What did Second Skin earn those

8    commissions for?

9          A.    I'll state again that I was paid

10   commission for goods that were manufactured and

11   sold to Private Label.

12         Q.    Thank you.

13               Is there a reason why those services

14   that you were offering through Second Skin could

15   not have been offered through Private Label?

16         A.    I set up Second Skin as a consulting

17   company, as a commissioned -- as a consulting

18   commission based company for multiple

19   relationships, not just for the business that was

20   being done through Atateks.

21         Q.    With respect to the business done

22   through Atateks, could that service have been

23   offered through Private Label?

24         A.    That's not what Private Label was set

25   up to do.

PIROZZI & HILLMAN
212-213-5858

28

1                            C. Dente

2          Q.    Was Second Skin profitable in 2005?

3          A.    Yes, it was.

Page 25

ATA 05 29 08

4      Q.    Do you have any idea of how much money

5    it made?

6      A.    I don't know.  I would have to check

7    for you.

8    MR. GRANNIS:  I'll ask that that be checked.

9      Q.    Do you know if it was profitable in

10    2006?

11      A.    Yes, it was.

12      Q.    Do you know how much?

13      A.    I would have to check for you.

14    MR. GRANNIS:  I'll ask that that information be

15    obtained.

16      Q.    Do you know if it was profitable in

17    2007?

18      A.    We haven't filed a tax return yet,

19    so...

20      Q.    Do you know whether it was profitable,

21    though?

22      A.    To the best of my knowledge, it will

23    be.

24          MR. GRANNIS:  Off the record.

25          (Discussion off the record.)

PIROZZI & HILLMAN
212-213-5858

29

1                    C. Dente

2      Q.    Let's go back to Private Label.

3          What types of services -- Private Label

4    earned money with respect to its business with

5    Atateks; is that correct?

Page 26

ATA 05 29 08

6    A.    Yes.

7    Q.    How did it earn money?

8    A.    We received orders from Target and

9  other retailers, but specific to Target we

10  received orders from Target.

11        Atateks manufactured them.  We shipped

12  them to Target with a markup.

13    Q.    Is it fair to say that you generally

14  tried to buy the goods for a certain amount from

15  Atateks and then sell them for somewhat more to

16  Target?

17    A.    That's correct.

18    Q.    And was there a set amount of the

19  markup?

20    A.    No.

21    Q.    And how was the markup determined?

22    A.    It was really done on a case by case

23  basis, depending open the quantity, the time

24  period that we would be shipping to Target.

25        You know, it really depended on

PIROZZI & HILLMAN
212-213-5858

☐

30

1              C. Dente

2  negotiations on both sides.  There's not one

3  specific formula.

4    Q.    Can you give me in just an order of

5  magnitude -- I'm not trying to pin you down to a

6  particular number -- whether or not the -- you

7  tended to mark things up 1 percent, 10 percent,

8  50 percent?  Some general range.

Page 27

ATA 05 29 08

9      A.    We tried to make anywhere between 8 to

10    10 percent, and that's for larger business that

11    were manufacturing.

12      Q.    Is it fair to say that you feel that

13    Private Label provided services which merited

14    earning 8 to 10 percent on these goods?

15      A.    Absolutely.

16      Q.    Can you tell me what types of services

17    did Private Label provide to Atateks or what did

18    Atateks -- what did Private Label do in this

19    process of buying and selling goods?

20      A.    I just want to be clear about your

21    question, because you referenced in the beginning

22    of your question -- if it could be read back to

23    me -- what services did Private Label provide to

24    Atateks.

25      Q.    Right.


PIROZZI & HILLMAN
212-213-5858


31

1                    C. Dente

2      A.    So --

3      Q.    Let me --

4      A.    I'm not clear as to what really you're

5    asking.

6              MR. GRANNIS:  Let me withdraw --

7              MR. BYLER:  You gave one question,

8        which I thought was confusing, and that's

9        why she asked, and then you rephrased it, I

10       thought in a better way.

Page 28

ATA 05 29 08

11          Why don't you start all over again.

12          MR. GRANNIS:  Exactly.

13      Q.    I did recognize and also from your

14   facial expression that the question may not have

15   been a good one.

16          In the course of buying goods from

17   Atateks and selling them to Target, Private Label

18   did some work; is that fair to say?

19      A.    Yes.

20      Q.    Tell me what Private Label did.

21      A.    We met with Target.  We developed the

22   product.  We had Atateks make samples.  There was

23   an approval process, and we helped facilitate

24   getting the products shipped.

25      Q.    Did you provide or did you arrange for

                    PIROZZI & HILLMAN
                    212-213-5858

                                              32

1                    C. Dente

2    any type of inspection of goods?

3       A.    Target inspected the goods.  Target

4    signs the inspection certificates.

5       Q.    When does it inspect the goods?

6       A.    At the FOB point overseas.

7       Q.    Is it a Target employee that does that?

8       A.    It is an independent agency that is

9    contracted by Target.

10      Q.    Who is that?

11      A.    It's part of TSS Services, which is

12   Target Sourcing Services.

13      Q.    Did Basul ever inspect the goods?

ATA 05 29 08

14          A.      There were dual inspections, both Basul

15     and Target.

16          Q.      Did you ever pay Basul to inspect

17     goods?

18          A.      Basul was paid a commission for their

19     services of working with Atateks in Turkey, since

20     we weren't present in Turkey, but they weren't

21     paid specifically, if you're asking me, just to

22     inspect goods.

23          Q.      Who was the commission paid by?

24          A.      It was included in the price of the

25     garment, and it was paid by Atateks.


PIROZZI & HILLMAN
212-213-5858


33

1                          C. Dente

2          Q.      Let me ask you this:  Why would Atateks

3     pay someone to inspect its own goods?

4          A.      I didn't say they paid them to inspect

5     goods.  I said they were paid a commission.

6                  I specifically said that what you were

7     referencing did not include just inspection of

8     goods.  It included a range of services.

9          Q.      What was the range of services?

10         A.      I think I had described it previously.

11     Are you asking my services or Basul?

12         Q.      I thought you said Basul.

13         A.      You would have to speak to Basul

14     exactly to find out the scope of their services.

15         Q.      What do you know about the scope of

Page 30

ATA 05 29 08

16    their services?

17         A.    I can speak to the scope of their

18    services for us, but not for Atateks.

19         Q.    You said earlier that Basul was not

20    only paid to inspect goods to Atateks, but also

21    for a scope of services.

22         A.    I don't know what those exact scope of

23    services are.

24         Q.    How do you know there was a scope of

25    services if you don't know what they are?

34

1                        C. Dente

2         A.    Because they did things other than

3    inspect goods.

4         Q.    How do you know they did things other

5    than inspect goods for Atateks?

6         A.    Because we had daily communications

7    with them.  They were the liaison between

8    ourselves and Atateks, so there were obviously

9    other -- there were other services being

10    performed.

11         Q.    I want to make sure that I understand

12    precisely what Private Label was doing, so I want

13    to go through the different things that you

14    referred to briefly.

15              I think you mentioned something about

16    developing goods.  Do I have that term correctly?

17         A.    Developing product.

18         Q.    Can you tell me what that means?

Page 31

ATA 05 29 08

19      A.      Product development.

20      Q.      And just could you -- I don't know much

21  in the fashion business.

22          Can you tell me what was involved in

23  doing that?

24      A.      Developing different garments,

25  different styles.


PIROZZI & HILLMAN
212-213-5858


                                                                35
1                       C. Dente

2       Q.      Would you design them?  What does that

3   mean, developing?

4       A.      Both shopping the marketplace and also

5   extracting specific, you know, details and

6   creating garments.  Yes, it's a product

7   development.  It's a product of shopping and

8   designing.

9       Q.      Would that also involve, for example,

10  saying to Target here is a manufacturer who could

11  manufacture this garment you're looking for?

12      A.      No.  It was the responsibility of

13  Private Label to source the product wherever they

14  felt it was best to be sourced.

15      Q.      So in other words, is it fair to say

16  that once it had -- you had figured out that

17  Target wanted to produce -- would want to buy a

18  certain garment, you would then figure out what

19  manufacturer could produce that garment?

20      A.      I believe I stated earlier in my

ATA 05 29 08

21    testimony that we had a list of over a hundred

22    factories that we potentially do business with,

23    so in order to get competitive pricing, we source

24    our things worldwide, and we decide ultimately,

25    you know, within the proper time frame where the

PIROZZI & HILLMAN
212-213-5858

36

1                              C. Dente

2    product's going to be manufactured.

3        Q.    You referred also to producing product.

4    What did you mean by that?

5             I thought you said earlier that one of

6    the things that -- maybe you said producing

7    samples.

8        A.    I did.

9        Q.    Producing samples, tell me about that.

10       A.    I'm not sure what you want to know

11    about that.

12       Q.    Who would produce these samples?

13       A.    Again, we would get samples from

14    multiple factories.

15       Q.    The factories who produced these

16    samples, what would you do with them?

17       A.    Review them, determine what we felt

18    was -- was the best fit for the order.

19       Q.    Tell me about the approval process.

20       A.    The approval process included both

21    ourselves and Target.  Target had to sign off on

22    the fit, colors.

23       Q.    Tell me about product shipment.

ATA 05 29 08

24      A.    I'm not sure what you want to know.

25      Q.    Just expand.  You used two words.  You

PIROZZI & HILLMAN
212-213-5858

37.

C. Dente

1

2    have to do product shipment.  What was the word?

3      A.    We helped facilitate product being

4    shipped.

5      Q.    What does that mean by facilitating?

6      A.    When the product was ready to be

7    shipped, we helped facilitate whether it was on a

8    direct LC basis, Target opening the LC to us,

9    delivering it to the forwarder in conjunction

10   with the factory or the goods being brought into

11   our warehouse, which we used our own forwarder.

12     Q.    In some cases, Target purchased goods

13   directly from Atateks on a letter of credit

14   basis; is that correct?

15     A.    That is correct.

16     Q.    And other cases Private Label purchased

17   goods from Atateks and sold them to Target; is

18   that correct?

19     A.    That is correct.

20     Q.    If Private Label was an intermediate

21   purchaser of the goods, did that affect the work

22   that Private Label had to do?

23     A.    No.

24     Q.    Did Second Skin provide services to

25   Atateks to earn these commissions?

ATA 05 29 08

38

1                          C. Dente

2        A.    They were the liaison.

3        Q.    Who was Second Skin the liaison with or

4    between?

5        A.    I'm not sure what the question is.

6        Q.    You said that Second Skin was liaison.

7        A.    Okay.

8        Q.    Do you understand that being a liaison

9    means you're a liaison between two people or two

10   companies or something like that?

11       A.    Yes.

12       Q.    Who was the Second Skin liaising

13   between?

14       A.    Let me rephrase that.

15             It was my relationship with Atateks,

16   okay, that was established a long time ago with,

17   again, multiple factories around the world, and

18   when I was able to generate business for them,

19   even when it was manufactured by Private Label,

20   there was a commission that was paid to Second

21   Skin, but Second Skin was not buying product.

22       Q.    Did you do any work to earn that

23   commission?

24       A.    My commission was based on my

25   relationships.

ATA 05 29 08

39

1                    C. Dente

2        Q.    So does that mean you didn't do any

3    work?

4        A.    The work or the relationships that I

5    established in order to earn the commission.  It

6    was a consulting based company that earned

7    commission.

8        Q.    Can you describe any actual work you

9    did to earn those commissions?

10            MR. BYLER:  Objection to form.  Go

11       ahead.

12       A.    It was my relationship that ultimately

13   led to orders being placed there.

14       Q.    This was a relationship with Atateks;

15   is that correct?

16       A.    If that's what you were referencing.

17   Are you referencing Atateks specifically?

18       Q.    I'm talking about the commissions paid

19   by Atateks, and you're saying you were being paid

20   for your relationship.

21            When you refer to your relationship,

22   are you referring to your relationship with

23   Atateks?

24       A.    Yes, I am.

25       Q.    Can you tell me -- when did you develop

PIROZZI & HILLMAN
212-213-5858

40

1                    C. Dente

ATA 05 29 08

2    that relationship?

3        A.    In 2002, we started doing business with

4    Atateks.

5        Q.    Through Private Label?

6        A.    Yes.

7        Q.    Did you develop this relationship with

8    Atateks in the course of doing work for Private

9    Label?

10       A.    Could you repeat the question one more

11   time?  Could she read it back to me?

12            MR. GRANNIS:  Sure.

13            (Question read.)

14       A.    I had developed a relationship with

15   Atateks even prior to them placing any business

16   with Private Label.

17       Q.    When did you develop that relationship

18   with Atateks?

19       A.    We had come in contact with each other,

20   I believe, back in 2000, 2001, but we didn't

21   start doing business at Private Label until 2002.

22       Q.    So are you amending your earlier answer

23   that you developed a relationship in 2002?

24       A.    I would have to read -- I would have to

25   have my testimony read back to me.


PIROZZI & HILLMAN
212-213-5858


41

1                    C. Dente

2            MR. GRANNIS:  Could you read it back?

3            (Record read.)

4        Q.    So you are changing your answer that

Page 37

ATA 05 29 08

5      you developed a relationship in 2002?

6          A.      Private Label developed a manufacturing

7      relationship during 2002, and I believe when you

8      did ask me the question, you did ask me to

9      clarify if I meant myself or Private Label.

10             May I say something?

11         Q.      Sure.

12         A.      I feel that if you want to ask me a

13     question you should ask me a direct question,

14     because you're asking the same question five

15     different ways, and it's very confusing, so I

16     just would like to state that for the record.

17         Q.      Sure.

18             Was Second Skin formed to work with

19     manufacturers all over the world?  Is that your

20     testimony?

21         A.      Yes.

22         Q.      Do you recognize that document?

23         A.      Yes.

24             MR. BYLER:  Let me state for the

25     record, this is a declaration in the C&C

PIROZZI & HILLMAN
212-213-5858

42

1                    C. Dente

2      Textile Company Limited versus Private Label

3      Sourcing, et al, case that was filed in the

4      Central District of California, and keep in

5      mind there were allegations in the complaint

6      in that case that were the concern of

ATA 05 29 08

7    dealing with issues in that case that came

8    up in the course of the declaration of

9    Christine Dente.

10        I also will add for the record the case

11    was dismissed for lack of jurisdiction.

12    Q.    Ms. Dente, is that your signature on

13    the last page?

14    A.    Yes, it is.

15    Q.    And did you review this declaration

16    before you signed it?

17    A.    Yes, I did.

18    Q.    I'll direct your attention to Paragraph

19    7.  You state there, "I formed Second Skin LLC as

20    a separate entity to undertake entirely different

21    business than PLSL."

22        MR. GRANNIS:  Let the record reflect

23    that PLSL is defined earlier as Private

24    Label.

25    Q.    Quote, Second Skin was formed to work

PIROZZI & HILLMAN
212-213-5858

☐

43

1                  C. Dente

2    with international manufacturers in Turkey

3    specializing in seamless apparel.

4        Is that statement true?

5    A.    Yes.

6    Q.    Was it formed to work with

7    international manufacturers in Turkey or

8    transformed to work with manufacturers worldwide?

9    A.    Worldwide.  I believe that was

ATA 05 29 08

10    answering specific as Phil stated to the

11    complaint that was...

12        Q.    Which international manufacturers in

13    Turkey is that referring to?

14        A.    Atateks and Orma.

15        Q.    Did it, in fact, work with Orma?

16        A.    Yes, it did.

17        Q.    Did it earn commissions from Orma?

18        A.    Yes, it did.

19        Q.    Are you amending your earlier answer

20    that the only entities that Second Skin earned

21    commissions from were Synko and Atateks through

22    Basul?

23        A.    I believe you were specifically

24    referring to Atateks at that point.

25        Q.    But in your deposition earlier today,

PIROZZI & HILLMAN
212-213-5858

44

1                    C. Dente

2    you told me that there were two entities that

3    Second Skin earned commissions from.  You said it

4    was Atateks through Basul, and you said it was

5    Synko.

6        A.    I believe I started with Basul, and we

7    were speaking specifically to Atateks, so I also

8    received through Basul commissions from Orma.

9        Q.    Are there any other entities that you

10    received commissions from through Basul, other

11    than Atateks and Orma?

Page 40

ATA 05 29 08

12    A.    No, no.

13         MR. BYLER:  Just for the record, don't

14    jump to conclusions about amending or

15    changing testimony.  I think hearing the

16    testimony -- I think at times it in the

17    testimony comes down to being specific in

18    ways and a matter of clarification as

19    opposed to change or amend, and this was one

20    last instance where some further detail, I

21    think, clarified and made more specific the

22    information being provided.

23         MR. GRANNIS:  Fortunately, a judge will

24    help us determine that at some point.

25    Q.    What did Orma pay commissions to Second

PIROZZI & HILLMAN
212-213-5858

45

1                        C. Dente

2    Skin for?

3    A.    Apparel that was being shipped.

4    Q.    Did Private Label purchase that

5    apparel?

6    A.    Yes, it did.

7    Q.    What did Second Skin receive

8    commissions from Synko for?

9    A.    Ladies' apparel.

10    Q.    Was that ladies' apparel sold to

11    Private Label?

12    A.    Yes, it was.

13    Q.    What amount of commissions did Second

14    Skin earn from Synko?

ATA 05 29 08

15       A.    I would have to look back and tell you.

16   MR. GRANNIS:  I'll ask that that be looked into

17   and the answer provided.

18       Q.    What amount of commissions did Second

19   Skin earn from Orma?

20       A.    I would have to look into that also.

21   MR. GRANNIS:  I'll ask that you do so and provide

22   it.

23       Q.    Would Private Label sometimes issue

24   chargebacks to Atateks?

25       A.    Yes.


PIROZZI & HILLMAN
212-213-5858


46

1                    C. Dente

2       Q.    Did Atateks ever object to a

3   chargeback?

4       A.    Prior to debit notes being written all

5   chargebacks were negotiated and agreed upon.

6            Whether at the time Atateks received

7   them and decided they no longer wanted to pay

8   them was a different story, but debit notes were

9   not written until negotiations were done and

10   chargebacks were agreed upon.

11       Q.    How were those negotiations done?

12       A.    Through Basul, as Basul was the liaison

13   between ourselves and Atateks, and through their

14   representative, Bahar.

15       Q.    Were they generally done orally or by

16   e-mail?

Page 42

ATA 05 29 08

17    A.    E-mail.

18         There were several occasions, though,

19    where there were one-on-one meetings to discuss

20    them, especially if they were larger.

21    Q.    Can you describe these negotiations?

22    A.    I'm not sure what the question is.

23    Q.    I take it -- is it fair to say that

24    sometimes Private Label would indicate that it

25    wanted to issue a chargeback in a certain amount;

PIROZZI & HILLMAN
212-213-5858

47

1                    C. Dente

2    is that correct?

3         A.    The chargebacks were generated directly

4    from the customer, so the chargebacks came from

5    Target.

6    Q.    Right.

7    A.    Does that answer your question?

8         In other words, Private Label did not

9    just generate a chargeback.

10    Q.    I understand.

11    A.    Okay.

12    Q.    Let's say I'm just going to try to take

13    a hypothetical figure in order to make it more

14    concrete.

15    A.    Okay.

16    Q.    Let's say that you get a chargeback

17    from Target for $10,000.

18    A.    Okay.

19    Q.    Then at least on some occasions you

ATA 05 29 08

20   would at that point go to Atateks and say, you

21   should be liable for this chargeback of $10,000

22   from Target; is that correct?

23        A.    Just to educate you, in case your

24   client didn't, that we knew about chargebacks

25   prior to them being issued by Target, so it was

48

1                    C. Dente

2   negotiated on a case-by-case basis, and obviously

3   when chargebacks were generated, it was by the

4   fault of something that the factory had done.

5   There's numerous reasons why chargebacks can be

6   generated.

7             There were times that we chose to

8   partner and help Atateks so they did not have to

9   absorb the chargeback by themselves, but again,

10   that was negotiated on a case-by-case basis, and

11   chargebacks were not arbitrarily issued.  They

12   were spoken about in advance as a debit note was

13   issued.

14        Q.    Was it ever in part the fault of

15   Private Label that a chargeback occurred?

16        A.    Not to my knowledge.

17        Q.    What are the reasons a chargeback can

18   occur?

19        A.    There could be quality claims, there

20   could be late shipments, cancellations, loss of

21   sales.  To name a few.

Page 44

ATA 05 29 08

22   Q.   Does Private Label play a role in

23   coordinating the ordering and shipment of goods

24   to assure that they arrive on time?

25   A.   Private Label takes the information

PIROZZI & HILLMAN
212-213-5858

49

1                    C. Dente

2   that's given to them by Target and then passes

3   that information along to the factories.

4         Everything is made to order, so we get

5   our direction directly from the retailer.

6   Q.   After Target places a purchase order,

7   was there ever a case in which Atateks might

8   require additional information to complete

9   manufacturing the goods?

10   A.   I think previous in our testimony in

11   questions that you asked me, you asked me about

12   an approval process, so obviously those approvals

13   are not located on a purchase order sheet.

14         Purchase order sheet indicates

15   quantities, other details, labels that are

16   required, but the approval process happens in

17   spite of the purchase order that's issued, so if

18   that's what you're asking me...

19   Q.   Does the approval process always occur

20   prior to the purchase order issuing?

21   A.   Not necessarily.  It's work in

22   progress.

23   Q.   So there could be some additional

24   details transmitted after the purchase order

Page 45

ATA 05 29 08

25    which are necessary to manufacture the goods?


PIROZZI & HILLMAN
212-213-5858

50

1                    C. Dente

2        A.    That is correct.

3        Q.    At least in theory, if Private Label

4    were to drop the ball and not convey certain

5    information to Atateks, then Atateks couldn't

6    manufacture the goods on time?

7            MR. BYLER:  Objection to form.  Go

8        ahead.

9        A.    We would be reliant on information

10   coming from Atateks to submit to Target to

11   manufacture that product, so if Atateks didn't

12   supply that information on time, we couldn't get

13   it to Target on time, and therefore, the ball

14   would be dropped on the Atateks side.

15            They have to stay within a time and

16   action calendar.  There were many times that

17   Atateks fell outside of that time and action

18   calendar which impacted them producing product.

19       Q.    Would you agree that if Private Label

20   were a poorly-run, negligent operation -- and I'm

21   not asking you to say it is.  I'm saying if it

22   were the case -- wouldn't that potentially impact

23   on getting these goods manufactured on time?

24       A.    I can't comment.

25            MR. BYLER:  Objection to form.


Page 46

51

1                           C. Dente

2         Hypothetical to a fact witness.  Go ahead.

3         A.    I can't comment on that, because I'm

4    not sure what a negligently run company would do.

5         Q.    How many chargebacks were there in

6    rough terms over the course of the years of

7    relationship that you had with Atateks?

8         A.    I think that's a very specific

9    question, even though you said roughly.  We

10   manufactured millions of units with Atateks.

11        Q.    Right.

12        A.    It would be unfair for me to guess at

13   that.

14        Q.    Is it your testimony that with respect

15   to the chargebacks issued with respect to the

16   millions of goods --

17        A.    Uh-huh.

18        Q.    -- that Private Label never did

19   anything that contributed even in part to a

20   chargeback?

21        A.    I really think that's a very unfair

22   statement.  I think that, you know, a working

23   relationship, there's partnership, there's all

24   parties involved.

25            I think I testified that there were

ATA 05 29 08

52

1              C. Dente

2    times that we chose to partner with Atateks to

3    contribute to those chargebacks so not one party

4    had to absorb anything.  So I think that what we

5    do is a human business.  There's always issues.

6              If you're asking me to pinpoint

7    collectively whose fault it is, I think that's --

8    I just -- it's -- it's unfair for me.  I think we

9    would have to go case by case.

10       Q.    So are you saying that --

11       A.    I can't answer that question generally.

12    I would have to answer on a case-by-case basis.

13             If you gave me a purchase order, you

14    gave me a chargeback, and you asked me based on

15    that situation whose fault it was, I would then

16    be able to answer you.

17       Q.    You testified earlier that in some

18    cases you, meaning Private Label, shared in the

19    chargeback.

20       A.    That's correct.

21       Q.    Meaning that effectively Atateks paid

22    part of the chargeback and Private Label paid

23    part of the charge?

24       A.    That is correct.

25       Q.    When you made that determination about

53

1              C. Dente

2    whether or not you would -- you meaning Private

ATA 05 29 08

3   Label would share in the chargeback, did you ever

4   consider whether or not Private Label might have

5   had some responsibility for the issuance of the

6   chargeback?

7        A.    I considered the whole situation.  I

8   didn't just consider Private Label.

9        Q.    Was that a consideration, whether or

10  not Private Label might have some fault?

11       A.    I considered the whole business

12  relationship and I -- I considered it on a

13  case-by-case basis, depending on the situation.

14       Q.    When you say you considered it, the

15  whole business relationship, did that include

16  whether or not Private Label might have had some

17  fault or did it exclude that fact?

18       A.    It included all the circumstances at

19  hand.

20       Q.    And was one of those circumstances

21  whether or not Private Label had any fault?

22       A.    It really depended on the situation.

23       Q.    So you are unwilling to tell me whether

24  or not a fault by Private Label was one of those

25  circumstances?

54

1                         C. Dente

2            MR. BYLER:  Objection to form.

3        A.    No.

4        Q.    Can you tell me then whether that was a

5   circumstance you considered?

ATA 05 29 08

6      A.     I think I did answer the question for

7    you.  I answered that we had an ongoing,

8    long-term business relationship, and I considered

9    the situation fairly, all parties being included.

10      Q.     Let me ask you one more time, and

11    you'll tell me whether or not you can answer this

12    yes or no.

13           When you consider all the circumstances

14    in determining whether or not Private Label would

15    share in the chargeback, did you consider as one

16    of those circumstances whether or not Private

17    Label might have been in part to blame for the

18    chargeback?

19           MR. BYLER:  Objection to the form.

20    Asked and answered.  Ambiguous wording.  Try

21    to do something with that.

22      Q.     Can you answer that yes or no?

23      A.     I believe I did answer the question.

24      Q.     I'd like you to, but you didn't answer

25    with a yes or no.  Can you answer it with a yes

□

55

1                 C. Dente

2    or no?

3      A.     No, I can't.

4           MR. BYLER:  We are going for an hour

5    and 25 minutes.  I mean --

6           MR. GRANNIS:  I'm happy to take a

7    break.  Off the record.

ATA 05 29 08

8          (Recess taken.)

9     EXAMINATION CONTINUED

10    BY MR. GRANNIS:

11         Q.    I'm going to show you what's been

12    marked as Plaintiff's Exhibit 502.

13              (Plaintiffs' Exhibit 501, Declaration,

14         marked for identification.)

15              (Plaintiffs' Exhibit 502, Commercial

16         Invoice, marked for identification.)

17              MR. GRANNIS:    I'm going to note for the

18         record that I previously questioned Ms.

19         Dente about a declaration in another action,

20         and I failed to note at that time that the

21         document had been marked as Plaintiffs'

22         Exhibit 501, and so I'm doing so now for the

23         record, and now I am handing Ms. Dente a

24         document Plaintiffs' Exhibit 502, which

25         states commercial invoice at the top.


PIROZZI & HILLMAN
212-213-5858


56

1                    C. Dente

2          Q.    And I will ask, Ms. Dente, if you

3     recognize this document.

4          A.    Yes, I do.

5          Q.    What is that?

6          A.    It's a piece of paper that's included

7     in all of the commercial documents when goods are

8     exported from a country.

9          Q.    Is there a style number on this

10    document?

ATA 05 29 08

11          A.      Yes.

12          Q.      What is that style number?

13          A.      135.  I can't see if it says 809 or

14   609.  I apologize.  It's not clear on the copy.

15          Q.      Who signed that style number?  Let me

16   clarify the question.  Is that a Target style

17   number?

18          A.      It's recognized by both Private Label

19   and by Target.

20          Q.      This shows us, am I right, that Atateks

21   manufactured goods with that style number for

22   sale to Target; is that correct?

23          A.      Yes, consigned to Private Label.

24          Q.      Do you know whether Private Label

25   arranged for any other manufacturers, other than

PIROZZI & HILLMAN
212-213-5858

57

1                           C. Dente

2    Atateks, to make that style number for Target?

3           A.      I would have to check.

4           Q.      In general, were there any cases in

5    which you, Private Label, had another

6    manufacturer in addition to Atateks make a

7    certain style number for Target?

8           A.      I would have to check.  I would have to

9    go back on a case-by-case basis.  We manufacture

10   lots of different styles.

11                  MR. GRANNIS:  I'm going to hand the

12          witness Plaintiffs' Exhibit 503, which

Page 52

ATA 05 29 08

13    states, "Debit Note 1580" at the top.

14            (Plaintiffs' Exhibit 503, Debit Note

15    1580, marked for identification.)

16        Q.    Do you recognize this document, Ms.

17    Dente?

18        A.    Yes, I do.

19        Q.    What is it?

20        A.    It's a debit note.

21        Q.    Can you explain what a debit note is?

22        A.    It is debiting back to a specific

23    factory moneys that are owed to Private Label for

24    various different reasons.

25        Q.    Who is being debited here?


PIROZZI & HILLMAN
212-213-5858


58

C. Dente

1

2        A.    Atateks.

3        Q.    You see a reference on the first page

4    to customer allowances?

5        A.    Yes.

6        Q.    Can you explain what that refers to?

7        A.    Yes, that's the difference between the

8    actual FOB and the sell price to Target.

9        Q.    What's the actual FOB?

10        A.    The actual price paid to Atateks for

11    the manufacturing of the goods.

12        Q.    Was this actual amount paid by Target?

13        A.    Rephrase the question.  Which actual

14    amount?

15        Q.    You said that the FOB --

Page 53

ATA 05 29 08

16      A.      Yes.

17      Q.      -- was the actual price paid to

18  Atateks.

19      A.      Correct.  Maybe I should explain

20  customer allowance to you.  Maybe --

21      Q.      Please.

22      A.      So there's a style that's manufactured

23  for Target.  There was an agreed upon sell price

24  between Private Label and Target.  A letter of

25  credit is opened by Target to Basul, transferred

PIROZZI & HILLMAN
212-213-5858

59

1                       C. Dente

2  to Atateks.

3               In there is a customer allowance.

4  There is a difference between the FOB price that

5  we're going to be paying the factory, Atateks,

6  and the actual sell price to Target.

7               Upon shipping the goods, the commercial

8  invoices are presented to the bank.  Atateks is

9  able to draw down on the LC.  Once they receive

10  those funds, they remit the difference between

11  the FOB and the actual sell price to Target.

12  That is the customer allowance.

13      Q.      If you turn to the second page with

14  respect to Style 121375.

15      A.      Yes.

16      Q.      I'm going to try to explain, because

17  this is new to me, and you can see if you think I

Page 54

ATA 05 29 08

18    have it right.

19         A.    Okay.

20         Q.    Private Label agreed that Atateks would

21    be paid $4.30 per unit for that style?

22         A.    Correct.

23         Q.    Target paid by letter of credit 4.50

24    per unit for that style.

25         A.    Correct.


PIROZZI & HILLMAN
212-213-5858


60

1                      C. Dente

2         Q.    The allowance is the 20 cents

3    difference between 4.50 and 4.30?

4         A.    Correct.

5         Q.    And Private Label was entitled to that

6    difference?

7         A.    Correct.

8         Q.    So with respect to this debit note and

9    the goods reflected in this debit note, Private

10    Label earned $61,722,51, which is reflected on

11    the first page.

12         A.    That is not correct, because there's

13    also a charge on here for QC charges.  That was

14    not money that was made by Private Label that was

15    collected by Target, so you would have to back

16    out your QC charges.

17         Q.    Fair enough.

18              With respect to this debit note and

19    with respect to these goods, Private Label earned

20    $55,479.70?

ATA 05 29 08

21      A.      That was the customer allowance, yes.

22      Q.      Did Private Label earn any other money

23  with respect to these goods?

24      A.      Yes.  They bill Target 8 percent.

25      Q.      Turning to the second page again.


PIROZZI & HILLMAN
212-213-5858

61

1                       C. Dente

2               So at some point you entered into a

3   deal with Atateks that Atateks would be paid

4   $4.30 a unit for that style number?

5       A.      Purchase orders were issued.  Our

6   business is done on purchase orders, purchase

7   order basis.  There are no contracts.  There are

8   no deals.  Everything is cut to order.  We issue

9   purchase orders.

10      Q.      At the time that you would issue this

11  purchase order, would you tell Atateks how much

12  Target was going to be paying for the garment?

13      A.      Yes, there was a rider that was

14  attached to the purchase order.

15      Q.      It would state in this case that Target

16  was going to be paid 4.50 per unit?

17      A.      Correct, correct.  You also have to

18  acknowledge that the LC was open to Basul and

19  transferred to Atateks, so Atateks was always in

20  full control of all the money.  The money did not

21  pass through Private Label.

22      Q.      The 8 percent you were referring to,

ATA 05 29 08

23    was that the 8 percent of the FOB or the LC

24    price?

25         A.    Of the LC price.


PIROZZI & HILLMAN
212-213-5858


62

1                         C. Dente

2         Q.    When did Nilda start working for Second

3    Skin?

4         A.    I would have to check the exact date.

5    I don't know off the top of my head.

6         Q.    Can you give me something approximate?

7         A.    Within the past year.

8         Q.    So that means you believe sometime

9    since June of 2007?

10         A.    Correct.

11         Q.    When did she stop working for Private

12    Label?

13         A.    It would have been at the same time.

14         Q.    Prior to Nilda working for Second Skin,

15    did anybody assist you with respect to your work

16    for Second Skin?

17         A.    No.

18         Q.    Where is Second Skin located?

19         A.    The physical address when the company

20    was registered was 935 Sedgewick Court,

21    Westfield, New Jersey 07090.

22         Q.    Where has the business of Second Skin

23    been conducted?

24         A.    Well, because it's a consulting based

25    business, and I am really the business, business

ATA 05 29 08

PIROZZI & HILLMAN
212-213-5858

63

1                          C. Dente

2    can be done anywhere.

3          Q.    Does Second Skin own any equipment?

4          A.    No.

5          Q.    Does it have any phone lines?

6          A.    Yes.

7          Q.    What phone line is that?

8          A.    That's my cell phone.

9          Q.    What about Nilda?  Is there a phone for

10   Nilda?

11         A.    Are you asking is there a phone line

12   specifically registered to Second Skin or in the

13   name of Second Skin?

14         Q.    Correct.

15         A.    No.

16         Q.    Does Nilda use a computer?

17         A.    She uses a laptop.

18         Q.    Who is that computer owned by?

19         A.    She has more than one laptop, so she

20   works from home from the laptop.  She works from

21   the office sometimes on a laptop.  We travel with

22   our laptops.

23         Q.    When you refer to the office, are you

24   referring to the offices of Private Label?

25         A.    I'm referring to any office that we go

ATA 05 29 08

64

1                          C. Dente

2      to.  Target offices, her home.

3          Q.     When she is here in New York City, does

4      she ever work at Private Label's offices?

5          A.     Yes, she does.

6          Q.     Does Second Skin pay any rent to

7      Private Label for that?

8          A.     No.

9          Q.     Could you please describe the offices

10     of Private Label?  One room?  Several rooms?

11         A.     It's one large, open room with three --

12     two individual offices within the large open

13     room.

14         Q.     Does Nilda work at an individual office

15     or does she work in the open area?

16         A.     Nilda works everywhere.  I mean,

17     it's -- it's -- that's a very ambiguous question.

18         Q.     Does she have a desk that's her desk?

19         A.     Yes, she does.

20         Q.     Is that located in the big open area or

21     in one of the two rooms?

22         A.     She works in both areas.  She works in

23     a desk and open area, and she also works in my

24     private office.

25         Q.     The desk in the open area, is that

65

1                          C. Dente

ATA 05 29 08

2      considered her desk?

3           A.    Yes, it is.

4           Q.    How long has she been -- has that been

5      her desk?

6           A.    I'm not sure what the question is.

7           Q.    It's her desk today, right?

8           A.    Yes.

9           Q.    She has a desk today?

10          A.    Right.  It was her desk yesterday.

11          Q.    If we take it back into prior

12     yesterdays --

13          A.    I'm sure where you're leading with the

14     question, and I can't answer the question because

15     I don't know what the question is.

16          Q.    Your job is not to understand where the

17     question's leading, just to answer them.  You

18     understand --

19          A.    I don't understand the question.

20          Q.    We know it was her desk today.  We know

21     it was her desk yesterday.  When did it begin

22     being her desk?

23          A.    I would have to check on that for you.

24     If this is not a memory test, I couldn't give you

25     an exact day, a specific time, a year.  I would

66

1                     C. Dente

2      have to check.

3           Q.    Has she ever had a different desk?

Page 60

ATA 05 29 08

4      A.     Yes, she has.  The business that we do

5  can be done from anywhere.  It's not specific to

6  a desk or an office, a city, a state, a country.

7      Q.     What's Nilda's phone number, her office

8  phone number?

9      A.     Her office phone number?

10     Q.     Right.

11     A.     Well, we just established that she

12  didn't have a number that was registered to

13  Second Skin.

14     Q.     What number --

15     A.     She uses her own personal cell phone.

16     Q.     Did you ever call her on a land line?

17     A.     Depending on where she is.  I call her

18  at her home.  I call her at multiple places.

19     Q.     If she's working at the offices of

20  Private Label, is there a land line there that

21  she will pick up?

22     A.     Yeah.  There's -- if she was in the

23  office, yes.

24     Q.     Is there a specific number for her?

25     A.     There's a general office number.


PIROZZI & HILLMAN
212-213-5858


67

1                  C. Dente

2      Q.     A general office?

3      A.     Yes.

4      Q.     If you wanted to reach her on a land

5  line when she was working at --

6      A.     You would call -- you would call the

Page 61

ATA 05 29 08

7      main number, and you could be transferred to her.

8          Q.     Does Nilda receive mail in the course

9      of her duties for Second Skin?

10         A.     I assume from time to time.

11         Q.     Where does she receive that mail?

12         A.     Again, be specific.  What mail?  I

13     mean, mail is a very general...

14         Q.     Business related mail relating to

15     Second Skin.

16         A.     What business?

17         Q.     Second Skin.  Second Skin does

18     business, right?

19         A.     I receive mail for Second Skin.

20         Q.     She doesn't review any mail to Second

21     Skin?

22         A.     No.

23         Q.     Where does the mail that you

24     received -- where is that received?

25         A.      It's received at multiple locations,

PIROZZI & HILLMAN
212-213-5858

68

1                     C. Dente

2      again the 935 Sedgewick Court.  It could be

3      received at 597 Broadway.

4          Q.     Is there a Second Skin e-mail account?

5          A.     Yes, there is.

6          Q.     Does Nilda have an e-mail address at

7      Second Skin?

8          A.     Yes, she does.

Page 62

ATA 05 29 08

9      Q.    Do you have one?

10     A.    Yes.

11     Q.    Does anybody else have one?

12     A.    I would have to check on that.  I don't

13  think so.

14     Q.    Turning back to Exhibit 503, I

15  apologize.  I'm asking a question twice, but what

16  are QC charges?

17     A.    Quality inspection charges, when goods

18  are checked for quality.

19     Q.    This is a cost that Private Label

20  incurred and is now charging back to Atateks; is

21  that right?

22     A.    Correct.  That's an agreed upon way of

23  doing business with all our factories.

24     Q.    Who did you pay this amount to?

25     A.    It's actually deducted from open

PIROZZI & HILLMAN
212-213-5858

69

1              C. Dente

2  invoices that are owed to Private Label and then

3  debited back to the factories, specific factories

4  by style.  A general way and industry standard

5  way of doing business.

6     Q.    Did Target deduct that amount from the

7  amount that it paid?

8     A.    Target deducts the amount in different

9  ways.  I can either deduct it from Private Label

10  open invoices or sometimes it's deducted from LC,

11  open LCs.

Page 63

ATA 05 29 08

12          Q.    I'm just trying to clarify.

13                This was money in effect that Target

14    initially charged?

15          A.    If it appears on a debit note, then it

16    was debited from a Private Label invoice and then

17    debited back to the specific factory.

18          Q.    It would have been debited by Target;

19    is that correct?

20          A.    That is correct.

21          Q.    Would there be underlying documentation

22    with respect to that?

23          A.    Absolutely, yes.

24                MR. GRANNIS:  Off the record.

25                (Discussion off the record.)


PIROZZI & HILLMAN
212-213-5858


                                                    70
1                        C. Dente

2                MR. GRANNIS:  I'm going to show the

3     witness Plaintiffs' Exhibit 504, bearing

4     Bates numbers D 590 through D 600, entitled,

5     "Invoice 1609."

6                (Plaintiffs' Exhibit 504, Documents

7     Bearing Bates Nos. D 590 through D 600

8     marked for identification.)

9          Q.    Do you recognize this document, Ms.

10    Dente?

11         A.    It's the same document you showed me

12    before.

13         Q.    Meaning it's the same type of document?

Page 64

ATA 05 29 08

14    A.    Correct.

15    Q.    Let me ask you this:  You see on Page

16  592 there -- do you see the Bates number on the

17  bottom right?

18    A.    Bates?

19    Q.    It's called -- just this is lawyer

20  talk, Bates, B-A-T-E-S, is a lawyer's fancy term

21  basically for when we put a number on a document,

22  so I may refer to that.

23        MR. BYLER:  Actually, there was a Mr.

24    Bates who devised this.  Okay?

25        MR. GRANNIS:  Right.


PIROZZI & HILLMAN
212-213-5858


71

1                    C. Dente

2    Q.    Do you see the document that says 592

3  at the bottom?

4    A.    Yes.

5    Q.    Does 592 relate to Page 590?

6    A.    I'm not sure what the question is.

7    Q.    We got these documents from your

8  counsel.

9    A.    Okay.

10    Q.    And they often -- I don't think they

11  were stapled.  I mean that as no criticism.

12  That's very common, but we used our best

13  judgments as to what documents to staple together

14  because they seem to relate to each other.

15    A.    Okay.

16    Q.    So we stapled these documents together,

Page 65

ATA 05 29 08

17    but I don't know if they're really related.

18           Is 592 related to 590?  Is it a type of

19    backup to 590 or have I just stapled together

20    documents that should be separate?

21        A.    I don't know.  I need time to go

22    through and specifically marry and match, and I

23    don't know.

24           If you're telling me that you attached

25    it, obviously you had good reason to attach it.


                    PIROZZI & HILLMAN
                    212-213-5858


                                                    72
1                      C. Dente

2        Q.    No, I don't necessarily know a lot

3    about the documents.

4           Maybe what I can ask you to do is, if

5    you wouldn't mind, when you are on lunch break,

6    maybe take a few minutes to see if there's any

7    connection between those documents.

8           MR. GRANNIS:  I'm handing the witness

9        Plaintiffs' Exhibit 505, which bears the

10       title "Invoice 1630," and Bates Nos. D 548

11       through D 551.

12          (Plaintiffs' Exhibit 505, Documents

13       Bearing Bates Nos. D 548 through 551 marked

14       for identification.)

15       Q.    Do you recognize this document, Ms.

16    Dente?

17       A.    Yes, I do.

18       Q.    What is this?

                    Page 66

ATA 05 29 08

19      A.    It's the same document we have been

20  discussing three times in a row.

21      Q.    One of them is entitled "Invoice," the

22  one you're looking at now, and Exhibit 503 was

23  entitled "Debit Note"?

24      A.    I need 503 again.

25          This was a change that actually was

PIROZZI & HILLMAN
212-213-5858

73

1                    C. Dente

2   initiated by Atateks, that they preferred to have

3   the correct title of this document noted as

4   invoice as opposed to debit note for their own

5   banking purposes.

6       Q.    Fair enough.

7           From your perspective, the debit note

8   where we see these types of documents, and it

9   says debit notes versus invoice, they're really

10  just the same thing?

11      A.    That is correct.

12      Q.    Ocean freight charges are being charged

13  back to Atateks by Plaintiffs' Exhibit 505; is

14  that correct?

15      A.    That's correct.

16      Q.    How would this have come about, that

17  they would have been charged for ocean freight

18  charges?

19      A.    Well, this particular situation happens

20  to stick out in my mind, that we had several

21  occasions in the year of 2006 where we had orders

Page 67

ATA 05 29 08

22    that were supposed to be shipped on a direct LC

23    basis, okay, meaning the LC was open to Basul,

24    transferred to Atateks.

25              Atateks was not able to fulfill their

PIROZZI & HILLMAN
212-213-5858

74

1                        C. Dente

2    delivery obligation, so the letter of credit had

3    to be cancelled, and the goods have to be -- had

4    to be brought through our warehouse.

5              When goods are shipped on a direct LC

6    basis, Target is responsible for the sea freight.

7    If in fact we have to change the terms and the

8    goods are brought through our warehouse, we then

9    in turn would charge Atateks back for the sea

10   freight.  It would become their responsibility to

11   move the freight to get it to us.

12        Q.    I'm going to show you Plaintiffs'

13   Exhibit 506, titled "Invoice 1631," bearing Bates

14   Nos. 542 through 545.

15              (Plaintiffs' Exhibit 506, Documents

16        Bearing Bates Nos. 542 through 545 marked

17        for identification.)

18        Q.    And is this essentially the same

19   document as you were just looking at in

20   Plaintiffs' Exhibit 505?

21              MR. BYLER:  When you say the same kind

22        of document --

23              MR. GRANNIS:  Same kind of document.

Page 68

ATA 05 29 08

24      A.      Yes, the same kind of document.

25      Q.      Were the circumstances for charging


PIROZZI & HILLMAN
212-213-5858

☐

75

1                          C. Dente

2      ocean freight charges the same in this case as

3      the previous exhibit?

4          A.      I would have to check on a case-by-case

5      basis.

6                  When I answered the question for you

7      before, I said I remember that there were several

8      occasions within the time of the year of 2006

9      where Atateks was not able to fulfill their

10     obligations on a direct LC base, and we had to

11     bring goods to the warehouse.

12                 If you would want me to check invoice

13     by invoice, I could do that.

14                 MR. GRANNIS:   I'm going to show the

15            witness Plaintiffs' Exhibit 507.   Off the

16            record.

17                 (Discussion off the record.)

18                 (Plaintiffs' Exhibit 507, Documents

19            Bearing Bates Nos. 535 through 539 marked

20            for identification.)

21                 MR. GRANNIS:   I'm handing the witness

22            Plaintiffs' Exhibit 507, which is titled,

23            "Debit Note 1632" bearing Bates Nos. 535

24            through 539.

25          Q.      Ms. Dente, this is another debit note

ATA 05 29 08

PIROZZI & HILLMAN
212-213-5858

76

1                              C. Dente

2      of the type we've seen before, correct?

3          A.    Yes.

4          Q.    In this case, expediting charges from

5      Target are being charged back to Atateks,

6      correct?

7          A.    Appears that way.

8          Q.    Do the remaining pages of this document

9      reflect these expediting charges shown on the

10     first page of the document?

11         A.    It seems to be that way, if you look at

12     comments, vendor pays negotiated expediting

13     charges per deviation.

14         Q.    Do you have any recollection or general

15     understanding as to why Atateks was being charged

16     expediting?

17         A.    They were obviously late.

18         Q.    Do you know whether or not there was

19     any type of e-mail negotiation which preceded the

20     issuance of this debit note?

21         A.    I would have to check for you, but I

22     believe that I testified earlier that all

23     chargebacks were negotiated prior to debit notes

24     being issued.

25         Q.    Was that the case even through 2007?

ATA 05 29 08

77

1                      C. Dente

2        A.    Yes.

3              MR. BYLER:  Just objection to the form.

4        2007?  Do you mean 2007?

5        Q.    Do you have any recollection that debit

6    notes were issued as late as April 2007?

7        A.    I would have to check.

8              MR. GRANNIS:  I am showing the witness

9        what has been marked as Plaintiffs' Exhibit

10       508, titled "Debit Note 1634," with Bates

11       No. 857 through 858.

12             (Plaintiffs' Exhibit 508, Documents

13       Bearing Bats Nos. 857 through 858 marked for

14       identification.)

15       Q.    Ms. Dente, this is another debit note

16   of the type we have seen before, correct?

17       A.    That is correct.

18       Q.    You see it states that new store

19   discount.  Do you see that?

20       A.    Yes.

21       Q.    Could you tell me what a new store

22   discount is?

23       A.    When Target opens a new store, we

24   agreed to a certain amount of goods of a master

25   purchase order that we're manufacturing to be

78

1                      C. Dente

2    delivered for that new store set, so the day the
                        Page 71

ATA 05 29 08

3    doors open, obviously there was no product

4    ordered specifically, so they add on to product

5    that was already been ordered so they have goods

6    to open the new store, and they ask for a

7    discount for them.

8            MR. GRANNIS:  Would you read that back?

9            (Answer read.)

10        Q.    Ms. Dente, I'm not sure I understood.

11            If there was a purchase order for, say,

12    10,000 garments, and this new store opens up --

13        A.    Okay.

14        Q.    -- would some of those 10,000 garments

15    be directed to the new store or are you saying

16    that you would add to the number of garments

17    reflected in the purchase order?

18        A.    We would create a separate purchase

19    order and add to it.

20        Q.    Would the separate purchase order

21    reflect this discount?

22        A.    I don't know.  I would have to check.

23        Q.    When did you first encounter with

24    Target this new store discount policy?

25        A.    They have always done business that

PIROZZI & HILLMAN
212-213-5858

79

1                    C. Dente

2    way.  It's standard industry practice.

3        Q.    Was it common for Target to impose this

4    new store discount?

Page 72

ATA 05 29 08

5       A.      Yes.

6       Q.      Do you know when Atateks's goods were

7   first sold at a new store and, therefore,

8   discounted?

9       A.      I have no idea.  I would have to check.

10       Q.      This new store discount chargeback is

11   being issued in November of 2006.

12       A.      Okay.

13       Q.      Correct?

14       A.      That's what it looks like.

15       Q.      At this point, Private Label has been

16   doing business with Atateks for three or four

17   years?

18       A.      Since, I think we established, around

19   2002.

20       Q.      So that's about four years?

21       A.      Uh-huh.

22       Q.      And there have been hundreds of

23   thousands or millions -- have to be millions of

24   garments?

25       A.      Yes, millions.


PIROZZI & HILLMAN
212-213-5858


80

1                   C. Dente

2       Q.      Do you think it's possible that the

3   first time that they -- that Target imposed the

4   new store discount on goods by Atateks was

5   November 2006?

6       A.      I would have to check.  I don't think

7   it would be possible, but I would have to check,

ATA 05 29 08

8    since we had been doing business, as you said,

9    for four years.

10        Q.    We have not been able to locate any

11   chargeback to Atateks with respect to a new store

12   discount until November of 2006.

13        A.    It is possible.  Like I said, I would

14   have to check.  It's possible that none of the

15   styles that were being manufactured by Atateks

16   were chosen for the new store openings, as I told

17   you that Target on a case-by-case basis, as they

18   determine they are going to be opening new

19   stores, go back and issue additional goods

20   against master purchase orders that have been

21   opened, so could have been that another vendor's

22   styles were chosen for the new store opening.

23        Q.    Is it possible that Target did impose

24   new store discounts before on Atateks's goods,

25   but you simply didn't charge them back to

81

1                    C. Dente

2    Atateks?

3        A.    I would really have to check, Eric.  I

4    mean, really in fairness, again --

5        Q.    How would you check?

6        A.    Have to go back and check the debit

7    notes that we have on file.

8        Q.    How would you check whether or not

9    Atateks's goods had previously been subject to a