ATA 05 29 08

10    new store discount?

11         A.    Because if it had been, a debit note

12    would have been issued, and it would state such.

13         Q.    How do you know it's not possible that

14    they were subject to a new store discount, but

15    you just didn't charge it back because you viewed

16    it as Private Label's responsibility?

17         A.    Can I pose another question?

18              Do you have debit note purchase orders

19    dating back to 2002?  In fairness, the reason I'm

20    saying -- I think we're both talking about a

21    subject that we may not have documents to review,

22    so if you would like a specific answer to that

23    question, we absolutely can check, because

24    everything is kept on file.

25    MR. GRANNIS:  I would appreciate your checking

PIROZZI & HILLMAN
212-213-5858

82

1                    C. Dente

2    and seeing if there are any new store discount

3    chargebacks prior to November 2006.

4              THE WITNESS:  Okay.

5              MR. GRANNIS:  And if in fact Target

6         imposed any new store discounts with respect

7         to goods manufactured by --

8              THE WITNESS:  I can absolutely do that.

9              MR. GRANNIS:  Irrespective of whether

10    or not you charged them back to Atateks.

11              THE WITNESS:  Okay, that's fine.

12         Q.    What does tank test refer to here?

Page 75

ATA 05 29 08

13     A.     I would have to assume since that's not

14     my handwriting that it must have been a test

15     order that was ordered for a new store.

16     Q.     Could you explain what that means, a

17     test order?

18     A.     From time to time Target, as opposed to

19     bulk ordering or ordering a large quantity up

20     front, chooses to test certain styles to see the

21     validity or the magnitude.

22     Q.     And by that do you mean sort of whether

23     consumers will actually buy them and how much?

24     A.     Yes, that's correct.

25     Q.     You mentioned that a purchase order

PIROZZI & HILLMAN
212-213-5858

83

C. Dente

1

2     would be issued with respect to this order for

3     goods for the new store, correct?

4     A.     Correct.

5     Q.     And I think you said you weren't sure

6     whether or not the price would reflect the

7     discount.

8     A.     That is correct or the terms.  I don't

9     know if the terms, because there is a part for

10     terms on our purchase orders.

11     Q.     When the purchase order was issued or

12     prior to that point, would Atateks be advised

13     that a new store discount was going to be imposed

14     upon it with respect to these goods?

ATA 05 29 08

15      A.      As I stated previously, it's an

16   industry standard, not just with Target, but most

17   large mass market retailers as they're opening

18   new stores in order to facilitate getting product

19   in there -- a product in there quickly when they

20   don't know an exact store opening, there are

21   discounts that are -- that are negotiated up

22   front, so yes, it's an industry standard.  It's

23   not anything that would come as a surprise.

24      Q.      Would the purchase order state that

25   these goods were being purchased for a new store?

PIROZZI & HILLMAN
212-213-5858

84

1                   C. Dente

2      A.      I just told you I would have to see a

3   purchase order.  I couldn't answer that off the

4   top of my head.

5      Q.      How can you be sure that Atateks was in

6   fact told that the goods it was manufacturing

7   were going to go to a new store?

8      A.      It would have to somewhere reference

9   it, but you're asking me would it be on the

10   purchase order.  You also asked me would it be on

11   e-mail, how it would be communicated.  I'm

12   telling you I would have to check.

13   MR. GRANNIS:  I'm going to call for the

14   production of documents which would establish

15   that in fact it was indeed communicated to

16   Atateks that a new store discount would be

17   imposed upon it.

Page 77

ATA 05 29 08

18          Let me just finish this.  Or that

19     these goods were in fact being ordered for a new

20     store, and I will advise you by letter of all of

21     the chargebacks reflected in the records for new

22     stores to back up that document production.

23          Q.    You were going to say?

24          A.    You're going to advise us by letter.

25     Could you state -- you're going to advise us by

PIROZZI & HILLMAN
212-213-5858

85

                           C. Dente

 1

 2     letter of what?

 3          Q.    Advise you by letter of the chargebacks

 4     which, like this, refer to new stores.

 5          A.     I thought you told me you were only

 6     able to locate one.

 7          Q.    This was the first one that I was able

 8     to locate.

 9          A.    So it's the first one.  It's not the

10     only one you were able to locate?

11          Q.    Correct.  There are others which are

12     later.

13          A.    Okay.

14          Q.    And to be frank when -- I think you

15     know where I'm going with this.

16          A.    I don't.  That's why I'm trying to --

17     I'm trying to help you, because I really don't

18     know.  I mean, of all the points, I don't know

19     why this is a point.

Page 78

ATA 05 29 08

20    Q.    One issue is that obviously we want to

21  make sure that Atateks was aware before it

22  manufactured the goods --

23    A.    Okay.

24    Q.    -- that a new store discount would be

25  imposed on it.


PIROZZI & HILLMAN
212-213-5858


86

1                    C. Dente

2              You would agree, would you not, it

3  would only be fair that Atateks would know some

4  way that it was going to be subject to the

5  discount?

6    A.    Absolutely, and what I wanted to

7  contribute before is that, in addition to our

8  purchase orders that are issued to Atateks, they

9  also received a copy of what's considered the

10  Target commit, which is another word for purchase

11  order for Target, and it clearly states on the

12  columns there when there's a new store order, but

13  the point I was trying make in all of the charges

14  of chargebacks, Eric, this is really so minimal

15  in the realm of things, but we -- we can pursue

16  it.

17    Q.    Our clients like to see us fighting for

18  every dime.

19    A.    And you should.

20          MR. GRANNIS:  I am handing the witness

21      Plaintiffs' Exhibit 509, entitled, "Debit

22      Note 1635" bearing Bates Nos. 841 through

Page 79

ATA 05 29 08

23      856.

24            (Plaintiffs' Exhibit 509, Documents

25      Bearing Bates Nos. 841 through 856 marked

PIROZZI & HILLMAN
212-213-5858

87

1                         C. Dente

2      for identification.)

3            THE WITNESS:  Can we actually go back

4      to the previous exhibits for a minute.  You

5      showed me for the new store?  Just the one

6      for the new store you previously showed.  I

7      think it was the one right on top.

8            MR. GRANNIS:  That's it.

9            MR. BYLER:  508.

10           THE WITNESS:  Okay.  I just want to

11     note for the record that these chargebacks

12     don't even pertain to Atateks.  It pertains

13     -- that was crossed out, and actually

14     pertains to a different factory, which is

15     Orma.

16           MR. GRANNIS:  That's very helpful to

17     know.  Thank you.

18           MR. BYLER:  In your testimony you're

19     referring to both Plaintiffs' Exhibit 508

20     and 509.

21           THE WITNESS:  That's correct.

22           So to clarify for you also how we would

23     know that, it would be referenced by the

24     purchase order number and the style number

Page 80

ATA 05 29 08
25            to determine which factory it applies to


PIROZZI & HILLMAN
212-213-5858


88

1                           C. Dente

2          from the Target paperwork.

3          Q.     Could I ask you to look at Page 843 of

4     Plaintiffs' Exhibit 509.

5                 How would you determine from this to

6     whom to attribute this new store discount?

7          A.     I'm going to go to the previous page,

8     because there may be a master page.

9                 Okay, it has on the very first page

10    where says Target Stores chargeback on Page No.

11    842, it says, "Department 18, July '06, new store

12    discount 7/19 to 7/23."

13         Q.     I'm sorry.  How would this tell you

14    which manufacturer to attribute this chargeback

15    to?

16         A.     Because of the department, okay, and

17    because of the July new store, we would know

18    whatever new store items we were producing during

19    that time period for Department 18.

20                There's also a vendor number on here,

21    and I would have to check again, not knowing

22    anything off the top of my head, but not only do

23    we have a vendor number, but so do the factories

24    have vendor numbers.

25                MR. GRANNIS:  I'm going to show the


PIROZZI & HILLMAN
Page 81

89

1                          C. Dente

2        witness Plaintiffs' Exhibit 510, which is a

3        document titled, "Debit Note 1642" with

4        Bates Nos. 829 to 838.

5              (Plaintiffs' Exhibit 510, Document

6        Bearing Bates Nos. 829 through 838 marked

7        for identification.)

8        Q.    With respect to the first amount

9   charged here, 179.31, can you tell me what that

10  is about?

11       A.    Target -- you are talking about this

12  first line, Target PO fill rate?

13       Q.    Correct.

14       A.    And revised -- wait.  Target fill rate

15  revised and carton shortage.  That means that we

16  short shipped.  Target transmits an EDI which is

17  electronically transferred, and then we are

18  responsible for inputting the exact number of

19  cartons that are to be shipped.

20             If we're not mirroring what they

21  ordered, they then impose a discount or a

22  chargeback for short shipping.

23       Q.    Does that mean that they didn't get the

24  quantity of goods which we told them we were

25  giving them?

90

ATA 05 29 08
1                    C. Dente

2        A.    That is correct.  We do advanced ship

3    notices.

4        Q.    Kindly turn your attention to Page D

5    837.  Do you see that it says dispute and then

6    absorbed?

7        A.    Yes.

8        Q.    Could you tell me what that would refer

9    to?

10       A.    I have no idea.  It's not my

11   handwriting.

12       Q.    Do you know whose handwriting that is?

13       A.    No, I don't.

14       Q.    Did you ever negotiate or dispute

15   chargebacks imposed by Target?

16       A.    Absolutely.

17       Q.    That's if you felt that they were

18   unjustified; is that correct?

19       A.    That's correct.

20       Q.    Can you remember any particular

21   circumstances in which you felt they were

22   unjustified?

23       A.    I mean, as to a specific circumstance?

24   No, but generally speaking, there are many times

25   that a retailer takes a discount and finds out


PIROZZI & HILLMAN
212-213-5858


91
1                    C. Dente

2    the details later.

3              For example, they could charge us back
                         Page 83

ATA 05 29 08

4    for expediting when it was agreed that they were

5    going to absorb the expediting, because we're

6    forced to use Target's forwarders, if they prepay

7    something, they find out the details later, so it

8    could be -- it could very well be that once they

9    find out the details that the department agreed

10   to pay for it, and then the chargeback would be

11   reversed, but they would automatically deduct it

12   from us.

13       Q.    Would you sometimes dispute or

14   negotiate a chargeback after they issued you

15   documentation or would that always occur prior to

16   documentation?

17       A.    It varied.

18            MR. GRANNIS:  I'm going to show the

19   witness Plaintiffs' Exhibit 511, entitled

20   "Invoice 1644" bearing Bates Nos. 820

21   through 822.

22            (Plaintiffs' Exhibit 511, Documents

23   Bearing Bates Nos. 820 through 822 marked

24   for identification.)

25       Q.    If you turn to Page 821, it says at the

PIROZZI & HILLMAN
212-213-5858

92

1                     C. Dente

2    top Basul Textile Limited.  Do you see that?

3        A.    Yes.

4        Q.    This is a documentation from Target;

5    isn't that right?

Page 84

ATA 05 29 08

6      A.    Yes.

7      Q.    So is this a chargeback from Target?

8      A.    It is a chargeback from Target.

9      Q.    Does this suggest that Basul Textile

10   Limited is in fact the vendor for these goods?

11     A.    Basul is listed as the vendor.  As I

12   explained to you before, the letter of credit are

13   open to Basul and then transferred to the

14   specific factory that's going to manufacture the

15   product, so Basul's vendor number is attached to

16   specific factories' vendor numbers, but Basul was

17   not a manufacturer of product.  They are not a

18   factory.

19     Q.    Does this document mean that with

20   respect to the goods at issue here those goods

21   were sold by letter of credit?

22     A.    I would have to double confirm the

23   terms on here or -- not the terms, but the

24   terminology, but if you look at the very bottom,

25   it says to Basul Textile Limited FLC.  I don't

0

93

1                        C. Dente

2   know if that means first letter of credit, so it

3   is possible.

4            Again, you have to explain that it's --

5   everything is attached.  There's an attachment

6   from Private Label to Basul, from Basul to their

7   specific factories, so all the vendor numbers are

8   attached.

Page 85

ATA 05 29 08

9      Q.    I think I can state better the question
10   I'm trying to get at.

11      A.    Okay.

12      Q.    On some occasions, Private Label
13   purchased goods from Atateks and sold them to
14   Target?

15      A.    Correct.

16      Q.    And I'm going to say in those cases,
17   just to establish terminology, that Private Label
18   was an intermediate purchaser.  I just mean that
19   Private Label --

20      A.    No, no.

21      Q.    -- purchased the goods from Atateks and
22   then sold the goods to Target.

23      A.    I think it's just a matter of
24   semantics, because everything was made to order
25   for Target.  It was ordered on Target's behalf.


PIROZZI & HILLMAN
212-213-5858


94

1                    C. Dente

2      Q.    I just want to distinguish between
3   those cases where goods went directly from either
4   Atateks or Basul to Target and ones where they
5   went through Private Label.

6              Can you come up with a terminology for
7   me to describe the circumstances in which goods
8   go through Private Label?

9      A.    Warehouse goods versus direct LC goods.

10      Q.    Does the fact that it says Basul

Page 86

ATA 05 29 08

11    Textile Limited mean that these were direct LC

12    goods?

13        A.    Not necessarily.  I would have to check

14    for you, because even when we brought goods

15    through our warehouse, it's mandatory for Target

16    to know where we are manufacturing our product,

17    because as I stated before, they inspect it.

18        MR. GRANNIS:  I'm going to hand the

19        witness Plaintiffs' Exhibit 512, bearing

20        Bates Nos. 764 through 784, with the title

21        "Debit Note 1654."

22        (Plaintiffs' Exhibit 512, Documents

23        Bearing Bates Nos. 764 through 784 marked

24        for identification.)

25        Q.    Can you tell me what this means when it

PIROZZI & HILLMAN
212-213-5858

95

C. Dente

1

2    talks about the improper loading of import

3    containers?

4        A.    When business is done on a direct LC

5    basis, containers are delivered to the factory to

6    be loaded, so the factory's responsible for

7    loading the containers, and then the containers

8    are picked up and brought back to the forwarder.

9        So in this case what it implies is that

10    the containers were loaded improperly.  They

11    could have maybe not be full container loads, and

12    they were supposed to be full container loads,

13    could mean that there were mixed styles within

Page 87

ATA 05 29 08

14    the containers, improper packing lists.  Can mean

15    a whole host of things, but the containers were

16    not packed correctly.

17        Q.    With respect to Atateks, what factory

18    of Atateks were goods picked up from?

19        A.    Both their Turkey factories and their

20    Jordan factories.

21        Q.    With respect to the obligation of

22    Atateks to deliver goods in a timely fashion, am

23    I correct in thinking that the obligation of

24    Atateks was to deliver those goods to its factory

25    door?

PIROZZI & HILLMAN
212-213-5858

96

1                    C. Dente

2        A.    No, delivery to the forwarder.

3        Q.    Where is the forwarder located?

4        A.    That I don't know.  I mean, within a

5    certain proximity to the factory.  They're using

6    local forwarders.  Whether they're for warehouse

7    goods, a forwarder we appoint, or Target's

8    forwarder.

9        Q.    You referred earlier to containers

10    being shipped at -- arriving at the factory?

11        A.    Delivered to the factory, yes.

12        Q.    Does the forwarder provide those

13    containers?

14        A.    Yes, and the reason for the factory

15    load is because the shipment may be so large

Page 88

ATA 05 29 08

16    instead of moving individual boxes that it's

17    loaded at the factory for ease for both the

18    factory and the forwarder.

19        Q.    If Atateks loads those garments onto

20    the container at the factory in a timely fashion,

21    and there are subsequent delays in

22    transportation, does Atateks have any liability

23    for that?

24        A.    No.

25        Q.    Its responsibility is to make those

PIROZZI & HILLMAN
212-213-5858

97

1                        C. Dente

2    goods available at its factory for those

3    containers?

4        A.    Correct, and I want -- I would like to

5    ask for you to be specific when you says there's

6    further delays, meaning that once the containers

7    are delivered to the forwarders' location, and

8    they're put on a vessel or being aired for

9    whatever reason, that there's delays in the

10    vessel or delays in the aircraft unbeknownst to

11    Atateks.

12            Is that what you're asking me?

13        Q.    Well, not exactly.

14        A.    Okay.

15        Q.    Would you agree with the following --

16        A.    Okay.

17        Q.    Containers are delivered to Atateks,

18    its factory.  Atateks loads garments onto the

Page 89

ATA 05 29 08

19     container.

20          A.     Uh-huh.

21          Q.     Once Atateks does that in a timely

22     fashion, it has no further responsibility for

23     delivery of the goods; is that correct?

24          A.     With all due respect, I think you're

25     speaking very generally, because you don't

⬚

98

1                              C. Dente

2      understand enough about the business.

3           Q.     I'm sure I don't.

4           A.     Okay, but as I stated previously in my

5      testimony, that chargebacks are no mystery to

6      anybody.  They're negotiated up front.

7                  Even when Target expects to receive

8      goods late because there's an agreed upon

9      extension, doesn't mean that Atateks is not

10     responsible for whatever discount was negotiated,

11     just because they delivered the goods on the

12     revised approved date.

13          Q.     Your response has in fact helped me

14     understand that my question was a little too

15     broad.

16                 What I'm really trying to get at is

17     only the issue of responsibility for delays in

18     transportation.  Okay?

19                 I understand that in general Atateks

20     can be liable for lateness.  My question is:  If

ATA 05 29 08
21    Atateks timely puts those garments on the

22    container that appears at its factory door --

23        A.    Right.

24        Q.    -- is it liable for any delays after

25    that point?


PIROZZI & HILLMAN
212-213-5858


99
1                        C. Dente

2        A.    I think I asked that question before,

3    so I'm going to make sure I understand you.  I

4    said that -- are you referring to once the goods

5    are received at the forwarder, which we

6    established is in close proximity to the

7    factory's location?

8                If there is a delay unbeknownst to

9    Atateks -- meaning the vessel's delayed, the

10   airplane blows up, the goods never arrive -- are

11   you asking me is Atateks ultimately responsible

12   for that?

13       Q.    Any of that, yes.

14       A.    Again, everything is negotiated on the

15   case-by-case basis.  I really have to know the

16   circumstances.  It's hard for me to generally

17   answer that question for you, because it's an

18   ongoing partnership.  It's an ongoing

19   relationship, and a human business.  There's also

20   issues, Eric.

21       Q.    Where was the quality check by Target?

22       A.    At the factory level.

23       Q.    Where was the quality check by Basul?
                         Page 91

ATA 05 29 08

24      A.    At the factory level.

25            As part of the commercial invoices and

PIROZZI & HILLMAN
212-213-5858

100

1                      C. Dente

2      inspection certificate is included the goods

3      can't leave without the inspection certificate

4      being signed.

5            MR. GRANNIS:  I'm handing the witness

6         Plaintiffs' Exhibit 513 titled, "Target

7         Stores Accounts Payable Research" bearing

8         Bates Nos. 79 through 89.

9            (Plaintiffs' Exhibit 513, Documents

10        Bearing Bates Nos. 79 through 89 marked for

11        identification.)

12     Q.    Who is Alyssa Mulhair?

13     A.    Where do you see that?

14     Q.    That's under reason for claim in the

15     second line.

16     A.    She's a buyer at Target.

17     Q.    What are in store and guest return,

18     returns defectives?

19     A.    I think that's pretty self-explanatory.

20     Those are goods returned to the store, returned

21     at store level by a consumer that purchases them.

22     Q.    What's the difference between in store

23     and guest returns?

24     A.    Target refers to their consumers as

25     guests.

Page 92

ATA 05 29 08

PIROZZI & HILLMAN
212-213-5858

□

101

1                           C. Dente

2      Q.     But maybe I'm misunderstanding, but it

3   seems to distinguish between in store and guest

4   returns as if those are different things.

5      A.     I think that they're just spelling out

6   very specifically that the guest is returning it

7   in store.

8              Again, this is a standard industry

9   practice with most mass market retailers, that at

10  the end of the selling period that they go back

11  and tie by item number any returns that were

12  manufactured by a specific vendor and charge them

13  back.

14     Q.     What is a selling period?

15     A.     It's by a specific -- we have to go

16  again, specific by style.  There's a three-month

17  selling period, six-month selling period.  That's

18  why you will find on many of Target's chargebacks

19  it takes six months to a year for them to even

20  generate chargebacks for goods that may have been

21  shipped a year to a year and a half prior to

22  receiving the actual claims.

23     Q.     If you turn to the third page of this

24  document bearing Bates No. 81, you'll see that it

25  says, "Begin date 1/30/2005, and end date January

ATA 05 29 08

102

1                    C. Dente

2      28, 2006."

3              Now, this cover memo to you wasn't

4      generated until January 22, 2007?

5          A.    Exactly my point that I made

6      previously.

7          Q.    This goes back, in fact two years back?

8          A.    I said a year, approximately a year and

9      a half, year to a year and a half.

10         Q.    So at this point in time in January 22,

11     2007, Target imposed these chargebacks upon

12     Private Label; is that correct?

13         A.    That is correct.

14         Q.    Do you have any idea of how this came

15     about?

16         A.    It's standard industry practice, as I

17     told you, with most mass market retailers, that

18     they have the latitude to charge you back for

19     goods that are returned at store level by their

20     consumers.

21         Q.    When you say the latitude, does that

22     mean it sometimes happens and sometimes doesn't

23     or does it always happen?

24         A.    I would have to assume that if they

25     receive an item back, and they are able to tie it

103

1                    C. Dente

ATA 05 29 08

2   back to our item number that was manufactured by

3   our vendor number, then in turn they would charge

4   us back, because retailers like to collect every

5   penny they can get.

6       Q.   Do you know whether or not you had

7   ever -- you meaning Private Label -- had ever

8   previously charged back to Atateks a chargeback

9   from Target for in store and guest returns

10   defectives?

11       A.   I would have to check for you, but I

12   would have to assume due to the time period of

13   which we were doing business from 2002 through

14   2006, that it's very possible.

15   MR. GRANNIS:  I would ask that you produce

16   documents to demonstrate that.

17       Q.   Whose handwriting is on this document

18   beginning on Page 81?

19       A.   I'm not sure.  It's not mine.

20       Q.   You see here it says, "Basul Atateks"

21   and below that "Basul Orma"?

22       A.   Yes.

23       Q.   How did the person doing this relate

24   these chargebacks to the particular manufacturer?

25       A.   Based on the DPCI number.

PIROZZI & HILLMAN
212-213-5858

104

1              C. Dente

2       Q.   What is a DPCI number?

3       A.   Department class and code.

4       Q.   How do you relate that to Atateks or

Page 95

ATA 05 29 08

5    Basul?

6        A.    How do we relate it to Orma or Atateks

7    you mean?

8        Q.    That's correct.

9        A.    Based on the DPCI.  Those are attached

10   to the garments.  These numbers are attached to

11   the garments that are shipped.  In addition, they

12   appear on Target's commit sheets.

13   MR. GRANNIS:  I would ask for the production, if

14   it hasn't previously been produced, of these

15   Target commitment --

16              THE WITNESS:  Commitment sheets.

17              MR. GRANNIS:  Commitment sheets, which

18        would show these DPCI numbers for Atateks

19        that would permit us to confirm that these

20        chargebacks have been properly charged.

21              THE WITNESS:  Atateks is in possession

22        of all commitment sheets as well, just so

23        you know, to permit you to cross reference

24        it.  That is how they manufactured the

25        product.  That's how they shipped the

PIROZZI & HILLMAN
212-213-5858

105

1                  C. Dente

2        product.

3              MR. GRANNIS:  The lawyers will debate.

4        Thank you for that information.  The lawyers

5        will debate later --

6              MR. BYLER:  We have a standing

Page 96

ATA 05 29 08

7          objection for these documents are already in

8          the possession of Atateks.

9              Q.    Are there any other names you can read

10     in the handwriting and recognize, other than

11     Orma, Synko, Basul, and Atateks?

12             A.    No, none that I can see.

13             Q.    Basul was not a manufacturer of goods,

14     right?

15             A.    That's correct.  They were not a

16     factory.

17             Q.    Correct.

18                 On Page 87, it simply refers to Basul,

19     and it doesn't refer to a manufacturer.  Can you

20     explain why that would be the case?

21             A.    Where specifically?  I do see where it

22     says factory FTY with a question mark.

23             Q.    Below though, Basul 81.

24             A.    Yes, and I believe that where it states

25     Basul factory, question mark, it's referring to

PIROZZI & HILLMAN
212-213-5858

106

1                          C. Dente

2      all the Basul underneath there.

3              Q.    So does that mean that you know it's

4      Basul, but you're not able to identify from this

5      which factory that is; is that right?

6              A.    Perhaps at this moment when they were

7      going through it, and then they had to go back

8      and cross reference it to documents, as I'm

9      suggesting you can do the same.

Page 97

ATA 05 29 08

10      Q.      Did Private Label ever transfer any

11   money to Second Skin?

12      A.      My salary was paid to Second Skin.

13      Q.      Did you also draw at the same time a

14   salary from Private Label?

15      A.      No.

16      Q.      Other than commissions that Second Skin

17   received from Atateks, Orma, and Synko, did

18   Second Skin ever receive any payments for goods

19   that were manufactured for Private Label?

20          MR. BYLER:  Objection to the form.  Go

21      ahead.

22      A.      Absolutely not.  There is no purchase

23   orders in the name of Second Skin.  Second Skin

24   did not purchase any goods whatsoever.

25          I'm going to state again, they are --


PIROZZI & HILLMAN
212-213-5858


                                                107
1                   C. Dente

2   they were a consulting based company.

3          MR. GRANNIS:  I'm going to show the

4      witness Plaintiffs' Exhibit 514, not bearing

5      any Bates labels.

6          For the record, these were documents

7      produced by plaintiffs, just for the record,

8      we did produce those with a Bates label, but

9      it seems that we have inadvertently printed

10      out one lacking the Bates label.

11          We're happy to subsequently identify

Page 98

ATA 05 29 08

12    the Bates numbers that apply to this

13    document.

14            MR. BYLER:  Okay.

15            (Plaintiffs' Exhibit 514, Document,

16    marked for identification.)

17    Q.    Does this document relate to the

18    commissions that were paid to Second Skin which

19    we have talked about in this deposition?

20    A.    Stating again that the only moneys that

21    were received from Atateks were for commissions,

22    that in order for us to, you know, have the

23    ability to cross reference these to what's

24    attached to the back, but again, stating for the

25    record the only money that was received from

PIROZZI & HILLMAN
212-213-5858

108

C. Dente

1

2    Atateks was for commissions.

3            I also would like to ask that -- I

4    believe when you presented these documents during

5    the first deposition with Ilhan, that we were

6    told they were irrelevant, because you were

7    backing out the commission payments from the

8    moneys that you're claiming.

9    Q.    Right.  These documents don't relate to

10    the total quantum of damages which are owed by

11    Private Label.  That is true, and we acknowledge

12    that.

13    A.    Okay.

14    Q.    However, they do go to the issue of

Page 99

ATA 05 29 08

15    possible fraudulent conveyances from Private

16    Label to Second Skin, and obviously if you want

17    to ask your lawyer about that, you can do that,

18    but just for the record, we're saying that.

19         MR. BYLER:  I think there's a

20         limitation on what you can try to do given

21         your representations to Judge Baer.  We

22         won't get into that now.

23         By the way, it's almost one o'clock.

24    What's your timing?

25         MR. GRANNIS:  I never make commitments

PIROZZI & HILLMAN
212-213-5858

109

1                    C. Dente

2    with respect to time, but I will make a

3    disclosure, which is that I have about an

4    eleven-page outline, and I am seven pages

5    through it, which if this reflects reality,

6    suggests that I'm more than half way done.

7         Would you like to take a lunch break

8    now?

9         THE WITNESS:  I would prefer to go

10    straight through.  I don't know.  I don't

11    want to make that decision though for

12    everybody.

13         MR. GRANNIS:  Off the record.

14         (Luncheon recess)

15

16

ATA 05 29 08

17

18

19

20

21

22

23

24

25

PIROZZI & HILLMAN
212-213-5858

110

1                          C. Dente

2                  AFTERNOON SESSION

3                      1:33 p.m.

4    CHRISTINE ANN DENTE,

5       resumed and testified as follows:

6    EXAMINATION CONTINUED

7    BY MR. GRANNIS:

8        Q.    I'm going to show you what has

9    previously been marked as exhibit -- as

10   Defendant's Exhibit 10, and I am remarking it as

11   Plaintiffs' Exhibit 515, Bates No. D 11262.

12              (Plaintiffs' Exhibit 515, Document

13       Bearing Bates Nos. D 11262 marked for

14       identification.)

15       Q.    And I'll ask you if you recognize this

16   document.

17       A.    I do.

18       Q.    What is that?

19       A.    It's a letter written by Atateks
                          Page 101

ATA 05 29 08

20    confirming that a payment of $150,000 was made to

21    me for commission income.

22        Q.    When you say to you, you mean more

23    technically to Second Skin?

24        A.    Yes, that is correct.

25        Q.    How did that letter come to be written?

PIROZZI & HILLMAN
212-213-5858

111

1                    C. Dente

2    Do you know?

3        A.    Yes.  I had requested it because I used

4    a portion of the money that I made in commission

5    to purchase an apartment here in New York, and in

6    order to identify where certain funds came from

7    for the mortgage company, they requested a

8    letter.

9            MR. GRANNIS:  I'm handing Ms. Dente

10        Plaintiffs' Exhibit 516, which is a tax

11        return for Private Label for 2003.

12            (Plaintiffs' Exhibit 516, Tax Return,

13        marked for identification.)

14        Q.    Do you recognize this document, Ms.

15    Dente?

16        A.    Yes, I do.

17        Q.    What is that?

18        A.    It's a 2003 tax return for Private

19    Label Sourcing.

20        Q.    I'll direct your attention to the

21    fourth page of this document, which says at the

Page 102

ATA 05 29 08

22    top, "Analysis of net income."

23         Do you see that?

24    A.    Yes.

25    Q.    Do you see that line that says total

PIROZZI & HILLMAN
212-213-5858

112

1                   C. Dente

2    assets there, Line 14?

3    A.    Yes.

4    Q.    That suggests that at the end of the

5    year 2003, Private Label had total assets of

6    1,634,000.

7    A.    Okay.

8    Q.    Would you agree with that?

9    A.    Which year?  I'm sorry.

10   Q.    The end of 2003.

11   A.    Okay.  Yes, I would agree that's what

12   it says here.

13   Q.    Would you agree that's true?

14   A.    I would agree that's what it says here.

15   Q.    Would you agree that's true?

16   A.    I would have to assume so.

17   Q.    By the way, it says here on Line 18,

18   "All nonrecourse loans," and it says, 1,752,201.

19   What does that refer to?  What loans are those?

20   A.    I have no idea.  I would have to go

21   back and cross reference records and documents.

22         As I stated earlier in my testimony

23   that during my partnership with Bruce Allen, he

24   handled the financials of the company, not --
                    Page 103

ATA 05 29 08

25      they were not reviewed with me, and I handled the

PIROZZI & HILLMAN
212-213-5858

113

1                              C. Dente

2      sales, merchandising, and production.

3          Q.    You see that recourse loans is listed

4      under liabilities and capital, right?

5          A.    Okay.

6          Q.    And you understand here that this is a

7      liability, that Private Label has this loan?

8          A.    Yes, yes.

9          Q.    Do you see that the amount of the

10     liability is greater than the amount of the

11     assets?

12         A.    Yes.

13         Q.    We usually refer to that as insolvency,

14     meaning that the liabilities are greater than the

15     assets.

16              MR. BYLER:  Objection.  You're starting

17          to ask legal questions, using a legal term

18          of insolvency.

19              This is one tax return.  You can ask

20          this witness about her personal knowledge

21          concerning this document, but, I mean, I

22          think you are going to get into a bar review

23          type examination that's not appropriate for

24          the deposition.

25         Q.    Do you have any reason to believe that

Page 104

114

1                              C. Dente

2      -- do you have any reason the disagree with the

3      statement that the liabilities exceeded the

4      assets?

5           A.     I don't have any reason to disagree

6      with the numbers that you are quoting off the

7      document in front of me.  I would --

8           Q.     Do you have any belief as to whether

9      Private Label was insolvent or solvent?

10          A.     I really -- I couldn't make any comment

11     towards that.  I'd have to have the opportunity

12     to review this and review other documents within

13     the company, and this was prepared by an outside

14     accounting firm, Mahoney Cohen, and Bruce was in

15     control of dealing with them and providing them

16     all the documentation to put this tax return

17     together.

18               MR. GRANNIS:  I'm showing the witness

19          Plaintiffs' Exhibit 517, which is a 2004 tax

20          return for Private Label with Bates Nos.

21          1321 to 1346.

22               (Plaintiffs' Exhibit 517, 2004 Tax

23          Return, marked for identification.)

24          Q.     What is this document?

25          A.     It's a Private Label tax return from

ATA 05 29 08

115

1              C. Dente

2    2004.

3         Q.    I'll again direct your attention to the

4    fourth page.  You'll notice here that it says on

5    Line 18 -- says "All Nonrecourse Loans."

6         A.    Yes.

7         Q.    2,583,000.  You again don't have any

8    knowledge as to the nature of that loan?

9         A.    That's correct.

10        Q.    You again don't have any views as to

11   whether or not Private Label was insolvent as of

12   this date?

13        A.    I don't have any views.

14        Q.    Just as not to take any time up, you'd

15   give the same answer if I asked you about 2005

16   and 2006?

17        A.    That is correct.

18        MR. GRANNIS:  I'm going to show the

19   witness Plaintiffs' Exhibit 518, bearing

20   Bates No. 1359 to 1383.

21        (Plaintiffs' Exhibit 518, Documents

22   Bearing Bates Nos. 1359 through 1383 marked

23   for identification.)

24        Q.    Can you tell me what that document is,

25   Ms. Dente?


PIROZZI & HILLMAN
212-213-5858

0

116

1              C. Dente

2         A.    2005 Private Label tax return.

Page 106

ATA 05 29 08

3    MR. BYLER: Do you have a 2005 tax

4    return?

5         MR. GRANNIS:  I'm not going to ask

6    questions about that.  I just wanted to

7    identify it.

8         I'm going to show the witness

9    Plaintiffs' Exhibit 519, bearing Bates Nos.

10   1384 to 1393.

11        (Plaintiffs' Exhibit 519, Documents

12   Bearing Bates Nos. 1384 through 1393 marked

13   for identification.)

14   Q.    What is this document?

15   A.    Private Label tax return from 2006.

16   Q.    Did you notice here that it says, "All

17   nonrecourse loans"?

18   A.    Where are we referring to?

19   Q.    This is Line 18 of Page 4.

20   A.    Yes.

21   Q.    You'll notice that on the right column

22   D it doesn't show anything.  Do you see?

23   A.    Yes.

24   Q.    On Line 18?

25   A.    Yes.

PIROZZI & HILLMAN
212-213-5858

117

1              C. Dente

2    Q.    I'll represent to you for the record

3    that this means that the beginning of the year

4    there was a loan outstanding, and at the end of

5    year there wasn't, and if I asked you how that

Page 107

ATA 05 29 08

6      loan came to be paid off, would you have any

7      information about that?

8          A.    I would have to see specific documents

9      and have to cross reference which loans we are

10     talking about and --

11         Q.    Who would know more about this than

12     you?

13         A.    Who would know more about this than me?

14         Q.    Right.

15         A.    Well, I would have to first say perhaps

16     Bruce Allen, because he had still been my

17     partner, and again, I told you he was in control

18     of the financial side of the business and

19     handling all the documents that would have been

20     given to the accountants to prepare the tax

21     return.

22         Q.    Do you see that on Page 1387, the same

23     page we were just looking at, for accounts

24     payable, it says 3,243,000?

25         A.    Accounts payable is a specific --


PIROZZI & HILLMAN
212-213-5858


118

                          C. Dente

1

2          Q.    I'm sorry.  Do you see it says on Line

3      15 accounts payable?

4          A.    Yes.

5          Q.    You understand that?  What are accounts

6      payable?

7          A.    Moneys that are owed.

Page 108

ATA 05 29 08

8      Q.     Owed by Private Label to another party?

9      A.     Correct.

10     Q.     Do you know what's included in this

11     3,243,000?

12     A.     For any of the figures that are located

13     in this document, 2006 tax return, I would have

14     to go back and have the opportunity to cross

15     reference other documents to how it was prepared.

16     MR. GRANNIS:  I would ask that the defendants

17     produce underlying work papers to establish how

18     this figure of 3,243,381 was arrived at, and in

19     particular, the amount if any of liability that

20     is -- to Atateks that is included in that figure.

21            THE WITNESS:  So to be clear, you only

22     want to know the details if Atateks is included

23     in that number.

24            MR. GRANNIS:  I'd like to know all of

25            them, but also interested particularly in

PIROZZI & HILLMAN
212-213-5858

119
1                      C. Dente

2      Atateks.

3      Q.     Ms. Dente, I've reviewed the tax return

4      and I'll tell you what I found, which is that in

5      2003 and 2004 Private Label had substantial

6      profits, okay.

7             2003 was 740,000, and 2004 was 308.

8      Then in 2005 and 2006, it had substantial losses

9      in each of those years.  It was in the range of

10     $700,000.

Page 109

ATA 05 29 08

11        Can you tell me why Private Label

12   became unprofitable?

13        A.     Yes.  We had some major shipping

14   problems, both out of Turkey, production problems

15   I should say, which led to shipping problems, the

16   majority of them in Turkey.  Had to give a ratio,

17   70 percent of the problems occurred in Turkey, 30

18   percent happened in Korea.

19        So there was an overall delay in

20   shipping goods, which led to cancellations,

21   sell-offs and things of that sort.

22        Q.     Did the delays in Turkey only involve

23   Atateks?

24        A.     No, at that particular time it actually

25   didn't involve Atateks at all.

PIROZZI & HILLMAN
212-213-5858

120

1                  C. Dente

2        Q.     What did it involve?

3        A.     It involved other factories in Turkey.

4        Q.     Which?

5        A.     For different type product.

6        Q.     What were those factories?

7        A.     I would have to get the names for you.

8   Totally unrelated to seamless product.

9        Q.     Were there any other causes of the

10   delays?

11        A.     I'm sorry?

12        Q.     Were there any particular causes of the

Page 110

ATA 05 29 08

13    delays?

14         A.    I think just general mismanagement of

15    production on the factory -- at the factory

16    level, but yes, in fact you are correct that was

17    a very difficult year for us.

18         Q.    2005 and 2006 was also unprofitable.

19         A.    It was very difficult.  We had to start

20    to work our way back from the problems of 2005.

21         Q.    Did Atateks ever deliver garments to

22    Basul's warehouse?

23         A.    Basul didn't have a warehouse.  Basul

24    for the record never took possession of any

25    goods.

PIROZZI & HILLMAN
212-213-5858

121

C. Dente

1

2         Q.    Did Private Label have a warehouse in

3    Turkey?

4         A.    No, they did not.

5         Q.    Second Skin never had a warehouse in --

6         A.    No, Second Skin never purchased any

7    product.

8         Q.    Did Atateks ever deliver goods to a

9    warehouse in Turkey for Private Label?

10        A.    Atateks shipped goods two ways, as I

11    previously mentioned in my testimony.  On a

12    direct LC basis, when LC was opened from Target,

13    those goods were delivered to Target's forwarder.

14    When goods were shipped to our warehouse, we

15    determined the forwarder that was going to be

Page 111

ATA 05 29 08

16    used, and the goods were shipped to a warehouse

17    in Miami.

18         Q.    What is AQL?

19         A.    AQL is a certain rating system of

20    industry standard by which goods are evaluated

21    for quality.

22         Q.    Can you expand on that, please?

23         A.    I don't know enough about -- that's not

24    my area of expertise.  I just know that there is

25    an industry standard that is used when inspecting

122

1                    C. Dente

2    goods for quality, and there's a certain method

3    in which the goods are inspected, certain amount

4    of goods that are inspected to ascertain if the

5    goods are 100 percent good quality to be shipped.

6              It's an industry standard for all

7    retailers.

8         Q.    Suppose that there is a proposed

9    shipment of goods, a collection of goods to be

10    shipped, which is inspected, and it contains

11    10,000 garments.

12         A.    All the same style?

13         Q.    All the same style.  Could that

14    shipment meet AQL standards if a single defect

15    was found?

16         A.    I don't know.  That's not my area of

17    expertise, I don't really know the rating system.

Page 112

ATA 05 29 08

18   I would not know even how to explain it to you

19   other than the general understanding that I tried

20   to give you as it's an industry standard that's

21   set, and any inspection services, any -- whether

22   they're independent or working for the retailer,

23   work off the same exact guidelines.

24        Q.    Would you agree that under the AQL

25   standard, there can be some defects in

PIROZZI & HILLMAN
212-213-5858

123

1                          C. Dente

2    merchandise in some number of items, and yet it

3    could still meet an AQL standard?

4        A.    I think what you're trying to say is

5    you're asking me is -- is there a difference

6    between the AQL standards versus goods that I

7    would believe to be commercially acceptable,

8    commercially acceptable for sale?

9             Because neither one of us would really

10   determine.  It really -- it's not -- it's a very

11   objective approach.  There's no -- there's no

12   room for opinion.  So there's a standard, certain

13   amount of garments are chosen, reviewed, and then

14   a report is done, and it's based on a whole, you

15   know, AQL standard.

16       Q.    I'm not trying to press you to --

17       A.    Okay, I -- just so you -- you can

18   understand that I couldn't answer that question,

19   you couldn't answer that question.

20             It is not a subjective question when
                          Page 113

ATA 05 29 08

21    inspection is being done.  There is, though, the

22    -- you can say subjectively would I believe them

23    to be commercially acceptable, does the average

24    consumer understand what you're talking about,

25    the AQL.  Would they wear the garment?  In

124

1                        C. Dente

2    layman's terms, would they still wear the

3    garment?  Is it commercially acceptable?

4        Q.    What I was saying is -- I'm not at all

5    -- I'm trying to find out how much you know about

6    AQL, and I'm not trying to put words in your

7    mouth.  Let me try one more time, and if you

8    don't know, you don't know.

9        A.    Okay.

10       Q.    Do you know whether the AQL standards

11   permit approval of shipments of goods, even if

12   there are some defects found, if the defects are

13   found on sufficiently few garments?

14       A.    Okay.  I'll try and answer for you one

15   more time.

16             With the AQL is a standard, so it would

17   not allow or disallow goods to be shipped.

18   That's really of the ultimate decision of the

19   retailer, the factory, and the vendor to make

20   that determination.

21       Q.    But a good isn't -- isn't a shipment of

22   goods determined to either not or to meet or not

Page 114

ATA 05 29 08

23    meet an AQL standard?

24         A.    That's correct.

25         Q.    Couldn't a shipment of goods be

PIROZZI & HILLMAN
212-213-5858

125

1                          C. Dente

2    determined to meet an AQL standard, even if there

3    might be some defects found, if the defects were

4    found on sufficiently few garments?

5         A.    Then it would be meeting AQL standard,

6    and it would be -- they would sign the inspection

7    certificate to allow the goods to ship.

8              Again, I don't know if I'm answering or

9    not.  That's not my area of expertise.

10             (Plaintiffs' Exhibit 520, Collection of

11    Documents, marked for identification.)

12        Q.    Ms. Dente, I'm going to give you a

13    collection of documents that has been labeled

14    Plaintiffs' Exhibit 520, and the first page of

15    this document is something I produced previously,

16    but we have modified again.  You have seen it

17    before, and it is our current calculation of what

18    we believe -- we meaning the plaintiffs believe.

19             We have eliminated the commissions to

20    you, although it's just subject to the statement

21    I made before about we believe they are

22    fraudulent transfers, but that's really just for

23    the record.  I'm not asking you about it.

24             So I've put -- so this now has been

25    revised.  I put a date on it, and it's not --
                        Page 115

ATA 05 29 08

PIROZZI & HILLMAN
212-213-5858

126

1                    C. Dente

2    actually this document, which my office prepared

3    in conjunction with the client is actually the

4    first four pages, okay?  Now, behind it is all of

5    the receipts.  I'm sorry.

6                This is all of the invoices, bills of

7    lading, airway bills, for goods we, the

8    plaintiffs, manufactured and sold to Target

9    through Private Label from December 15, 2005, on.

10   Okay?

11       A.    Can I go back and just comment that you

12   made as far as the commission payments that are

13   backed out of here because you believe them to be

14   fraudulently transferred.  I -- just again I want

15   to just comment that I'm not quite sure where

16   you're going and stating that for the record,

17   because they were commission payments made to

18   Second Skin, not made to Private Label, so

19   nothing was transferred from Private Label to

20   Second Skin.

21       Q.    I understand, and I wouldn't have taken

22   your silence to be any concession.  I understand

23   that.

24       A.    Okay.

25       Q.    Do you disagree with any of the

ATA 05 29 08

127

1                    C. Dente
2    invoices contained in here or --
3        A.    What I disagree --
4              MR. BYLER:  Hold on.  I object to the
5        line of the questioning.
6              We just got handed a page -- an inch
7        thick, a lot of documents.  The first four
8        pages are what you have compiled.  There are
9        other documents which you're representing to
10       support.
11             To be asking in a deposition well, do
12       you disagree with anything, I think is a
13       fundamentally flawed question.
14             I mean, it's unfair to the witness,
15       because, you know, you're representing while
16       these correlate -- there was four years of
17       business that was done by the two companies,
18       and it would take time really to, you know,
19       check what's been clipped to the first four
20       pages to see if it correlates, not to
21       mention whether it is complete or
22       incomplete.  In other ways.
23             We've been going through a lot of
24       different documents concerning chargebacks
25       and the like, so I have to state for the

128

1                    C. Dente
                     Page 117

ATA 05 29 08

2    record the objection to this approach to

3    questioning the witness.

4         You're asking this witness her personal

5    knowledge of.  That's the purpose of

6    deposition, but what you handed her is

7    basically a representation on your part of

8    what really amounts to a legal case on your

9    part, and I don't think that's, you know, a

10   way of going at this that's appropriate for

11   a deposition.

12       MR. GRANNIS:  I'm always amenable to

13   help with suggestions.

14       Do you have a method you would prefer

15   to have that question answered?

16       THE WITNESS:  I have an opinion.

17       MR. BYLER:  The witness has an opinion.

18       THE WITNESS:  I have an opinion,

19   because we believe -- and again I don't know

20   if these are reflective of the exact

21   documents we reviewed previous to the first

22   deposition of Ilhan, but we don't agree with

23   your approach to your accounting, because we

24   did business on a purchase order basis, so

25   you would really have to cross reference all

129

1              C. Dente

2    of the purchase orders back to what you're

3    considering invoices.

ATA 05 29 08

4      Then we would have to take it on a

5  case-by-case basis, because there are

6  counterclaims being helped against those

7  purchase orders, so it's almost impossible

8  for us to reconcile this.

9      Q.    Do you have your own reconciliation of

10  how much you owed to our client?

11      MR. BYLER:  I thought there was a

12  presentation to Atateks in --

13      THE WITNESS:  And Ilhan.

14      MR. BYLER:  And Ilhan, but that may

15  have occurred, come to think of it, before

16  you, Eric, were counsel to Atateks in this

17  case.

18      There was such an effort, and it did

19  reflect a different methodology.  I would

20  call this a macro approach.

21      What the witness just now -- I'm glad

22  she spoke, not me, but said is -- you have

23  to do it by purchase order because it was a

24  purchase order business.  There wasn't any

25  large master contract.  It was a purchase

130

1          C. Dente

2  order business, so to do an accounting of

3  damages, which is what you're getting at,

4  you have to go by purchase order and then

5  start to, you know, look at each purchase

6  order in terms of what may have been

Page 119

ATA 05 29 08

7    chargebacks, what may have been, you know,

8    accounts, whatever, and that's the approach

9    you have to take in terms of doing

10    accounting for damages.

11        MR. GRANNIS:  Off the record.

12        (Discussion off the record.)

13        MR. BYLER:  All I was going to say, we

14    don't agree with the approach you've taken

15    reflected in Plaintiffs' Exhibit 520, and

16    that's, you know, the explanation I gave in

17    response to your document.

18        We have had an off the record

19    discussion in terms of how we can deal with

20    the issue of damages more productively,

21    which I think was a good discussion.

22  MR. GRANNIS:  I will state for the record that

23  obviously parties disagree in litigation.  I

24  understand that the deposition format may not be

25  a format in which Private Label wishes to explain

PIROZZI & HILLMAN
212-213-5858

131

1        C. Dente

2    its position with respect to the accounting.

3        I, therefore, would request that

4    Private Label set forth its own accounting.  As

5    we know, this case, if we can't resolve it, is

6    going to result in a trial before Judge Baer.

7        I'm sure Judge Baer would want us in

8    the course of discovery to exchange our

Page 120

ATA 05 29 08

9    respective positions in advance of the trial so

10   that we know where we differ, and I hope that we

11   we'll be able to get Private Label's concrete

12   position with respect to its accounting,

13   including the backup documentation.

14        MR. BYLER:  The only further comment is

15        there was a settlement conference where

16        Private Label did make a presentation,

17        understanding you don't have it, but I just

18        say that for the record to indicate only

19        that it's not that Private Label is trying

20        to hide the ball.

21        It's just that we're not prepared today

22        to present that to you, because you know,

23        you --

24        THE WITNESS:  We thought you had it.

25        MR. GRANNIS:  I would note that whether

PIROZZI & HILLMAN
212-213-5858

132

1                    C. Dente

2    or not we have it, documents exchanged in

3    settlement are for settlement purposes only,

4    and I think I would have been inappropriate

5    for me to question the witness about --

6        MR. BYLER:  I'm not saying it was

7    inappropriate for you to raise the question.

8    It's just I wanted to indicate there was

9    something done by Private Label, and yes it

10   was for settlement.

11        On the other hand, it did reflect the

                    Page 121

ATA 05 29 08

12      methodology in terms of the approach we

13      believe appropriate.

14          Q.    Back to the questioning on a new topic.

15              When did you last speak with Bahar?

16          A.    I'm not quite sure of her exact

17      departure from Atateks, but it was somewhere --

18      my last interactions with her were somewhere

19      between December of 2006 to April 2007.

20              I couldn't exactly pinpoint exactly

21      when she departed from Atateks, and when she

22      departed from Atateks I had no further contact

23      with her.

24          Q.    Have you had any contact with her in

25      any form, either directly or indirectly, in the

133

                        C. Dente

1      last couple of weeks?

2          A.    Indirectly through attorneys.

3          Q.    Through which attorneys?

4          A.    Through my attorneys.

5          Q.    They contacted her?

6          A.    We contacted Basul, who in turn

7      contacted Bahar.

8          Q.    What does Bahar do now for employment?

9  Do you know?

10         A.    No.  You would have to question Bahar

11     about that.

12         Q.    Does that mean you don't know?

ATA 05 29 08

14        A.    I don't know.

15        Q.    What meetings have you had with Ihsan?

16        A.    I've had multiple meetings with Ihsan.

17        Q.    How many meetings approximately?

18        A.    I couldn't even venture to guess.

19    Many, many occasions.  On three very major

20    occasions that I can think of is when I flew from

21    New York and met upper management of Target and

22    brought them to Ihsan's factories.

23        Q.    What was the purpose of bringing them

24    to Ihsan's factories?

25        A.    To show them the factories, establish a

PIROZZI & HILLMAN
212-213-5858

134

1                    C. Dente

2    relationship, help plan and grow business going

3    forward, business relationships going forward to

4    kind of seal the bond.  There were higher level

5    meetings.

6        Q.    Did you ever discuss with him the

7    details in particular amounts owed or invoices,

8    other than any recent settlement agreement that

9    occurred, settlement meetings that occurred?

10        A.    Yeah, he called me on several

11    occasions.  He e-mailed me directly.

12        Q.    Tell me what you generally recall about

13    the substance of those communications.

14        A.    It was specific to when are we going

15    the get our money.

16        Q.    Did he make any admission that your
                    Page 123

ATA 05 29 08

17    chargebacks were correct?

18         A.    Ihsan on -- any time in trying to

19    discuss chargebacks or overall problems with him,

20    he would be very defensive.  He never felt his

21    factory was at fault.  He blamed Basul, he blamed

22    Target, he blamed Private Label.

23              He didn't want to get involved in

24    details, specific details of numbers, and he did

25    not want to acknowledge why there was a delay in

PIROZZI & HILLMAN
212-213-5858

135

1                    C. Dente

2    paying them due to all the problems that occurred

3    specifically out of Jordan.

4         Q.    What were the problems out of Jordan?

5         A.    There were major, major production

6    problems and, you know, the cause for those

7    production problems, according to Atateks, is a

8    very gray area.  They claim it was the war.

9              If you read the articles from the

10   National Labor Committee, they claim that there

11   was tremendous upheaval in the Atateks factory,

12   workers being abused.

13             When Target went in and inspected the

14   factories themselves and audited the factories,

15   they found payroll were incomplete.  People not

16   being paid for overtime.  They did not have

17   proper sleeping conditions, that the overall

18   treatment of the employees was improper.

Page 124

ATA 05 29 08
19     The working conditions were not

20     functional, and Atateks claims it was because

21     they didn't get proper information from Private

22     Label and Basul, so there was conflicting stories

23     all the way around.

24          Q.     Have you had many meetings with Mr.

25     Duman, Alp Duman?

PIROZZI & HILLMAN
212-213-5858

136
1                         C. Dente

2          A.     No.

3               MR. GRANNIS:  Off the record.

4               (Recess taken.)

5               MR. GRANNIS:  Ms. Dente, I think you

6     indicated you just had something you wanted

7     to add.

8               THE WITNESS:  Yes.  With regard to our

9     discussion of the tax returns, where we're

10     looking at Page 4 and you were referencing

11     accounts payable, you were also referencing

12     assets, liabilities.

13          I just want to be clear that in the

14     business that we do, if we have goods prior

15     to December 31 that are on water that

16     haven't yet arrived, they're entered into

17     your inventory, but not yet paid for, so

18     where you're also looking at loans and

19     things of that sort, that is all tied back

20     to inventory versus invoicing and tied back

21     to payable, so I just wanted to -- that
                    Page 125

ATA 05 29 08

22      information I think you did request, though,

23      and can be clarified with the accountants.

24          MR. GRANNIS:  I have no further

25      questions.  Do you have any questions?


PIROZZI & HILLMAN
212-213-5858

                                                    137

1                       C. Dente

2              (Continued on next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ATA 05 29 08

24

25

PIROZZI & HILLMAN
212-213-5858

[]

138

1                    C. Dente

2        MR. BYLER:  No.

3        (Time noted:  2:40 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ATA 05 29 08

PIROZZI & HILLMAN
212-213-5858

139

1                          C. Dente

2     May 29, 2008

3

4                          ERRATA

5

6     PAGE/LINE CHANGE/REASON

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

PIROZZI & HILLMAN
212-213-5858

ATA 05 29 08

140

1        C. Dente

2

3

4

5

6

7                                    _____

8                                    CHRISTINE ANN DENTE

9

10    Subscribed and sworn to

11    before me this      day

12    of                2008

13    _____

14

15

16

17

18

19

20

21

22

23

24

25

PIROZZI & HILLMAN
212-213-5858

141

1

2              CERTIFICATE
              Page 129

ATA 05 29 08

3

4       STATE OF NEW YORK )

5                        ) ss.

6       COUNTY OF NEW YORK)

7

8              I, Maureen McCormick, a Shorthand

9       Reporter and Notary Public within and for the

10      State of New York, do hereby certify:

11             That CHRISTINE ANN DENTE, the witness

12      whose deposition is hereinbefore set forth, was

13      duly sworn by me and that such deposition is a

14      true record of the testimony given by such

15      witness.

16             I further certify that I am not related

17      to any of the parties to this action by blood or

18      marriage and that I am in no way interested in

19      the outcome of this matter.

20

21

22             _____

23                    MAUREEN MCCORMICK

24

25


                         PIROZZI & HILLMAN
                          212-213-5858


                                                142

1

2       May 29, 2008

3

4                        INDEX

        WITNESS          EXAMINATION BY          PAGE
                           Page 130

ATA 05 29 08

5
6       Christine Dente    Mr. Grannis          3

7
                        EXHIBITS
8                                                    55
        Plaintiffs' Exhibit 501, Declaration
9
        Plaintiffs' Exhibit 502, Commercial        55
10      Invoice
                                                    57
11      Plaintiffs' Exhibit 503, Debit Note
        1580
12                                                  70
        Plaintiffs' Exhibit 504, Documents
13      Bearing Bates Nos. D 590 through D
        600
14                                                  72
        Plaintiffs' Exhibit 505, Documents
15      Bearing Bates Nos. D 548 through 551
                                                    74
16      Plaintiffs' Exhibit 506, Documents
        Bearing Bates Nos. 542 through 545
17                                                  75
        Plaintiffs' Exhibit 507, Documents
18      Bearing Bates Nos. 535 through 539
                                                    77
19      Plaintiffs' Exhibit 508, Documents
        Bearing Bats Nos. 857 through 858
20                                                  86
        Plaintiffs' Exhibit 509, Documents
21      Bearing Bates Nos. 841 through 856
                                                    89
22      Plaintiffs' Exhibit 510, Document
        Bearing Bates Nos. 829 through 838
23                                                  91
        Plaintiffs' Exhibit 511, Documents
24      Bearing Bates Nos. 820 through 822
                                                    94
25      Plaintiffs' Exhibit 512, Documents
        Bearing Bates Nos. 764 through 784


                        PIROZZI & HILLMAN
                          212-213-5858



                                                        143

1

2

3       May 29, 2008

4
                        INDEX (Continued)
5

6       Plaintiffs' Exhibit 513, Documents        100
        Bearing Bates Nos. 79 through 89
7                                                  107
                        Page 131

ATA 05 29 08

| | | |
|---|---|---|
| 8 | Plaintiffs' Exhibit 514, Document | 110 |
| 9 | Plaintiffs' Exhibit 515, Document Bearing Bates Nos. D 11262 | 111 |
| 10 | Plaintiffs' Exhibit 516, Tax Return | 114 |
| 11 | Plaintiffs' Exhibit 517, 2004 Tax Return | |
| 12 | | 115 |
| 13 | Plaintiffs' Exhibit 518, Documents Bearing Bates Nos. 1359 through 1383 | 116 |
| 14 | Plaintiffs' Exhibit 519, Documents Bearing Bates Nos. 1384 through 1393 | |
| 15 | | 125 |
| 16 | Plaintiffs' Exhibit 520, Collection of Documents | |
| 17 | | |
| 18 | REQUESTS:  16, 27, 28, 45, 81, 103, 104, 118, 130 | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

PIROZZI & HILLMAN
212-213-5858