UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ATATEKS FOREIGN TRADE LTD, JORDAN
AND ATATEKS DIS TICARET A.S.,

                         Plaintiffs,

            v.                              Index No.  07 Civ. 6665 (HB)

PRIVATE LABEL SOURCING, LLC
AND SECOND SKIN, LLC,

                         Defendants.

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO SUMMARY JUDGMENT**

LAW OFFICES OF ERIC J. GRANNIS

620 Fifth Avenue
New York, New York 10020
(212) 903-1025

Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

    Plaintiffs ................................................................................................................ 2

    Private Label ......................................................................................................... 2

    The Second Skin Kickback Scheme ...................................................................... 3

    Private Label's Insolvency .................................................................................... 8

    Ms. Dente's Credibility ...................................................................................... 10

ARGUMENT .......................................................................................................... 10

I.     There is ample Evidence that Second  Skin and Private Label are Alter Egos. ............... 10

    A.    Second Skin Dominated Private Label. ...................................................... 11

        1.    The Existence of Corporate Formalities. ............................................ 12

        2.    Overlap in Ownership, Directors, and Personnel. .............................. 12

        3.    Inadequate Capitalization. .................................................................. 13

        4.    Common Office Space, Address, and Telephone Numbers. ................ 13

        5.    Lack of Arms Length Dealings. .......................................................... 13

        6.    Whether the Corporations are Treated as Independent Profit Centers. ................ 13

        7.    The Amount of Business Discretion Displayed by the Allegedly Dominated Corporation. .................................................................... 14

        8.    Siphoning Off Funds. ......................................................................... 14

    B.    A Wrong was Committed Against Third Parties. ....................................... 14

    C.    Equitable and Policy Reasons Favor Application of the Alter Ego Doctrine. ............ 16

    D.    There Is Sufficient Evidence to Create a Material Issue of Fact on the Alter Ego Issue. ................................................................................... 17

II.    BREACH Of CONTRACT and Accounts Stated Claim. ................................. 18

III.    Quantum Meruit AND  UNJUST ENRICHMENT ClaimS. ............................................ 19

IV.    FRAUDULENT CONVEYANCE CLAIMS.................................................................. 19

   A.    New York Debtor Creditor Law § 276: Conveyances Made With Actual Intent
         to Defraud............................................................................................................... 19

   B.    New York Debtor Creditor Law § 273: Conveyances Made While Insolvent. .......... 21

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Austin Powder Co. v. McCullough*, 628 N.Y.S.2d 855 (3d Dept. 1995) ................................................14

*Balmer v. 1716 Realty, LLC*,2008 WL 2047888 (E.D.N.Y. 2008) ...................................................12, 15

*Coastal States Trading, Inc. v. Zenith Nav. S. A.*, 446 F. Supp. 330 (S.D.N.Y. 1977) ....................17, 18

*Cobre de Chile v. Orrego Hirsch*, 242 A.D.2d 183, 673 N.Y.S.2d 681 (1st Dept. 1998) .....................19

*Feist v. Druckerman*, 70 F.2d 333 (2d Cir. 1934) .................................................................................21

*Golden Budha Corp. v. Canadian Land Co. of America*, 931 F.2d 196 (2d Cir. 1991) ........................20

*Hassett v. Goetzmann*, 10 F. Supp. 2d 181 (N.D.N.Y. 1998) ................................................................19

*Hopfan v. Knauth*, 156 Misc. 545 (N.Y. Municipal Court 1935) ..........................................................21

*In Matter of Mediators, Inc.*, 1996 WL 297086 (S.D.N.Y. 1996) .........................................................18

*In re Corcoran*, 246 B.R. 152 (E.D.N.Y. 2000)...................................................................................21

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032 (2d Cir. 1984)...........20

*In re Kaiser*, 722 F.2d 1574 (2d Cir. 1983).........................................................................................20

*In re Nirvana Restaurant Inc.*, 337 B.R. 495 (Bkrtcy. S.D.N.Y. 2006)................................................21

*IItel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698 (2d Cir. 1990) .....................11

*Mobius Management Systems, Inc. v. Technologic Software Concepts, Inc.*, 2002 WL 31106409
   (S.D.N.Y. 2002) .................................................................................................................................15

*Morris v. New York State Dept. of Taxation and Finance*, 82 N.Y.2d 135, 603 N.Y.S.2d 807 (1993)..18

*Pereira v. Cogan*, 2001 WL 243537 (S.D.N.Y. 2001) .........................................................................15

*U.S. Barite Corp. v. M.V. Haris*, 534 F. Supp. 328 (S.D.N.Y 1982) ................................................17, 18

*U.S. v. McCombs*, 30 F.3d 310 (2d Cir. 1994) .....................................................................................20

*Variable-Parameter Fixter Development Corp. v. Morpheus Lights Co.*, 1993 WL 335027
   (S.D.N.Y.1993 ) .................................................................................................................................15

*William Wrigley Jr. Co. v. Waters*, 890 F.2d 594 (2d Cir. 1989) ...............................................11, 14, 16

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991) ..................................................................................................................10, 11, 14

## STATUTES

*McKinney's Debtor and Creditor Law § 273* ........................................................................ 21

Plaintiffs respectfully submit this memorandum of law in opposition to the motion of Defendant Second Skin, LLC for summary judgment.

## PRELIMINARY STATEMENT

This case arises out of the failure of Defendant Private Label Sourcing, LLC, a clothing importer, to pay for goods manufactured by Plaintiffs, who are foreign clothing manufacturers. Private Label initially claimed that it was having cash flow difficulties but that it would in time pay its debts to Plaintiffs. These payments, however, never materialized.

At issue on Second Skin's motion is whether it should be held liable to Plaintiffs. Second Skin was founded by Christine Dente, who also founded and runs Private Label. Ms. Dente founded Second Skin so she could divert funds from Private Label. This is not conjecture: Ms. Dente expressly told this to Plaintiffs. In 2005, Ms. Dente wanted to get rid of Bruce Allen, her 50% partner in Private Label. By diverting funds from Private Label to Second Skin, Ms. Dente sought to accomplish two purposes. First, she would assure that any profits accruing would flow exclusively to her rather than be shared with Mr. Allen. Second, by eliminating Private Label's profits, Ms. Dente would make it appear that Private Label was a losing business and thereby cause Mr. Allen to sell on the cheap. She succeeded on both scores: she diverted substantial funds to herself through Second Skin and, in January of 2006, Mr. Allen sold his stake in Private Label for an amount that was less than the single year profits he had earned from the company only two years earlier.

Ms. Dente used several means to divert money from Private Label but the primary one was a kickback scheme. Ms. Dente advised Plaintiffs to inflate their invoices to Private Label to build in a "commission" that would be paid to Second Skin. In other words, if Atateks was willing to sell a garment for $4, it would be instructed to raise the price to $4.10 and turn the extra 10 cents over to Second Skin. This would diminish the profits of Private Label by narrowing the spread between Private Label's purchase and sale prices for goods. The same effect would have been achieved by having Private Label simply write a check out to Second Skin, but in that case a direct paper trail of

transfers between these entities would have been created that Mr. Allen might have discovered by examining Private Label's books. Second Skin engaged in this kickback scheme with at least two other manufacturers in addition to Plaintiffs.

Private Label also diverted to Second Skin some payments for "chargebacks" and subsidized the operations of Second Skin by making office space, equipment, telephone lines and personnel available to Second Skin without charge. The result was predictable: in 2005, Private Label, previously quite profitable, began having substantial losses and became grossly insolvent. Thus, Private Label is unable to pay its liability to Plaintiffs. Given that Private Label's inability to pay its debts was due to this diversion of funds by Second Skin, it is only just that Second Skin be held liable for this debt, and the law fully supports this outcome.

Second Skin protests that Private Label is actually in fine financial condition. Private Label's true financial condition, however, is demonstrated by its tax returns and is reflected in Ms. Dente's conduct. Ms. Dente fully controls both Private Label and Second Skin. If Private Label has sufficient resources to pay a judgment, then Second Skin's joint liability will be a moot issue. The fact that Ms. Dente has spent considerable resources to get Second Skin out of this case, both on this motion and on a prior motion to dismiss, can only be explained by the fact that she knows full well that there will be a collection issue with respect to Private Label.

## STATEMENT OF FACTS

*Plaintiffs*

Plaintiffs (collectively referred to as "Atateks" herein) are related entities that manufacture clothing including seamless ladies' undergarments.

*Private Label*

Private Label is a clothing importer that Christine Dente founded in 2001 along with Bruce Allen; each held a 50% ownership interest. Deposition of Christine Dente, dated May 29, 2008, at 6-8 ("Dente Dep.," attached as Exhibit F to the Declaration of Eric J. Grannis ("Grannis Decl.")).

Ms. Dente is an employee who receives W-2 income from Private Label and also derives a profit through her ownership interest. *Id.* at 10; Grannis Decl. Exs. A-D. In January 2006, Mr. Allen sold his 50% interest in Private Label to Jetwell Garments. Dente Dep. at 10.

Beginning in 2002, Private Label started arranging for the sale of goods from Atateks to Target Corporation, the U.S. retail chain. *Id.* at 22. Private Label would either purchase goods from Atateks and sell them to Target, pocketing a price differential in the process, or would broker a direct sale from Atateks to Target and then receive payment from the funds remitted by Target to Atateks. *Id.* at 37.

Beginning in 2006, Private Label began having difficulties paying for goods it had purchased from Atateks. Private Label claimed that it was only having cash flow issues, that its finances were fundamentally sound, and that it would soon pay. Arslan Decl. Ex. A. These payments, however, never materialized.

*The Second Skin Kickback Scheme*

In July of 2005, Ms. Dente formed Second Skin. She was and remains its sole owner. Dente Dep. at 17. Ms. Dente was Second Skin's sole employee until sometime in the second half of 2007 when Nilda Corchado, a longtime employee of Private Label, stopped working for Private Label and became an employee of Second Skin. *Id.* at 18.

Second Skin was created for one purpose: to permit Ms. Dente to divert funds and corporate opportunities from Private Label to Second Skin and thereby ditch her partner Bruce Allen. Beginning in the second half of 2005, Ms. Dente began to request that "commissions" be paid to her through Second Skin with respect to transactions in which Private Label purchased goods from Atateks. *Id.* at 17; Arslan Dep. at 3. Diverting profits from Private Label to Second Skin meant that the profits ended up in an entity of which Ms. Dente was a 100% owner rather than a partial owner. Private Label had been doing business with Atateks since 2002 but Ms. Dente had never previously asked for these side payments with respect to these transactions. Dente Dep. at 22; Arslan Decl. ¶ 4.

Atateks made these payments not because it was getting any services from Second Skin but simply because Private Label was requiring Atateks to do so. Arslan Decl. ¶ 4.

Ms. Dente was quite frank about her reasons for asking for these kickbacks: to funnel the profits to her and help her get rid of Mr. Allen. Ms. Dente said that Atateks should build Second Skin's commission into its prices – that Atateks should increase the price of the goods it was selling to Private Label and then turn over that price difference to Second Skin as a commission. Arslan Decl. ¶ 3. This would have the effect of diminishing the margin between the price at which Private Label bought goods and the price at which it resold them to Target. This would in turn decrease or eliminate Private Label's profits. Ms. Dente was happy for this to occur because Mr. Allen could then be bought out cheaply. In fact, Mr. Allen came to sell his half interest in January of 2006 for only $300,000 even though just two years earlier his share of the profits from one year alone had exceeded that amount. Grannis Decl. Exs. A, E.

When questioned at her deposition about these payments – which Ms. Dente charitably referred to as "commissions" – she was utterly unable to justify why these funds should have been paid to Second Skin rather than Private Label. Ms. Dente was able to explain at length the work that Private Label did with respect to transactions between Private Label and Atateks, such as helping to develop and price the goods to be manufactured. Dente Dep. at 31-37. However, when she was then asked what work Second Skin did in order to justify the payment of commissions to it, Ms. Dente could not describe a smidgeon of actual work performed by Second Skin. When asked "Did you do any work to earn that commission?" Ms. Dente replied that "My commission was based on my relationships." *Id.* at 38. When pressed further for any "actual work," Ms. Dente responded that she was paid for "my relationship with Atateks, okay, that was established a long time ago." *Id.* Ms. Dente, however, had been developing that relationship for three years in her capacity as an employee of Private Label, which had been doing business with Atateks since 2002. Accordingly, Ms. Dente

was in reality doing nothing more than exploiting her position with Private Label to extract a side payment from Atateks, a Private Label customer. This is a classic kickback scheme.

It also bears observation that until mid-way through 2007, Ms. Dente was the only employee of Second Skin. Thus, it was impossible for Second Skin to provide any services that were separate from those being provided by Private Label: Second Skin's only employee was the head of Private Label who was already working for Private Label on the very same deals with respect to which Second Skin was getting commissions.

Moreover, even if one were to accept the premise of Ms. Dente's theory that she was being paid a "commission" on each garment for her "relationship," the documents demonstrate that the transfers went beyond this. Among the things that Second Skin issued invoices for were "chargebacks" from Target. When Target purchased goods, it would sometimes "charge back" amounts later with respect to various issues, such as defective goods. *Id.* at 46-47. Private Label would incur the chargebacks and would then try to pass them along to Atateks by means of an "invoice" or "debit note." *Id.* at 46. In July of 2006, however, invoices for chargebacks were issued to Atateks by Second Skin. Arslan Decl. ¶ 5 and Exs. B-D. This made utterly no sense. Second Skin never sold goods manufactured by Atateks to Target. Dente Dep. at 24. Only Private Label sold these goods and therefore only it incurred chargebacks. Thus, Second Skin was seeking reimbursement for costs it had not incurred. It was purely a scheme to divert to Second Skin payments owed to Private Label. Moreover, as requested, Atateks made payment to Second Skin on this chargeback. Arslan Decl. ¶ 5. (It bears observation that Second Skin's Rule 56 Statement at paragraph 16 states that "Plaintiffs did not receive any charge-backs from, nor issue any refunds for goods to, Defendant Second Skin." This statement is demonstrably untrue as the Court may determine from a quick examination of the chargebacks at issue. Arslan Decl. Ex. D.)

Ms. Dente has given inconsistent explanations as to why she created Second Skin. In an effort to rebut alter ego allegations in a California lawsuit, Ms. Dente claimed that Second Skin

"was formed to undertake entirely separate business than P[rivate] [L]abel" namely "to work with international manufacturers in Turkey specializing in seamless apparel."  Declaration of Christine Dente dated March 21, 2008 ¶ 7 (Grannis Decl. Ex. F).  This was obviously untrue because "work[ing] with international manufacturers in Turkey specializing in seamless apparel" is exactly the business that Private Label already did with Atateks and continued to do after the formation of Second Skin. Dente Dep. at 24.  Indeed at her deposition, Ms. Dente not only stated that "Atateks supplied us with seamless product" but that "[t]hat business was never done with Second Skin," although in her declaration, Ms. Dente claimed that Second Skin was formed for the purpose of doing this work.  *Id.* at 24.

Since this explanation of why Second Skin was formed was demonstrably untrue, Ms. Dente was forced to come up with another story at her deposition in this case.  This time, she claimed that Second Skin was created to import "different product categories, different types of product, different fabrics, different styles."  *Id.* at 24.  This explanation made no sense for a couple of reasons. First, there was no business reason that Ms. Dente could articulate why a whole different company was required just to import a different type of garment.  In any event, upon pressing the matter further, Ms. Dente admitted that in fact Second Skin was earning commissions on not only the same kinds of garments that Private Label bought but in fact exactly the same transactions:

> Q.    You received certain commissions from Atateks through Basul?
>
> A.    That's correct.
>
> Q.    What were those commissions for?
>
> A.    Seamless product.
>
> Q.    That seamless product you're referring to, wasn't that the same seamless product that Private Label was purchasing?
>
> A.    It was not purchased by Second Skin.  It was purchased by Private Label.  Second Skin was acting as a consultant.

. . . .

Q.     What did Second Skin earn those commissions for?

A.     I'll state again that I was paid commission for goods that were manufactured and sold to Private Label.

*Id.* at 25, 27.  Thus, in fact, Second Skin was not formed to deal with separate "product categories" or even "separate styles."  Rather, Second Skin was earning commissions on exactly the same orders that Private Label was already placing.

Ms. Dente's repeated lies about the reason for forming Second Skin demonstrate that she knows full well that her purposes in forming Second Skin were improper, which is why she does not want to admit to them.  The purpose was to divert assets from Private Label.  This is perfectly born out by looking at the tax returns of Second Skin and Private Label.  Private Label was profitable in 2003 (when it made $740,919) and 2004 (when it made $308,186.00).  Grannis Decl. Exs. A, B.  But then, when Second Skin was created in 2005, Private label became unprofitable and remained so in 2006.  *Id.* Exs. C, D.  Second Skin, however, was profitable during these years.  Dente Dep. at 28.

The kickback scheme, moreover, was not limited to Atateks.  Second Skin received commissions from two other companies – Synko and Orma – with respect to apparel being sold to Private Label.  *Id.* at 45.  It seems that these kickbacks were the only source of revenue for Second Skin from 2005 until 2006.  *Id.* at 21-22.  Moreover, even in 2007, the only other source of revenue for Second Skin was Target.  *Id.* at 21-22.  However, Target was itself a major customer of Private Label, so Ms. Dente was simply diverting a corporate opportunity to Second Skin that belonged to Private Label.  Despite the fact that Ms. Dente was given a chance at her deposition to explain why it was that Private Label could not pursue these business opportunities itself, she was utterly unable to give a coherent explanation.  *Id.* at 23.

Second Skin has no separate offices from Private Label.  Second Skin's only full time employee, Ms. Corchado, works from a desk in Private Label's offices that is exclusively hers.  *Id.* at 64.  Ms. Corchado also uses Ms. Dente's private office at Private Label.  *Id.*  Mail for Second Skin is

received at Private Label's offices.  *Id.* at 67-68.  There is no telephone line in the name of Second

Skin nor does Second Skin pay for any phone line with the possible exception of Ms. Dente's cell

phone.  *Id.* at 63.  Second Skin also owns no equipment of its own.  *Id.*  If Ms. Dente wants to reach

Ms. Corchado when she is working at Private Label's offices, she calls the general number for Private

Label.  *Id.* at 66.  Second Skin does not compensate Private Label in any way for the use of its offices

space, desks, telephone lines, or equipment.  *Id.* at 63.

 Even Ms. Dente's claim that Ms. Corchado did not work for Second Skin until the

second half of 2007 is suspect.  On July 24, 2006, for example, Ms. Corchado wrote an email from her

Private Label account stating that "Christine [Dente] needs confirmation that you will wire the

approx[imately] $15,000 to second skin by tom[mo]r[o]w."  Arslan Decl. Ex. C.  Plainly, Ms.

Corchado did work for Second Skin while she was on the Private Label payroll.

*Private Label's Insolvency*

 Private Label has been insolvent since at least 2003 as demonstrated by the tax returns it

produced.  These show that the insolvency became quite substantial in 2005 and 2006.  The Court can

readily confirm this by simply examining a few lines on these tax forms: Line 14 which shows "total

assets," and lines 15 line 18, which show liabilities of Private Label.  Grannis Decl. Exs. A-D.  In each

of these years, these liabilities exceeded the total assets of Private Label.  By the end of 2005, Private

Label had assets of $1.5 million and liabilities of $2.7 million, for a deficit of $1.2 million.  *Id.* Ex. C at

1362.  By 2006, Private Label's assets were $1.4 million and its liabilities were $3.4 million, for deficit

of $2 million.  *Id.* Ex. D at 1387.  This can also be seen by simply examining the "partners capital

accounts" line, which is line 22.  This is a "plug" number that was calculated by subtracting liabilities

from assets.  When the number is positive, it means that if the company were liquidated, there would

be a surplus; when it's negative, it means that if the company were liquidated, the partners would have

to contribute more capital to pay off all creditors.

Moreover, Second Skin cannot dispute that these tax returns accurately reflect the financial condition of Private Label. In discovery, Plaintiffs demanded "Financial statements and records sufficient to show the financial condition of Private Label from January 1, 2002 until present including whether Private Label was solvent during this period." *Id.* Ex. H. In response to this request, Defendants simply produced their tax returns and refused to produce any other documents, stating that the "statement of income . . . and balance sheet at 'Schedule L' together show all of the information that would appear on a financial statement" and "report Private Label Sourcing, LLC's complete financial condition." *Id.* Ex. I. In light of the Defendant's position and refusal to produce additional documents, Defendants would be estopped from claiming in this litigation that Private Label's tax returns do no reflect its "complete financial condition."

Moreover, to further investigate this topic, Plaintiffs sought a Rule 30(b)(6) deposition of a person who would testify concerning, among other things, "[t]he financial condition of Private Label including whether or not Private Label was solvent during the period from January 1, 2002 to present." *Id.* Ex. J. Ms. Dente was proffered as their corporate representative. Grannis Decl. Ex. K ("Christine Dente will be appearing for the 30(b)(6) deposition.") Ms. Dente was asked about the tax returns and was entirely unable to explain why these tax returns did not demonstrate that Private Label was insolvent. Ms. Dente was first asked whether, with respect to 2003, she had "any reason to disagree with the statement that the liabilities exceeded the assets." She replied: "I don't have any reason to disagree with the numbers that you are quoting off the document in front of me." Dente Dep. at 114. Ms. Dente was further asked "Do you have any belief as to whether Private Label was insolvent or solvent?" She replied "I really – I couldn't make any comment towards that." *Id.* Ms. Dente also agreed that she "didn't' have any views as to whether Private Label was insolvent or solvent" in 2004, 2005 or 2006. *Id.* at 114-115.

In her declaration dated June 3, 2008, only three business days after her deposition, Ms. Dente mysteriously declares that "the value of [Private Label's] assets is greater than the liability of its

existing debts." Declaration of Christine Dente, dated June 3, 2008 ("Dente Decl.") ¶ 9. She gives absolutely no basis for this opinion. Her declaration cites to the 2003-2006 tax returns upon which only three days later she was utterly unable to comment. Also, those tax returns bear little relationship to the time frame of her statement – which refers to "existing debts" and therefore the present time. Neither in Ms. Dente's declaration nor in any other location, including Defendants' Rule 56 Statement, is any assertion made regarding the solvency of Private Label at any time other the present.

*Ms. Dente's Credibility*

Ms. Dente demonstrated at her deposition and elsewhere that she is an unreliable witness whose testimony should be viewed by the Court with great suspicion. For example, at her deposition, she initially claimed that it was not "ever in part the fault of Private Label that charge backs occurred" but then conceded when pressed that "we would have to go case by case." Dente Dep. at 52. As discussed above, she has given patently contradictory and untrue explanations of why she formed Second Skin in order to hide her real reasons for doing so. *See supra* at 6-7. Ms. Dente also resisted disclosing information plainly known to her. For example, she refused to give any approximation of Private Label's revenues other than stating that they were less than 100 million dollars this year. Indeed, she initially claimed that she would "have to check" whether the sales were "less or more than a billion dollars" but later conceded that this was false and that she actually knew they were less. *Id.* at 10-11.

## ARGUMENT

I.   THERE IS AMPLE EVIDENCE THAT SECOND
     SKIN AND PRIVATE LABEL ARE ALTER EGOS.

Under New York law, alter ego liability "may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties." *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 - 139 (2d Cir. 1991); *accord Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703

(2d Cir. 1990) ("New York law allows the corporate veil to be pierced *either* when there is fraud *or* when the corporation has been used as an alter ego.")(italics added).

In this case, Second Skin, through its sole owner Ms. Dente, dominated Private Label, forcing it to subsidize the operations of Second Skin and to require the payment of kickbacks to Ms. Dente through Second Skin. This occurred specifically in relationship to the transactions at issue here, namely the purchase of certain goods by Private Label from Atateks. Thus, a portion of the funds that Private Label received for selling these goods was diverted to Second Skin. The result has been to further harm the finances of Private Label and make it more difficult for Atateks to obtain payment for the goods that it sold to Private Label. For these reasons, as explained further below, Second Skin should be held liable for the debt of Private Label in this matter.

A.    Second Skin Dominated Private Label.

In considering whether one corporation dominated another to the extent that the alter ego doctrine should be applied, the following factors should be considered:

> (1) the existence of corporate formalities; (2) overlap in ownership, directors and personnel; (3) inadequate capitalization; (4) common office space, address and telephone numbers; (5) whether the related corporation deals with the allegedly dominated corporation at arms length; (6) whether the corporations are treated as independent profit centers; and (7) the amount of business discretion displayed by the allegedly dominated corporation.

*Leykis v. NYP holdings, Inc.,* 899 F.Supp. 986, 992 (E.D.N.Y. 1995) (citing *Wm. Passalacqua Builders Inc. v. Resnick Developers S.,* 993 F.2d 131, 139 (2d Cir. 1991)).[1] Another fact that has been considered is whether the dominating company siphoned off funds from the dominated company. *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-601 (2d Cir. 1989). As set forth below, all of these factors support a finding that the Second Skin, through its owner Ms. Dente, dominated Private Label.

---

[1] The Second Circuit decision cited by the Court, *Passalacqua*, sets forth certain additional factors that apply in alter ego cases but these factors are applicable to instances in which a corporation is alleged to be the alter ego of an individual.

1.    The Existence of Corporate Formalities.

In Plaintiffs' document requests, Plaintiffs asked for "Documents sufficient to show the officers and directors of Defendants from January 1, 2002 until present."  Grannis Decl. Ex. H. Defendants stated in response that they have "no documents in their possession, custody or control responsive to this request."  *Id.* Ex. L.  Thus, Private Label does not even have documents such as minutes of meetings appointing officers or other documents establishing who its officers and directors are.  This suggests that Private Label was run in a very informal manner.  In simple terms, Ms. Dente controls Private Label completely and therefore apparently does away with all corporate formalities such as minutes and corporate resolutions.

Turning to the transactions at issue here, Defendants have proffered no evidence that there was any approval by the directors or shareholders of Private Label, other than Ms. Dente herself, of the arrangement by which Ms. Dente earned kickbacks through Second Skin with respect to transactions between Private Label and other vendors including Atateks.  *See Balmer v. 1716 Realty LLC*, 2008 WL 2047888, 5 (E.D.N.Y.  2008) (imposing alter ego liability where there was "absence of corporate formalities between Defendants [due to] common ownership.")

2.    Overlap in Ownership, Directors, and Personnel.

There is substantial overlap in the ownership, directors and personnel of Second Skin and Private Label.  Ms. Dente is a 100% owner of Second Skin and a 50% owner of Private Label. Moreover, even the 50% ownership interest of a third party in Private Label is suspect: this 50% interest appears to have been purchased with a loan from Private Label itself.  Grannis Decl. Ex. E.

More importantly, however, Ms. Dente effectively runs both operations.  According to Ms. Dente, Mr. Allen, the co-owner of Private Label, ceased playing any active role in the management of Private Label in 2005 due to health problems that prevented him from coming to the office.  Dente Dep. at 9.  This left Ms. Dente in complete control of Private Label at precisely the time that Ms. Dente began her kickback scheme.

In addition, there is substantial if not complete overlap in the personnel at these companies.  From mid-2005 until mid-2007, the only employee of Second Skin was Ms. Dente, who was obviously also employed by Private Label.  *Id.* at 62.  In Mid-2007, Ms. Corchado – a longtime Private Label employee – transferred to Second Skin.  Thus, Second Skin has never had an employee who was not also a current or recent employee of Private Label.  Moreover, evidence shows that Ms. Corchado did work for Second Skin in 2006 while she was still formally an employee of Private Label. Arslan Decl. Ex. B.

      3.      Inadequate Capitalization.

Since 2003, Private Label has not merely been inadequately capitalized but actually insolvent.  *See supra* at 8-10.

      4.      Common Office Space, Address, and Telephone Numbers.

Defendants have the same office space, addresses, and telephone numbers.  *See supra* at 8.  Second Skin does not rent any offices of its own or pay anything for using Private Label's.  *See supra* at 8.  Mail for Second Skin is received at Private Label's offices.  *See supra* at 8.

      5.      Lack of Arms Length Dealings.

Private Label and Second Skin obviously did not deal with each other at arms length. Private label employees – namely Ms. Dente and Ms. Corchado – directed Atateks and other vendors to overcharge Private Label and then funnel these additional payments to Second Skin.  This was a completely irrational transaction from the perspective of Private Label.  Private Label was forced to pay more for certain goods to fund the kickbacks to Second Skin and received nothing in return.  *See supra* at 3-4.

      6.      Whether the Corporations are Treated as Independent Profit Centers.

Obviously, Private Label and Second Skin were not treated as independent profit centers.  Private Label did not make sure that it maximized the profits from the deals in which it

engaged.  Rather, it was willing to hand over a substantial portion of those profits to Second Skin for

no business reason.

       7.     The Amount of Business Discretion Displayed by the Allegedly Dominated
            Corporation.

Private Label does not have the ability to act independently of Second Skin for the

simple reason that both entities are completely controlled by Ms. Dente.  If Ms. Dente wants Private

Label to make clients pay commissions to Second Skin, then that is what Private Label does.  If Ms.

Dente wants Private Label to make office space and telephone lines available to Second Skin for free,

then that is what Private Label does.  No other explanation exists for Private Label's irrational

economic behavior.

       8.     Siphoning Off Funds.

Siphoning off funds from an entity may serve as basis for piercing the corporate veil.

*William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-601 (2d Cir. 1989).  Here, that is precisely what

happened.  As set forth above, Second Skin siphoned off funds from Private Label in many ways

including the commission kickback schemes, the improper chargebacks, the making available of

facilities to Second Skin for free, and the taking of corporate opportunities by Second Skin that could

have been exploited by Private Label.

    B.    A Wrong was Committed Against Third Parties.

As noted above, to apply the alter ego doctrine, there must be "complete control by the

dominating corporation that leads to a wrong against third parties."  *Wm. Passalacqua Builders, Inc. v.*

*Resnick Developers South, Inc.*, 933 F.2d 131, 137 -139 (2d Cir. 1991).

Courts have repeatedly held that where a dominated company is rendered unable to pay

third parties with valid claims in whole or in part because a dominating party has siphoned off the

funds of the dominated company, this constitutes a wrong against such third parties.  *See Austin*

*Powder Co. v. McCullough*, 628 N.Y.S.2d 855, 857 (3d Dept. 1995)(applying alter ego doctrine where

shareholder's personal use of company funds had contributed to its inability to pay its debts); *Balmer v. 1716 Realty LLC*, 2008 WL 2047888, 6 (E.D.N.Y. 2008)(applying alter ego doctrine where company was unable to pay the claims pending against it because of another company or individual's domination of the business); *Mobius Management Systems, Inc. v. Technologic Software Concepts, Inc.*, 2002 WL 31106409, at *4 (S.D.N.Y. 2002) (applying alter ego doctrine under California law where dominating shareholder had caused money to be transferred to himself at time when company was insolvent); *Pereira v. Cogan*, 2001 WL 243537, at *21 (S.D.N.Y. 2001) ("element of injustice would be satisfied if shown that corporate directors siphon[ed] off corporate assets to themselves")(quotation omitted); *Variable-Parameter Fixter Development Corp. v. Morpheus Lights Co.*, 1993 WL 335027, 1 (S.D.N.Y. 1993)(allegation that dominating shareholder significantly increased compensation of company to him after lawsuit was initiated made out alter ego claim).

In the instant case, it is beyond dispute that beginning in 2005, Second Skin began diverting substantial funds from Private Label to Second Skin. As a result, Second Skin became profitable and Private Label became unprofitable. In 2006, Private Label began saying that it was having trouble paying its bills in a timely fashion. Arslan Decl. Ex. A. Private Label claimed that this was a temporary cash flow issue rather than a more fundamental one. However, it has become apparent that this problem is more profound and was in large measure caused by Second Skin siphoning off funds from Private Label. Private Label has never made good on its debts to either Atateks or to C&C Textile Company Limited, another company that is suing Private Label. Grannis Decl. Ex. M. In addition, the tax returns of Private Label suggest that it has been insolvent for several years.

Moreover, it is now clear that Private Label's financial problems are due in significant measure to the fact that the money Private Label was earning from selling goods from Atateks and other vendors was being looted by Second Skin. It is therefore only just that Atateks should be able to recover the money owed to it from Second Skin.

C.      Equitable and Policy Reasons Favor Application of the Alter Ego Doctrine.

The Second Circuit has said that in weighing factors to determine whether the corporate veil should be pierced, "[w]hile there is no set rule as to how many of these factors must be present in order to pierce the corporate veil, the general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-601 (2d Cir. 1989).  Here, there can be no doubt that piercing the corporate veil would achieve an equitable result.

It is highly uncertain whether Private Label will be able to satisfy any judgment against it because it has been rendered insolvent or at least thinly capitalized by the looting of its assets by Second Skin.  Moreover, the recovery of fraudulent transfers to Second Skin would not be an adequate remedy because the extent of these transfers is impossible to fully measure.  In addition to the commission and chargeback schemes, Second Skin's operations have been subsidized by the free use of Private Label's office space, office equipment and phone lines.  Moreover, Ms. Dente has not been fully forthcoming about Ms. Corchado's role in Second Skin.  Ms. Dente claimed at her deposition that Ms. Corchado didn't work for Second Skin until late 2007 but there is evidence that Ms. Corchado did some work for Second Skin as early as July of 2006.  Arslan Decl. Ex. B.  It is impossible to know precisely how much time Ms. Corchado and other Private Label employees spent on the affairs of Second Skin while they were on the Private Label payroll.  Finally, Second Skin's entire existence is premised on taking corporate opportunities that plainly could have been exploited by Private Label but which Ms. Dente preferred to direct to Second Skin.

The totality of the resources and opportunities that were diverted from Private Label to Second Skin will never be fully known nor could their value be accurately measured even if they were. Ms. Dente's muddling together of Private Label's affairs with those of Second Skin has made this calculation impossible.  Therefore, the only full and equitable remedy for Plaintiffs is to hold Second Skin liable for the debts of Private Label.

Second Skin suggests that it is unnecessary to hold it liable because Private Label is solvent. Private Label's tax returns suggest otherwise. *See supra* at 8-9. In addition, Second Skin's own behavior suggests that the collectibility of a judgment against Private Label is uncertain. Ms. Dente controls both Private Label and Second Skin. If Private Label had sufficient assets to pay a judgment against it, Ms. Dente would not be concerned about whether Second Skin was held jointly liable. Ms. Dente's strenuous efforts to avoid such joint liability demonstrates that she is concerned that Private Label will not be able to pay a judgment against it.

D.    There Is Sufficient Evidence to Create a Material Issue of Fact on the Alter Ego Issue.

As noted above, every one of the factors in determining alter ego liability weighs in favor of such a finding here. Due to this overwhelming evidence, Plaintiffs are arguably entitled to summary judgment in their favor on this issue. At a minimum, however, Second Skin's motion – on which all factual disputes must be resolved and all inferences drawn in favor of the non-moving party – must be denied given the substantial evidence supporting the application of the alter ego doctrine.

Second Skin cites only two cases for the proposition that it is entitled to summary judgment on the alter ego claims against it. In both cases, however, only "superficial indicia" supported the alter ego theory. *See U.S. Barite Corp. v. M.V. Haris,* 534 F. Supp. 328, 330 (S.D.N.Y 1982) (Only "Superficial indicia such as common offices and telephone numbers" favored alter ego liability not "important factors [such] as the degree of overlap of personnel, the amount of business discretion displayed by the alleged puppet corporation and whether the two entities deal with each other at arms length."); *Coastal States Trading, Inc. v. Zenith Nav. S. A*., 446 F. Supp. 330, 337 (S.D.N.Y. 1977)(only "superficial indicia" favored alter ego finding; no evidence that "dealings [between companies were] conducted on anything but an arm's length basis, or that the employees failed to observe [corporate] formalities," of "over-reaching" or that one entity "sought, either properly or improperly, to alter or affect the way [the other entity] carries on its business.") Here, the non-arms

length dealings and kickbacks are precisely the type of non-superficial indicia factors that were lacking in these cases.

Moreover, neither *U.S. Barite* nor *Coastal* involved an application of the summary judgment standard.  Rather, both cases involved a judge's decision whether to enforce an arbitration agreement against a party that was allegedly an alter ego of a party that had signed the agreement.  *U.S. Barite,* 534 F. Supp. at 329; *Coastal*, 446 F. Supp. at 337.  Thus, the standard applied was not the existence of material facts but rather whether the claim was supported by a "preponderance of the evidence."  *Coastal*, 446 F. Supp. at 337.  Second Skin has fallen far short of demonstrating that there are no material facts with respect to the alter ego claim against it.

II.     BREACH OF CONTRACT AND ACCOUNTS STATED
        CLAIM.

Atateks has asserted breach of contract and accounts stated claims against Second Skin on the grounds that Second Skin is an alter ego of Private Label.  Some Courts have held that the alter ego doctrine does not provide a separate cause of action but rather simply extends a cause of action to an additional defendant.  *Morris v. New York State Dept. of Taxation and Finance,* 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810 (1993) ("an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners."); *see also In Matter of Mediators, Inc.*, 1996 WL 297086, 8 (S.D.N.Y. 1996) (noting argument that "veil piercing is a remedy, not a cause of action" and that "pleadings which assert the alter ego claim as a separate cause of action are facially deficient.")  Under this logic, the proper pleading of Atateks' claims is to plead the underlying substantive causes of action – breach of contract and accounts stated – against Second Skin as Private Label's alter ego.  Accordingly, Plaintiffs have pled these claims and they must be sustained on the current record given the substantial evidence that Second Skin is in fact the alter ego of Private Label.

III.     QUANTUM MERUIT AND
         UNJUST ENRICHMENT CLAIMS.

Atateks concedes the dismissal of its quantum meruit claim and unjust enrichment claims.

IV.     FRAUDULENT CONVEYANCE CLAIMS.

Plaintiffs have asserted fraudulent transfer claims under both New York Debtor Creditor Law Section 276, applicable to transfers with an intent to defraud, and claims under Section 273, applicable to transfers made while insolvent.

Second Skin contends that both types of claims are subject to dismissal because it was not the recipient of any fraudulent transfers.  However, the kickbacks that Second Skin earned on sales to Atateks constituted fraudulent transfers.  As noted above, Ms. Dente instructed Atateks to raise its price over what it would otherwise charge Private Label and then, when it received payment of this excess amount, to turn it over in the form of a "commission" to Second Skin.  *See supra* at 3-5. This procedure was nothing more than a mechanism for transferring money from Private Label and Second Skin using Atateks as an intermediary to disguise what was going on.  Kickbacks such as this plainly constitute fraudulent transfers.  *See Corporacion Nacional del Cobre de Chile v. Orrego Hirsch*, 242 A.D.2d 183, 184, 673 N.Y.S.2d 681, 682 (1st Dept. 1998) (kickbacks paid to futures trader for corporation constituted fraudulent transfers).

A.      New York Debtor Creditor Law § 276: Conveyances Made With Actual Intent to Defraud.

Second Skin contends that the Section 276 claims against it are subject to dismissal because there is no proof that Private Label intended to defraud creditors.  There is sufficient evidence of Private Label's fraudulent intent to withstand summary judgment.  "Actual intent is rarely, if ever, established by direct evidence." *Hassett v. Goetzmann*, 10 F.Supp.2d 181, 188 (N.D.N.Y. 1998). Accordingly, under Section 276, the fraudulent nature of a conveyance may be inferred from the circumstances surrounding the transaction. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15,*

*1983,* 731 F.2d 1032, 1041 (2d Cir. 1984).  The relevant circumstances, commonly referred to as the "badges of fraud," include, *inter alia:* transfers to relatives or close friends of the transferor; suspicious timing of the transfers or transfers that are unusual or hasty; lack of fair consideration for the transfers; whether the transfers rendered the transferor insolvent; the financial condition of debtor both before and after transaction; whether there was questionable transfer not in the usual course of debtor's business; and concealment of facts and false pretenses by the transferor.  *U.S. v. McCombs,* 30 F.3d 310, 328 (2d Cir. 1994); *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983).

In the instant case, all of the foregoing badges of fraud exist.  First, Private Label is closely related to Second Skin given Ms. Dente's common ownership.  *See supra* at 2-3.  Second, the transfers were made without adequate, or indeed any, consideration.  *See supra* at 4-5.  Third, the timing of the transfers was suspicious, since they took place in 2005, when Ms. Dente was seeking to hide funds from Private Label's other shareholder, Bruce Allen, and then continued in 2006, when Private Label was having financial difficulties.  *See supra* at 3-4.  Fourth, the transactions rendered Private Label insolvent or at least contributed to its insolvency.  *See supra* at 8-9.  Fifth, the transactions were not in the ordinary course of business since Private Label, in its three prior years of business with Atateks, had never previously insisted that Atateks make payments to Second Skin. Arslan Decl. ¶ 4.  Finally, Ms. Dente sought to conceal the transfers from Private Label to Second Skin by running them through this kickback scheme.  *See supra* at 4-5.

All of the above factors make this issue properly one for determination after a trial.  The Second Circuit has observed that "ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind."  *Golden Budha Corp. v. Canadian Land Co. of America*, 931 F.2d 196, 201-202 (2d Cir. 1991).  The instant case is certainly not one of those rare cases in which the facts are so clear that the issue of intent may be resolved prior to trial.

20

B.      New York Debtor Creditor Law § 273: Conveyances Made While Insolvent.

New York Debtor Creditor Law § 273 provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  *McKinney's Debtor and Creditor Law § 273*.  Second Skin contends that Private Label was not insolvent at the time of the transfers at issue.

Under New York law, "[o]nce it is established that a debtor transferred property without fair consideration . . . the law presumes that the transfer rendered him insolvent."  *In re Corcoran,* 246 B.R. 152, 163 (E.D.N.Y. 2000);  *accord Feist v. Druckerman,* 70 F.2d 333, 334-35 (2d Cir. 1934) (if one indebted makes [transfer without consideration], it is presumed, in the absence of some proof to the contrary, that he was then insolvent.");  *In re Nirvana Restaurant Inc.,* 337 B.R. 495, 505 (Bkrtcy. S.D.N.Y. 2006) ("If the plaintiff shows the absence of 'fair consideration,' the burden of going forward with proof of insolvency shifts to the defendant.")

Incredibly, Second Skin purports to advise the Court that there is no presumption of insolvency by citing to two decisions that are both more than 73 years old and which emanate, respectively, from the New York Municipal Court and the Surrogate's Court of Chenango County: *Hopfan v. Knauth*, 156 Misc. 545 (N.Y. Municipal Court 1935) and *In Re Decker's Estate*, 149 Misc. 364 (Surrogate's Court Chenango Co. 1933).  The primary appeal of these decisions to Second Skin seems to have been that they were too obscure for any subsequent Court to bother noting that they were no longer good law.

Second Skin has failed to adduce any evidence that Private Label was or is solvent.  To be sure, Second Skin's memorandum states in conclusory fashion that "the fair salable value of [Private Label]'s assets is greater than the liability of its existing debts."  Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment at 17.  The memorandum cites, however, to Private Label's tax returns from 2003 through 2006, which all show that Private Label has

been insolvent since 2003 and that it was insolvent by more than $1 million in both 2005 and 2006. *See supra* at 8-10. Second Skin's statement to the contrary is therefore utterly mysterious and unsupported.

Second Skin has failed to meet is burden of demonstrating its solvency. On this ground alone, Second Skin's motion must be denied. However, even if the burden were upon Plaintiffs to raise material facts as to Private Label's insolvency, that burden has clearly been met.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Second Skin's motion for summary judgment dismissing the Plaintiffs' Alter Ego, Breach of Contract, Accounts Stated, and Fraudulent Conveyance Claims.

Dated: New York, New York
           June 10, 2008

LAW OFFICES OF ERIC J. GRANNIS

By: _____
        Eric J. Grannis         (EJG 8403)
        620 Fifth Avenue
        New York, NY 10020
        212-903-1025

        Attorneys for Plaintiffs

22