UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATATEKS FOREIGN TRADE LTD, JORDAN
AND ATATEKS DIS TICARET A.S.,

                Plaintiffs,

v.

PRIVATE LABEL SOURCING, LLC
AND SECOND SKIN, LLC,

                Defendants.

Index No. 07 Civ. 6665 (HB)

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT**

**Defendants' Statement 1**

Plaintiff Atateks Foreign Trade LTD, Jordan ("Plaintiff Atateks Jordan") is a manufacturer of women's apparel located in Amman, Jordan, and Plaintiff Atateks Dis Tiscaret A.S. ("Plaintiff Atateks Turkey") is a manufacturer of women's apparel located in Istanbul, Turkey (Byler Decl. Ex. C: Ihlan Dep. p. 7ln 2-5, 16-19).

**Plaintiffs' Counterstatement 1**

No response.

**Defendants' Statement 2**

Defendant PLSL is a Delaware limited liability company that acts as a purchasing agent of women's apparel for Target Stores and other retail outlets. Defendant PLSL is owned in equal shares by Christine Dente and Jetwell Garments, LT, a Hong Kong company (Dente Decl. para. 2; Byler Decl. Ex. E: Dente Dep. 9).

**Plaintiffs' Counterstatement 2**

Plaintiffs note that Jetwell's 50% ownership interest appears to have been purchased with a loan from Private Label itself (Declaration of Eric J. Grannis Ex. E ("Grannis Decl."): Purchase Agreement dated January 4, 2006).

**Defendants' Statement 3**

Defendant PLSL was formed in 2001 by Bruce Allen and Christine Dente (Dente Decl. para. 2 & Ex. 1; Byler Decl. Ex. E: Dente Dep. 7-8).

**Plaintiffs' Counterstatement 3**

No response.

**Defendants' Statement 4**

Defendant PLSL is still in business today, and the value of Defendant PLSL's assets is greater than the liability of its existing debts (Dente Decl. para. 9; Exhibit 6).

**Plaintiffs' Counterstatement 4**

Defendants have not provided documents with any bearing on the current financial status of PLSL. Defendants' Exhibit 6 in support of their claim of current solvency consists of tax filings from 2003 to 2006 (Grannis Decl. Exs. A-D). Thus, the most current financial data Defendants have produced is from the fiscal year 2006. Moreover, Private Label's tax returns show that in fact it has been insolvent since at least 2003.

**Defendants' Statement 5**

Defendant Second Skin is a New Jersey limited liability company that is registered to do business and has its principal place of business in New York (Dente Decl. para. 3 & Ex. 2). Defendant Second Skin was formed in 2005, by Christine Dente to market her consulting services, including to Atateks (Dente Decl. para. 3; Byler Decl. Ex. E: Dente Dep. 17).

**Plaintiffs' Counterstatement 5**

Defendant Second Skin's principle place of business is the office of Private Label (Grannis Decl. Ex. G: Deposition of Christine Dente, dated May 29, 2008, at 63 ("Dente

Dep."). Second Skin was created to permit Ms. Dente to divert funds and corporate opportunities from Private Label to Second Skin and thereby ditch her partner Bruce Allen. Beginning in the second half of 2005, Ms. Dente began to request that "commissions" be paid to her through Second Skin with respect to transactions in which Private Label purchased goods from Atateks (Dente Dep. at 17; Declaration of Ilhan Arslan ¶ 3 ("Arslan Decl.")). Diverting profits from Private Label to Second Skin meant that the profits ended up in an entity of which Ms. Dente was a 100% owner rather than a partial owner. Private Label had been doing business with Atateks since 2002 but Ms. Dente had never previously asked for these side payments with respect to these transactions (Dente Dep. at 22; Arslan Decl. ¶ 4). Atateks made these payments not because it was getting any services from Second Skin but simply because Private Label was requiring Atateks to do so (Arslan Decl. ¶ 4).

    Ms. Dente was quite frank about her reasons for asking for these kickbacks: to funnel the profits to her and help her get rid of Mr. Allen. Ms. Dente said that Atateks should build Second Skin's commission into its prices – that Atateks should increase the price of the goods it was selling to Private Label and then turn over that price difference to Second Skin as a commission (Declaration of Philip A. Byler Ex. C ("Byler Decl."): Deposition of Ilhan Arslan, dated May 23, 2008, at 103 ("Arslan Dep.")). This would have the effect of diminishing the margin between the price at which Private Label bought goods and the price at which it resold them for to Target. This would in turn decrease or eliminate Private Label's profits. Ms. Dente was happy for this to occur because Mr. Allen could then be bought out cheaply. In fact, Mr. Allen came to sell his half interest in the company in January of 2006 for only $300,000 even though just two years earlier his share of the profits from one year alone had exceeded that amount (Grannis Decl. Exs. A, E).

Ms. Dente has given inconsistent explanations as to why she created Second Skin. In an effort to rebut alter ego allegations in a California lawsuit, Ms. Dente claimed that Second Skin "was formed to undertake entirely separate business than P[rivate] [L]abel" namely to "to work with international manufacturers in Turkey specializing in seamless apparel." (Grannis Decl. Ex. F: Declaration of Christine Dente dated March 21, 2008). This was obviously untrue because "work[ing] with international manufacturers in Turkey specializing in seamless apparel" is exactly the business that Private Label already did with Atateks and continued to do after the formation of Second Skin (Dente Dep. at 24). Indeed at her deposition, Ms. Dente not only stated that "Atateks supplied us with seamless product" but that "[t]hat business was never done with Second Skin," although in her declaration, Ms. Dente claimed that Second Skin was formed for the purpose of doing this work (Dente Dep. at 24).

Since this explanation of why Second Skin was formed was demonstrably untrue, Ms. Dente was forced to come up with another story in her deposition in this case. This time, she claimed that Second Skin was created to import "different product categories, different types of product, different fabrics, different styles" (Dente Dep. at 24). This explanation made no sense for a couple of reasons. First, there was no business reason that Ms. Dente could articulate why a whole different company was required just to import a different type of garment. In any event, upon pressing the matter further, Ms. Dente admitted that in fact Second Skin was earning commissions on not only the same kinds of garments that Private Label bought but in fact exactly the same transactions:

Q. You received certain commissions from Atateks through Basul?
A. That's correct.
Q. What were those commissions for?
A. Seamless product.

4

> Q. That seamless product you're referring to, wasn't that the same seamless product that Private Label was purchasing?
>
> A. It was not purchased by Second Skin. It was purchased by Private Label. Second Skin was acting as a consultant.
>
> . . . .
>
> Q. What did Second Skin earn those commissions for?
>
> A. I'll state again that I was paid commission for goods that were manufactured and sold to Private Label.

(Dente Dep. at 25, 27). Thus, in fact, Second Skin was not formed to deal with separate "product categories" or even "separate styles." Rather, Second Skin was earning commissions on exactly the same orders that Private Label was already placing.

Ms. Dente's repeated lies about the reason for forming Second Skin demonstrate that she knows full well that her purposes in forming Second Skin were improper, which is why she does not want to admit to them. Indeed this is perfectly born out by looking at the tax returns of Second Skin and Private Label. Private Label was profitable in 2003 (when it made $740,919) and 2004 (when it made $308,186.00)(Grannis Decl. Exs. A-B). But then, when Second Skin was created in 2005, Private label became unprofitable and remained so in 2006 (*Id.* Exs. C-D). Second Skin, however, was profitable during these years (Dent Dep. at 28).

The kickback scheme, moreover, was not limited to Atateks. Second Skin received commissions from two other companies – Synko and Orma – with respect to apparel being sold to Private Label (Dente Dep. at 45). It seems that these kickbacks were the only source of revenue for Second Skin from 2005 until 2006 (Dente Dep. at 21-22).

**Defendants' Statement 6**

Defendant Second Skin is owned in its entirety by Christine Dente (Dente Decl. para. 3; Byler Decl. Ex. E: Dente Dep. 17).

**Plaintiffs' Counterstatement 6**

No response.

**Defendants' Statement 7**

Defendant Second Skin has pursued different business opportunities and has different sourcing agents than Defendant PLSL. No monies or other assets have ever been transferred from Defendant Private Label to Defendant Second Skin. (Dente Decl. para. 4; Byler Decl. Ex. E: Dente Dep.126.)

**Plaintiffs' Counterstatement 7**

Second Skin has not provided any information supporting its claim that it pursued business opportunities different from Private Label. In her deposition, Ms. Dente was only able to identify Atateks, Orma, and Synko as manufacturers with whom Second Label conducted business. These three factories were also clients of Private Label, and the business that Second Skin did with them consisted in taking commissions on business done with Private Label (Dente Dep. at 22, 43).

It is also incorrect that no monies or other assets were ever transferred from Defendant Private Label to Defendant Second Skin. Second Skin occupied the same office as Private Label and used the same equipment at no cost to itself (Dente Dep. at 63). Also, commissions paid to Second Skin by Atateks constituted a transfer of funds since they were paid for by increasing invoices to Private Label at the instruction of Ms. Dente (Arslan Dep. at 103).

**Defendants' Statement 8**

Defendant Private Label and Defendant Second Skin each maintain its own separate books and records, and Defendant Private Label and Defendant Second Skin have different employees. (Dente Decl. para. 4; Byler Decl. Ex. E: Dente Dep.106.)

**Plaintiffs' Counterstatement 8**

Defendant Second Skin's only employee for its first year of business was Christine Dente, who was simultaneously operating in the capacity of CEO for Private Label. Currently Second Skin also employs Nilda Corchado, formerly an employee of Private Label. Ms. Dente claimed at her deposition that Ms. Corchado didn't work for Second Skin until late 2007 (Dente Dep. at 62) but there is evidence that Ms. Corchado did work for Second Skin as early as July of 2006 (Arslan Decl. at Exs. B-D).

**Defendants' Statement 9**

In 2002, Defendant PLSL was introduced to Plaintiffs by Imer Basul, an agent for factories that produce women's apparel in Turkey. Defendant PLSL had a Purchase Order business with Plaintiffs; there was no master contract (Byler Decl. Ex. E: Dente Dep. 61).

**Plaintiffs' Counterstatement 9**

No response.

**Defendants' Statement 10**

Defendant PLSL, representing Target Stores, placed orders for women's apparel with Plaintiffs. Each of these orders was represented by a Purchase Order, which indicated, among other information, the style of garment, the total number of pieces, the price per piece, the shipping date, and the method of payment. (Dente Decl. ¶ 4.)

**Plaintiffs' Counterstatement 10**

The Purchase Orders did not always contain all the information necessary to manufacture the garments and the information in the Purchase Order was subject to change during an approval process (Dente Dep. at 49; Arslan Dep. at 78). Therefore, though the

Purchase Order was the document that started the process, it often did not reflect the reality of the ultimate transaction.

**Defendants' Statement 11**

There were two ways that these Purchase Orders were paid. First, the majority of the Purchase Orders were paid by a direct Letter of Credit ("LC") from Target Stores. Second, Defendant Private Label financed the sale of garments manufactured by Plaintiffs made to order for Target Company upon Defendant PLSL's Purchase Orders; Plaintiffs shipped these goods to Defendant PLSL's warehouse and issued invoices for the amount due for the goods to Defendant PLSL (Dente Decl. para. 5; Byler Decl. Ex. E: Dente Dep. 93-94, 121; Byler Decl. Ex. C: Arslan Dep. 10, 29).

**Plaintiffs' Counterstatement 11**

No response.

**Defendants' Statement 12**

Throughout the time Plaintiffs and Defendant PLSL engaged in a business relationship, Plaintiffs at times failed to produce and/or shipment of garments in compliance with the terms of the Purchase Orders. As a result, there were charge-backs for late goods, cancelled orders, expediting charges, inferior quality, Target store level returns, and other issues with the goods manufactured by Plaintiffs that prevented Defendant PLSL from delivering goods of a sufficient quality to Target Company by the contract date. Defendant PLSL had e-mail correspondence with Target concerning late shipments and cancellations that resulted in charge-backs (Dente Decl. para. 6 & Ex. 3; Byler Decl. Ex. E; Dente Dep. 50, 74, 119; Byler Decl. Ex. C: Arslan Dep. 68-73).

**Plaintiffs' Counterstatement 12**

Plaintiffs' were not exclusively responsible for chargebacks from Target. Often Private Label did not abide by the Time and Action Plan which outlined the production process (Arslan Dep. at 78). Ms. Dente admitted that Private Label may have been responsible for some chargebacks and that to determine responsibility "we would have to go case by case" (Dente Dep. at 52).

**Defendants' Statement 13**

Plaintiffs manufacturing relationship was exclusively with Defendant PLSL. Defendant Second Skin did not issue any Purchase Orders to Plaintiffs (Dente Decl. para. 7; Byler Decl. Ex. E: Dente Dep. 25-27).

**Plaintiffs' Counterstatement 13**

Plaintiffs' relationship was with both Private Label and Second Skin, insofar as Atateks remitted money to both Private Label and Second Skin in relation to the manufacturing of garments it did for Target (Arslan Decl. Exs. D-E)

**Defendants' Statement 14**

Presented at the depositions of both Plaintiffs' Ilhan Arslan and Defendants' Christine Dente were all the Purchase Orders produced by Plaintiffs in this case, and none were from Defendant Second Skin (Byler Decl. para. 10 & Ex. G ; Byler Decl. Ex. C : Arslan Dep. 38 & Ex. 1 ; Byler Decl. Ex. E: Dente Dep. 55 & Ex. 502).

**Plaintiffs' Counterstatement 14**

No response.

**Defendants' Statement 15**

Plaintiffs did not issue any invoices to Defendant Second Skin (Dente Decl. para. 7 & Ex. 4).

**Plaintiffs' Counterstatement 15**

No response.

**Defendants' Statement 16**

Defendant Second Skin did not make any payments for garments to Plaintiffs; Plaintiffs did not ship any goods to Defendant Second Skin; Plaintiffs did not make any kind of seamless garments for Defendant Second Skin (Dente Decl. para. 7; Byler Decl. Ex. E: Dente Dep. 25, 38; Byler Decl. Ex. F: Bahar Dep. 25).

**Plaintiffs' Counterstatement 16**

No response.

**Defendants' Statement 17**

Plaintiffs did not receive any charge-backs from, nor issue any refunds for goods to, Defendant Second Skin. The only payments made by Plaintiffs to Defendant Second Skin were commission payments for Christine Dente's consulting services and not for product (Dente Decl. para. 7; Byler Decl. Ex. E: Dente Dep. 19-22, 38).

**Plaintiffs' Counterstatement 17**

Second Skin issued five charge-backs to Atateks (Arslan Decl. Exs. B-D). Second Skin issued refunds for these chargebacks (Arslan Decl. Ex. E).

**Defendants' Statement 18**

   Target Company never made any payment to Defendant Second Skin for goods manufactured and shipped by Plaintiffs. Defendant PLSL was "factored," or had transferred the right to its receivables from Target Company to BB&T Bank (Dente Decl. para. 8 & Ex. 5).

**Plaintiffs' Counterstatement 18**

   No response.

**Defendants' Statement 19**

   Target Company made all payments to BB&T for any goods that were manufactured by Plaintiffs on Defendant PLSL's Purchase Orders. No payments were made to Defendant Second Skin with respect to garments manufactured by Plaintiffs. What money that Defendant Second Skin received later in 2007 from Target had to do with unrelated products manufactured by factories other than Plaintiffs' (Dente Decl. para. 8).

**Plaintiffs' Counterstatement 19**

   No response

Dated: New York, New York
    June 10, 2008

                LAW OFFICES OF ERIC J. GRANNIS

                By: *Eric Grannis*
                  Eric J. Grannis
                620 Fifth Avenue
                New York, New York 10020
                (212) 903-1025

                Attorneys for Plaintiffs