UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ATATEKS FOREIGN TRADE LTD, JORDAN
and ATATEKS DIS TICARET A.S.,

      Plaintiffs,

   -against-

PRIVATE LABEL SOURCING, LLC
and SECOND SKIN, LLC,

      Defendants.
------------------------------------------------------------------x

Index No. 07 Civ. 6665 (HB)

**REPLY DECLARATION OF CHRISTINE DENTE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING DEFENDANT SECOND SKIN, LLC**

  **CHRISTINE DENTE** hereby declares subject to the penalties of perjury pursuant to 28 U.S. C. § 1746:

  1. I am a 50% owner of Defendant Private Label Sourcing, LLC ("Private Label") and the sole owner of Defendant Second Skin, LLC "Second Skin"). I have been deposed in this action, and I have moved for partial summary judgment to dismiss Second Skin from this action because, among other things, Second Skin was not a party to any of the purchase orders, did not receive any of the garments subject to the purchase orders and did not receive payment for any of the garments made pursuant to the purchase orders.

  2. I have read the papers submitted by Plaintiff in opposition to my motion for partial summary judgment. Because those papers are based on accusation without evidence and misstatement, I submit this Reply Declaration. I am a competent witness to the facts of this matter. Plaintiff's attorney is but someone who makes a series of erroneous arguments based on misstated facts and personal attack on me.

-2-

**Founding of Second Skin**

3. I did not establish Second Skin to divert funds from Private Label to Second Skin by way of kickbacks or chargebacks or any other way.

4. I testified that I founded Second Skin to be a consulting firm to join retailers and factories and act as a liaison in which a finder's fee or commission would be paid directly by the factory to Second Skin for its services (Grannis Decl. Ex. G: C. Dente Dep. 17-18, 22-24); and there is no testimony by me or anyone else that kickbacks were involved.

5. I did not seek to get rid of my former 50-50 business partner in Private Label, Bruce Allen. I testified that Bruce Allen sold his half of Private Label to Jetwell Garments Ltd. because Bruce Allen was ill and did not spend much time in the office, and his health issues caused him to make a decision to pursue other interests. (Grannis Decl Ex. G: C. Dente Dep. 8-9.)  This is the only evidence in the record on the point.

6. I did not arrange the diversion of monies from Private Label to Second Skin; Plaintiff's arguments on this point are completely unfounded.  There was no such evidence of diversion of monies: commission payments to Second Skin were NOT kickbacks, and chargebacks from an ultimate customer such as Target are a regular feature of business in the garment industry.

7. The charge of Plaintiff's attorney that I repeatedly lied about the formation of Second Skin and that I did not want to admit to those lies (Pl. Mem. p. 7) is false.  This abusive accusation is based on a misreading of the evolution of Second Skin's business.  I testified in this case that the original purpose of Second Skin was as a consulting firm (Grannis Decl. Ex. G: C. Dente Dep. 25-26); and I testified in a prior Declaration in a case that had been brought but then dismissed in federal court in Los Angeles that Second Skin was formed to undertake entirely different business than

-3-

Private Label (Grannis Decl. Ex. G: C. Dente Dep. 42-44).

**False Charges of "Kickbacks"**

8. The charge that I received "kickbacks" is false. There was no testimony by me or anyone that I received kickbacks. Asserting that I asked for "kickbacks," as Plaintiff's attorney does (Pl. Mem. p. 4), is especially false.

9. My testimony is that Second Skin received commissions for the service of marrying/joining retailers to factories. (Grannis Decl. Ex. G: C. Dente Dep. 17-18.) Notably, during 2005 and 2006, Plaintiff also paid commissions to Second Skin for other retailers -- *e.g.*, Dick's Sporting Goods and Wal-Mart. For anyone conversant with how business works, economic exchanges make the economic world go around, and when someone arranges for a economic exchange, that is considered a service for which a commission or finder's fee is paid. So when Plaintiff's attorney asserts that I am being "charitable" in calling the "commissions" as "commissions" (Pl. Mem. p. 4), he is just being argumentative. Plaintiff's attroney, when he qustioned me at the depostion, used the word "commission,:not "kickbacks." (Grannis Decl. Ex. G: C. Dente Dep. 24.) Plaintiff's attorney cross-examined me at my deposition about what I did to earn the commission, and I did explain that Second Skin received commissions for the service of marrying/joining retailers to factories (Grannis Decl. Ex. G: C. Dente Dep. 17-18), that Second Skin was "the liaison" to Atateks and that "[i]t was my relationship that ultimately led to orders being placed there [with Atateks]" (Grannis Decl. Ex. G: C. Dente Dep. 37-39). For someone conversant with the business world, that is an understakable response. But Plaintiff's attorney pretends otherwise and persists in just calling "commission" as "kickback" with nothing more than his own say-so. A lawyer working on a commercial case should not be mislabeling as kickbacks the

-4-

payments that were earned fairly as commissions.

10. Plaintiff's attorney writes fiction when he asserts, incorrectly, that the commission payments involved an arrangement to increase the FOB ("freight on board") price to Private Label (Pl. Mem. p. 4). There was no increase in price to Private Label; there was no effective diversion of monies to Second Skin. Private Label paid FOB per garment, as reflected in all the commercial invoices. If, for example, Private Label paid $4 per garment to Plaintiff and Second Skin was paid 5 cents to 15 cents by Plaintiff a garment, there was no addition to the FOB garment price paid by Private Label. Private Label paid Plaintiff for garments; Plaintiff paid commission to Second Skin out of their own profit; Private Label did not pay Second Skin commission. This was not a kickback scheme, much less a classic kickback scheme.

11. There was nothing done by either Plaintiff or me to hide the commission payments because they were kickbacks. Even in the June 10, 2008 Declaration of Ilhan Arslan, he refers to the commissions as commissions and nothing but commissions; and Plaintiff's internal document by Plaintiff's Memet Karayel referred to the payment of commission to Second Skin LLC and Ms. Christine Dente as "commission" (Ilhan Arslan Dep. Dfs. Ex. 10). It is only the editorializing of Plaintiff's attorney that results in the word "kickback" being used.

**False Statements About Chargebacks**

12. My testimony was that chargebacks were generated by the ultimate customer Target for problems such as late deliveries, quality issues, cancellations and loss of sales; and their treatment was negotiated on an ongoing basis by Private Label and Plaintiff in the ordinary course of business. (Grannis Decl. Ex. G: C. Dente Dep. 45-48.) Plaintiff's attorney is really straining badly on this one to try to link "chargebacks" with diversion of funds.

-5-

13. I note that Exhibit D to the Ihlan Arslan Declaration, Debit Note 1005 for $596.80 dated July 20, 2006, is generated incorrectly. Target never generated any chargebacks to Second Skin because there never was a direct relationship between Second Skin with regards to these garments. Further to that, Exhibit E, a wire transfer, was falsely presented as payment for that Debit Note; in fact, this wire transfer shows payment of $10,000 dated September 15, 2006 with no cross-referencing information to Debit Note 1005.

**"Insolvency"**

14. The accompanying affidavit by John Huber, C.P.A. shows that the word "insolvency" is being misused by Plaintiff's attorney to describe Private Label's business affairs. Private Label was not a defunct business in the years 2003 through 2006. Private Label has not gone out of business, but rather has continued in business.

15. Another indication that Private Label has continued as a viable business is that Bruce Allen was able to sell his share of the Private Label company for $300,000. While it is true in a sense that Private Label loaned $300,000 to Jetwell Garments Ltd., that obligation was paid off. Attached as Exhibit A is a copy of a spreadsheet showing the payments by Jetwell Garments Ltd. to Private Label. What happened was that: (i) there was the $300,000 loan from Private Label to Jetwell for the purchase of Bruce Allen's interest; (ii) Jetwell loaned $310,951 to Private Label from January 5, 2006, to January 27, 2006; and (iii) on January 27, 2006, less than one month after the initial loan, the loan from Private Label to Jetwell was deemed paid off.

16. In the process of Bruce Allen putting up his share of Private Label for sale, there were two arms length valuations of Private Label done by outside companies, one by Sax Macy Fromm & co, PC and one by Rosenberg Rich Baker Berman & Company. Attached as Exhibit B is a copy

-6-

of the Sax Macy valuation; and attached as Exhibit C is a copy of the Rosenberg Rich valuation. What these two valuations show is that Bruce Allen chose to make a quick sale rather than realize fuller value reflected in the valuations.

17. Also reflecting the fact that Private Label was (and is) a continuing business was (and is) that Private Label established a new banking relationship in January 2006 with BB & T. One cannot establish a relationship with a new factoring bank and be defunct as a business; to the contrary, a good credit rating is required.

**The Two Methods of Conducting Business With Target**

18. Plaintiff's attorney managed to misstate the two methods of conducting business with Target. One was the "warehouse" method in which garments were shipped to a Private Label warehouse and then on to target, which would pay Private Label's factor BB & T. The second way was that Target opened a letter of credit to Basul, which was transferred to Plaintiff, which delivered the garments directly to Target; commercial documentation for those shipments were transmitted to Private Label, which then in turn invoiced Target 8% of the FOB price for services rendered. There was no pocketing of a price differential by Private Label, as grossly misstated by Plaintiff's attorney.

**The Dispute**

19. According to my testimony (as opposed to Plaintiff's argumentation), the dispute that was the genesis of this case had two sources at Plaintiff's end of what had been a satisfactory business relationship from 2002 to 2006. One was that Plaintiff had problems in its Jordanian plant so serious that Target put Plaintiff on suspension. The second was that Plaintiff starting in November 2006 did not accept Target claims and chargebacks, departing from the practice expected in the garment industry of working out responsibilities for those claims and chargebacks between

-7-

factory and supplier. The consequence was that Private Label was absorbing those chargebacks and loss of sales because Target offset payments to Private Label, thus causing the cash flow problem referenced by Plaintiff and in turn the dispute with Plaintiff.

I declare under the penalty of perjury that the foregoing is true and correct.

**Dated: New York, New York**
**June 16, 2008**

*[signature: Christine A. Dente]*

___/s/_Christine Dente_____
**Christine Dente**