UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

ATATEKS FOREIGN TRADE LTD, JORDAN    :

AND ATATEKS DIS TICARET A.S.,    :    07CV6665(HB)

                Plaintiffs,    :    OPINION & ORDER

                      :

    -against-    :

                      :

PRIVATE LABEL SOURCING, LLC AND    :

SECOND SKIN, LLC,    :

             Defendants.    :

----------------------------------------------------------------------X

Hon. HAROLD BAER, JR., District Judge:

      This is a case about a business relationship gone bad.  Plaintiffs Atateks Foreign Trade Ltd., Jordan, and Atateks Dis Ticaret A.S. (collectively, "Atateks"), foreign companies in the garment manufacturing business, assert claims of breach of contract, account stated, and fraudulent conveyance against their former purchasing agent, Defendant Private Label Sourcing, LLC ("Private Label"), and an alleged alter ego Second Skin, LLC ("Second Skin").  Defendants assert counterclaims for breach of contract.  This Opinion follows a one-day bench trial and post-trial briefing submitted by the parties.

    **I. FINDINGS OF FACT**

    **A. The Parties.**

      Plaintiffs Atateks Foreign Trade, Ltd., Jordan ("Atateks Jordan") and Atateks Dis Ticaret A.S., ("Atateks Turkey") are related foreign companies that manufacture women's apparel in Jordan and Turkey respectively. (Trial Decl. of Ilhan Arslan ("Arslan Decl.") ¶ 1, 6, 7).  Of relevance to this case, Atateks Turkey produced seamless garments in Turkey and also knitted and dyed fabrics that were sent to Jordan to be cut and assembled into garments by Atateks Jordan. (*Id.* ¶ 6, 7).  Atateks is owned by Ihsan Arslan.  (Trial Transcript ("Tr.") 81-82.)  His younger brother, Ilhan Arslan ("Arslan"), was the general manager of Atateks Jordan until 2007 and the only witness to testify on Atateks' behalf at the trial.

Private Label is a New York-based limited liability company that, during the relevant time periods acted as a purchasing agent of women's apparel for Target Stores.   (Trial Decl. of Christine Dente ("Dente Decl.") ¶1, 3, 4.)   At root, Private Label's role was that of a middle-man.  The company would either purchase garments from Atateks and other manufacturers for resale to Target or facilitate transactions pursuant to which the manufacturers sold garments directly to Target, and Private Label earned a profit that was paid by Target.  (Tr. 32; 46.) Private Label was formed by Christine Dente and Bruce Allen in 2001, and until 2006 each were co-owners of equal shares.  (*Id.* ¶4.)  In January 2006, Allen sold his fifty percent interest in Private Label to a Hong Kong-based company named Jetwell Garments Ltd. (*Id.* ¶5.)

Second Skin is a New Jersey limited liability company that was formed in 2005 and is owned entirely by Dente.  (*Id.* ¶ 45.)  Dente testified that she formed Second Skin in order to focus on the seamless garment business.  (Tr. 34.)  In 2005 and 2006, one-hundred percent of Second Skin's income came from commission payments paid directly to Second Skin from Private Label's customers including Atateks.  (Tr. 36-37.)   Dente and Nilda Corchado, a former employee of Private Label and then-current employee of Second Skin, were the only other witnesses to testify live at the trial.[1]

**B.  The Business Relationship.**

In 2002, Atateks and Private Label were introduced to one another by Imer Basul, whose company, Basul Texkstil Ltd. ("Basul"), is a Turkish sourcing agent. (Dente Decl. ¶ 9; Arslan Decl. 9.)   Basul served as Private Label's agent in Turkey and as the day-to-day intermediary between Private Label and Atateks. From 2002 until the latter half of 2006, the parties conducted business without significant problems.  (Tr. 33.)

The business relationship between Atateks and Private Label was not documented in a master written contract.  (Pretrial Order, Stipulations, No. 1.)  Rather, the parties conducted business pursuant to a system of purchase orders and invoices.  To initiate an order for garments, Private Label would send Atateks a purchase order that specified the style, color, quantity and per-unit price of the goods to be manufactured.[2]  (Dente Decl. ¶ 10; Arslan Decl. ¶ 10; Tr. 46.)

---

[1] Defendants also submitted a trial declaration of an accountant, John Huber.  The trial declaration is in evidence and Mr. Huber was not cross-examined by the Plaintiffs.

[2] Atateks contends that the purchase orders did not always contain all the information that was needed to manufacture the goods, and that after Atateks produced a sample garment, the colors, fabrication, and sizing of the garments would need to be approved by Private Label and/or Target.  (Ilhan Decl. ¶ 11.)

When the goods were manufactured and shipped, Atateks would send Private Label an invoice for the agreed-upon price of the goods.

1. <u>Direct Letter of Credit and Warehouse Transactions</u>.

The parties' transactions took two forms:  transactions conducted on a "direct letter of credit" basis and those conducted on a "warehouse" basis.  Transactions conducted on a direct letter of credit basis constituted the vast majority of the parties' business.  (Dente Decl. ¶11.) Under this system, Target paid Atateks directly via a line of credit and Atateks was responsible for shipping its garments directly to Target's appointed forwarder.  (*Id*. at ¶15.)  If Target approved the goods, the freight forwarder would send Atateks a stamped bill of lading, which Atateks used to collect payment on the invoice from the bank that administered the letter of credit. (*Id*. at ¶16.)  Private Label was then separately remunerated by Target.

For the smaller number of transactions conducted on a warehouse basis, Private Label paid Atateks directly for the garments and Private Label took possession of the garments, storing them in its own warehouse before they were shipped to Target.  (Dente Decl. ¶ 11; Tr. 42.) Private Label generally arranged for shipping through its appointed freight forwarder and took possession of the goods at the port of departure.   Dente testified that all of the shipments at issue in this case were warehouse shipments, although the evidence establishes that some of the disputed transactions began as direct line of credit transactions and were converted to a warehouse basis to facilitate timely delivery to Target.  (Tr. 42.)  Private Label earned a profit on warehouse goods that averaged 10% of the sales price.  (Tr. 48-49.)

2. <u>Charge Backs</u>.

Another relevant feature of the parties' business relationship are "charge-backs" pursuant to which certain costs incurred by Private Label were charged back to Atateks.  (Arslan Decl. ¶28; Dente Decl. ¶26.)  The parties agree that charge-backs were standard protocol in the garment manufacturing business and in their course of dealing in particular.  (Tr. 97.)  In large measure, the charge-backs originated with Target, which invoiced Private Label for certain costs, some of which Private Label then charged back to Atateks.  For example, Target invoiced Private Label for merchandise returned to the retailer by customers and for "new store discounts," the discounted rates for which goods in a newly opened store were sold.  (Dente Decl. ¶26-29.)  According to Dente, it was common practice for Target to take between six

---

The evidence corroborates that the terms of the purchase orders were routinely modified through a collaborative process between Atateks, Private Label, and Target.

months and one year to generate charge-backs. As discussed below, the evidence shows that while Atateks routinely accepted smaller charge-backs, responsibility for larger charge-backs was negotiated between the parties.

4. Commissions.

Although it was Basul who introduced Private Label and Atateks in 2002 and commissions had not been previously paid, Arslan testified that in mid-2005 Dente requested that "commissions" be paid to her through Second Skin because she was having trouble with Bruce Allen, the other owner of Private Label, and wanted funds to be diverted to her without passing through Private Label. (Arslan Decl. ¶43). Althouth Dente acknowledged that the relationship between Private Label and Atateks was "pretty well developed" by 2005, she testified that the commissions were earned for the "service that [she] provided in expanding the seamless business with Target and Atateks," and denied that the prices Atateks charged to Private Label were increased in order to pay the commissions. (Tr. 89.)

**C. Deterioration of Business Relationship.**

The parties' business relationship broke down in the latter half of 2006, ultimately leading to this litigation.   Plaintiffs allege generally that Target breached or rescinded its contracts to purchase certain garments from Private Label, but that Private Label improperly tried to pass the losses off on Atateks.  Private Label, for its part, contends that Atateks was responsible for production delays and quality control issues that led Target to cancel the orders and that Atateks agreed at a meeting in New York in October 2006 to bear some of the losses, but later reneged.  Private Label further contends that substandard labor conditions at Atateks' Jordanian factory caused Atateks to fail audits conducted by Target, which resulted in Atateks Jordan being placed on "probation" such that Target would not accept future orders manufactured by the Jordanian plant.

1. Cancelled Orders and Alleged October 2006 Agreement.

On September 28, 2006, Target cancelled two large orders for garments in the "rouched" and "racerback" styles.  Target contended that the racerback garments, which had already been shipped from the Middle East, were late and that delays in earlier shipments of rouched garments required cancellation of additional orders for garments in that style that were to be delivered in November.  The next day, Dente sent an email to Basul informing her of the cancelled orders and attempting to shift the burden of loss to Atateks.  Dente stated that Target would allow the rouched garments to be converted to a warehouse basis "at factory liability" and that Private

Label would either return the boat shipments of the racerback garments or sell off the goods on consignment for Atateks, but that Private Label would "not be making payment on these units." (PX-35.)  In an email to Dente dated October 3, 2006, Arslan objected to Dente's statement that the shipments were late and noted that the racerback garments had already been approved and shipped. (PX-52.)

Arslan, Dente, and Private Label employee Nilda Corchado met in New York City in October 2006 to discuss the cancelled orders, but their accounts of the agreement reached at that meeting vary significantly.  (Tr. 133: 16-17; Dente Decl. ¶ 74; Tr. 50.)   Defendants contend that at the meeting the parties agreed that (i) Atateks would keep the racerback garments and sell them in the secondary market, thereby releasing Private Label's obligation to pay the contract price; (ii) Private Label would sell the rouched garments and whatever price was obtained would satisfy Private Label's liability to Atateks for those goods; and (iii) liability for the amount due under an invoice for rouched garments dated March 22, 2006, would be split equally between Private Label, Atateks, and Basul.  Atateks, for its part, acknowledges the meeting but disputes Private Label's account—particularly the alleged term that permitted Private Label to satisfy its obligation to pay for the rouched goods with whatever price it secured for those goods in the resale market.

2.  <u>Labor Problems at the Jordanian Factory</u>.

In her trial declaration, Dente stated that in April or May of 2006, Target conducted an audit of the Jordanian factory and found problems in "payroll, safety, and with forced labor." (Dente Decl. ¶66.)  On cross examination, Dente acknowledged that she had characterized Atateks' failure to pay proper overtime as "forced labor."  (Tr. 23.)  In her written declaration, Dente also testified that Target cancelled its orders for certain goods "after the Jordan factory was suspended/deactivated," but on the stand she acknowledged that the suspension/deactivation of the Jordanian factory was not the *cause* of the cancelled orders.  Rather, Dente testified that the invoices were cancelled due to "late delivery and quality problems" not the labor problems at Atateks' Jordanian factory. (Dente Decl. ¶¶ 70, 73; Tr. 22-25.)  Target's audits did identify certain features of the Jordanian factory that "need[ed] improvement" and after a third audit Target placed the Jordanian factory on "probation."  This meant that Target would not accept *future* orders fulfilled with goods manufactured there.  As discussed below, whether Atateks "failed" the Target audits is immaterial to resolution of the parties' competing claims.

## II.  CONCLUSIONS OF LAW

### A.  Applicable Law.

The New York Uniform Commercial Code governs the parties' dispute.  The parties' briefs assume that New York substantive law governs and such implied consent is sufficient to establish the applicable choice of law. *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 (2d Cir. 2001) (citing *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir. 2000)). The Uniform Commercial Code ("UCC") applies because the garments at issue are "goods" within the meaning of U.C.C. § 2-105.  N.Y. U.C.C. § 2-105.

### B.  Breach of Contract Claims.

"Two elements give rise to a breach of contract claim: (i) a contract between the parties and (ii) an act allegedly in violation of that agreement. Both are necessary elements of the claim; neither is sufficient by itself." *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.*  98 F.3d 25, 31 (2d Cir. 1996).  The parties' business relationship was conducted on a purchase order basis:  no master contract governed the relationship of the parties.  Consequently, each purchase order issued by Private Label and accepted by Atateks represents a distinct contractual obligation and must be analyzed separately.  Because Private Label acknowledges that it has not paid Atateks for the transactions in dispute, Private Label's liability for breach of contract will turn on the existence of a contractual obligation and the terms thereof.

Evidence of the parties' course of dealing over the course of their business relationship may be used to assist the Court's interpretation of the contracts where they are ambiguous.  N.Y. U.C.C. § 2-205(4); *Travellers Intern. AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1102 (S.D.N.Y. 1989) (past performance of the parties under the contract and previous agreements which incorporated identical provisions "supply more than adequate context for the Court to determine the meaning the parties intended to ascribe to [a contractual term.") Industry custom and trade usage may also be considered to assist the Court in determining the intent of the parties.  However, the parties' course of dealing controls over evidence of commercial custom, and the written terms of the purchase orders and invoices generally control over both forms of extrinsic evidence. *See Christiania General Ins. Corp. of New York v. Great American Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992).

1.  Accounting Issues and Summary of Breach of Contract Claims.

Quite regrettably, two distinguishing features of this litigation are the parties' inability to produce a comprehensive, accurate, and mutually acceptable accounting and their vituperative

disagreements before, during, and after the trial as to who is to blame.  Ultimately, and I believe correctly, Plaintiffs conceded that Defendants' accounting, submitted shortly before the trial, is far more comprehensive, and at trial and in their post trial briefs they work from that "premise." (Tr. 7:1-3.)  Although this is fatal to their account stated claims[3] it is the only viable means to resolve the parties' disputes.[4]  Unfortunately, the Court has been forced to piece together documentation of the transactions at issue, an arduous task not made any easier by the disorganized volumes of trial exhibits and the parties' shoddy bookkeeping practices.

As a starting point, according to their own accounting and exclusive of their counterclaims, Defendants acknowledge that they owe Atateks $562,091.77.[5]  Because Defendants' obligation to pay Atateks this sum stems from their contractual obligations under the purchase orders, this is the "starting point" for Defendants' breach of contract liability.  From this "premise" Atateks contends that five categories of "adjustments" must be made to

---

[3] An account stated claim requires, as a matter of law, that the party with the burden of proof establish either that the account was presented and mutually accepted as correct or that the party to whom the account was presented failed to object within a reasonable time. *Interman Indus. Products, Ltd. v. R.S.M. Electron Power, Inc.,* 37 N.Y.2d 151, 154 (1975); *Shea & Gould v. Burr,* 194 A.D.2d 369, 370-371 (1st Dep't 1993); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* No. 95 Civ. 2144 (JGK), 1999 WL 58680, *4 (S.D.N.Y. 1999)

[4] Because neither party's hands are entirely clean with respect to production of the documents necessary for either side to create an accurate accounting, it would be unfair to penalize the Plaintiffs for electing to work from Defendants' accounting.  Prior to the trial, the Plaintiffs complained that they had requested an accounting from Defendants in May 2008 but never received one.  The Plaintiffs initially objected to the accounting Defendants produced with their pretrial submissions on the basis that it had not been produced in discovery.  However, prior to the trial the parties agreed not to object to one another's trial exhibits on that basis. (Tr. at 75.)  Although Defendants produced 500 pages of untabulated documentation for the disputed charge-backs literally on the eve of trial, their *accounting* was presented sufficiently in advance of trial to permit the Plaintiffs to make use of it at trial.  Where otherwise credible and competent, the supporting documentation for the charge-backs has been admitted into evidence pursuant to the rule of completeness.  *See* Fed. R. Evid. 106.

[5] Defendants concede that the accounting summary introduced at trial as Defendants' Trial Exhibit A contains an arithmetic error in that it fails to account for two invoices that together total an additional $98,233.20 owed by Private Label to Atateks. (*See* Defs.' Mem. at 14-15.)  However, Defendants contend that their Trial Exhibit A also failed to include three debit notes which total $45,167.83 owed by Atateks to Private Label.  Defendants contend that these three debit notes were correctly included in the Plaintiff's listing of debit notes set forth in Plaintiff's Trial Exhibit 4.  Upon close comparison of Defendants' accounting in their Exhibit A with the Plaintiffs' Exhibit 4, there appear to be more than three debit notes omitted, but they total less than $45,000.  I find thirteen omitted debit notes for a total of $34,080.13. Consequently, *my* "starting point" for the breach of contract claims is $573,179.47.

Defendants' accounting which together increase the amount owed to Atateks by $868,917.27, to a total of $1,377,955.67.

Specifically, Atateks contends that Defendants' accounting should be revised to include (i) $153,774.86 for charge-backs that Defendants asserted against Atateks after November 1, 2006 (the "Charge-Back Claims"); (ii) $205,921.80 in unpaid invoices for an order of "racerback" style garments that Private Label contends was validly cancelled and covered by the October 2006 Agreement (the "Racerback Claims"); (iii) $280,836 in unpaid invoices for an order of "rouched" style garments that Private Label contends was validly cancelled and also covered by the October 2006 Agreement (the "Rouched Goods Claims"); (iv) $93,090.20 in unpaid invoices for a purchase order dated March 22, 2006 (the "March 2006 Invoice Claims"); and (v) $116,940.00 for payments that were allegedly made by Private Label to Basul (the "Basul Claims").  Because distinct contractual obligations serve as their predicates, each of the Plaintiffs' proposed "adjustments" to Defendants' accounting must be analyzed as a separate breach of contract claim.  These separate claims are addressed seriatim.

2.  <u>Charge-Back Claims.</u>

The parties agree that charge-backs were part of the ordinary course of their business relationship, and that after November 2006 Atateks refused to accept any of the charge-backs issued by Private Label. Atateks contends that Private Label's financial difficulties in 2006 led the company to break from past practice and issue unfounded charge-backs without justification and without first obtaining Atateks' agreement as to their amount.  (Arslan Decl. ¶29.)  Atateks contends that because large charge-backs were negotiated and Atateks did not agree to any charge-backs after November 2006, all charge-backs issued after that date should be rejected. Private Label, for its part, contends that charge-backs were "readily accepted by Plaintiffs throughout the course of [the parties'] business dealings, until sometime in 2006" and that Atateks' unilateral decision to reject charge-backs triggered the disputes that led to the dissolution of the business relationship.  (Dente Decl. ¶25.)  Private Label argues that Atateks' refusal to agree to the charge-backs was inconsistent with their prior course of dealing and "a complete departure from industry wide business procedures." (Dente Decl. ¶56.)

The purchase orders themselves do suggest that Plaintiffs will be responsible for some types of charge-backs.  The purchase orders provide that by accepting the order, "vendor [i.e. Atateks] assumes full responsibility for all resultant claim(s) from us and our customer(s) due to shipment delays, quality and workmanship of goods, and any causes pertaining to shipment(s)

8

under this order." (*See, e.g.*, DX-A, 1.B., 2.B., 3.B.)  Private Label also places heavy reliance on industry custom, but the contracting parties' specific course of dealing takes precedence over such usage of trade evidence.  U.C.C. §2-205(4).  Here, the evidence is clear that large charge-backs were negotiated between the parties.  (*See, e.g.*, Ilhan Decl. ¶29; Tr. 108.)  Arslan testified that Atateks generally accepted smaller charge-backs because the company was "trying to accommodate our biggest client . . . to accommodate them for smaller amounts" but when it came to larger amounts Private Label needed its client's prior authorization.[6] (Tr. 157.)  Dente testified similarly, that "charge-backs when issued were no mystery, especially large ones, because they were already discussed, negotiated and agreed upon before ever being issued." (Tr. 108.)

The purchase orders obligate Atateks to accept certain types of charge-backs where they are legitimately imposed, and the parties' course of dealing confirms this approach. Atateks could not then unilaterally reject all charge-backs issued by Private Label after November 2006. However, the evidence also makes clear that the parties' course of dealing would not allow Private Label to unilaterally assess Atateks with unsubstantiated, five-figure charge-backs. Consequently, each category of disputed charge-backs must be analyzed separately.

a. *Charge-Backs for Defective Merchandise.*

Plaintiffs challenge fourteen charge-backs for allegedly defective merchandise which Private Label issued between April 12 and April 18, 2007 (the "Defective Merchandise Charge-Backs").[7]  Plaintiffs contend that deductions for these charge-backs, which total $39,181.54, should be eliminated from Private Label's accounting.  However, Private Label's purchase orders provide that as manufacturer, Atateks is liable for defective merchandise. (*See, e.g.,* DX-A-31-B.)  Moreover, in his testimony Arslan acknowledged the propriety of charge-backs for defective merchandise. (Ilhan Decl. ¶28.)  Therefore, to the extent supported by the evidence, these charge-backs will be assessed to Atateks.

Plaintiffs contend that Target's documentation, Debit Memo No. 90C605845, cannot support the Defective Merchandise Charge-Backs because the charge-backs summarized therein

---

[6] Arslan testified that lower-level employees of the two companies would generally administer smaller charge-backs but "if it goes to a big number, Christine Dente and I was interfering to find a middle way, to find an agreement." (Tr. 157.)

[7] Specifically, Plaintiff's challenge charge-backs assessed as Invoice Numbers 1684, 1707, 1708, 1709, 1710, 1713, 1715, 1716, 1717, 1718, 1719, 1720, 1721, 1723.

total only $33,268.54 whereas Private Label seeks $39,181.54.[8]  However, once Target's document is compared with Private Label's charge-backs, it becomes clear that some, but not all of the Defective Merchandise Charge-Backs are substantiated.   For example, Private Label's Invoice No. 1708 is a Defective Merchandise Charge-Back that bears a Reference No. 90C605845.  Therein, Private Label charges Atateks a total of $11,821.54 for "customer returns due to defect style 016011024T Merona Seamless Vee."  The invoice is itemized into six quantities of returned merchandise.  The Target Debit Memo provides evidentiary support for charge-backs in the amount of $2,271.37 for 454 returned garments and $6,919.19 for 1,383 returned garments, at a charge-back rate of  $5.03 per garment.  However, the Target Debit Memo does *not* support a charge-back of $2,482.00 for 184 garments, at a charge-back rate of $13.48 per garment.  Similarly, Private Label's Invoice No. 1710 purports to assess Plaintiffs with $19,142.79 in charge-backs for customer returns of the "Merona Seamless Crew."  The Target Debit Memo supports itemized charge-backs at a rate of $4.98 per unit, but not a $3,247 charge-back for 260 returned garments at a rate of $12.49 per unit.

Upon review of the record, I find that $9,516.59 in purported charge-backs under invoice numbers 1684, 1707, 1708, 1709, 1710, 1713, 1715, 1716, 1717, 1718, 1719, 1720, 1721, and 1723 are not supported by documentary evidence.   On the other hand, those charge-backs supported by the evidence, which total $29,664.95, will be credited against the amounts Private Label owes to Atateks. The unsupported sum of $9,516.59 will be added into Defendants' accounting.

  b.   *Charge-Backs for New Store Discounts.*

Plaintiffs next challenge six charge-backs that total $11,342.61 and are allegedly related to garments used by Target to stock new stores and that were therefore subject to a new store

---

[8] Plaintiffs contend that Private Label's proffered support for the Defective Merchandise Charge-Backs, found in the several hundred pages of untabulated materials that constitute Trial Exhibit DX-CC, is a sixteen-page document from Target dated September 24, 2007, several months *after* the charge-backs were issued.  Private Label acknowledges an "apparent assembly error" in DX-CC, but contends that the Defective Merchandise Charge-Backs are supported by a document from Target titled Debit Memo No. 90C605845 and dated January 22, 2007, which is included elsewhere in DX-CC and is separately marked as PX-38.  Each of the valid Defective Merchandise Charge-Backs bears a reference number that matches the Debit Memo No. 90C605845, corresponding to documentary support for the charge-backs dated January 22, 2007.  Consequently, the supporting documentation precedes the date on which Private Label issued invoices to Plaintiffs for these charge-backs.

discount (collectively, the "New Store Charge-Backs").[9]  Dente testified that "new store discounts" were common and issued in the ordinary course of business.  (Dente Decl. ¶ 27.) Plaintiffs argue that the New Store Charge-Backs were issued so far after the purchase orders to which they relate—in some cases up to one year after the purchase order, and shortly before the instant litigation commenced—as to raise doubts about their authenticity.

Although Dente did testify that sometimes it took Target as much as one year to issue charge-backs, Defendants offer no credible explanation as to why, in some instances, nearly an entire year elapsed between the date that Target billed Private Label for the New Store Charge-Backs and the date that Private Label issued a charge-back invoice to Atateks.  Because the evidence shows larger charge-backs were commonly negotiated and that Private Label was having cash-flow issues late 2006, and because Arslan testified that Private Label began to issue unsubstantiated charge-backs after the parties' business relationship deteriorated, I find suspect the charge-backs that Private Label issued to Atateks several months after being billed by Target. For example, Private Label's Invoice No. 1757, for a New Store Charge-Back in the amount of $4,368.75 is dated May 16, 2007, but relates to Target new store discounts for the month of July 2006, based on a report dated August 7, 2006.  The nine-month delay in Private Label's issuance of this charge-back cannot be credibly blamed on Target's delay in invoicing Private Label.

I find that New Store Charge-Backs issued under Private Label Invoice Numbers 1635, 1646, 1644 (with the exception of an unsupported $719.60 charge), and 1768 are credible and supported by the evidence.  I find Private Label Invoice Numbers 1757 and 1758, issued more than nine months after the supporting documentation from Target, unsupported by credible evidence.  Consequently, the sum of $5,898.68 will be credited against the amounts owed by Private Label to Atateks and $5,594.31 will be added into Defendants' accounting.

c.  *Charge-Backs for Freight.*

Plaintiffs challenge seven charge-backs for freight costs that Private Label issued between November 6, 2006 and July 27, 2007 (the "Freight Charge-Backs").[10]  These charge-backs are not substantiated by the evidence and thus must be rejected.  First, a preponderance of

---

[9] Specifically, Plaintiffs challenge charge-backs for new store discounts issued under Private Label Debit Note Numbers 1635, 1644, 1646, 1757, 1758, 1768.

[10] Specifically, Plaintiffs challenge charge-backs for freight issued under Private Label Debit Note Numbers 1630, 1631, 1649, 1655, 1656, 1771, 1772.

the evidence makes clear that Private Label, as buyer, was generally obligated to pay for freight.[11] Each of Atateks' commercial invoices for the shipments of goods associated with the Freight Charge-Backs specifies that the goods are "FOB Haifa," the port of departure. All applicable bills of lading specify that freight is payable at the destination.  (See PX-8 at 116, 119, 147, 158, 167.)  Pursuant to U.C.C. §2-319, unless otherwise agreed, the term FOB (which means free on board) is a delivery term, and when the place of shipment is specified the seller bears only the risk and expense of putting the goods into the possession of the carrier.  N.Y. U.C.C. §2-319.  Generally, use of the term FOB "'means that title to property passes from the seller to buyer at the designated FOB point.'" *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 843 n.2 (2d Cir. 1985) (quoting 10 *Williston on Contracts,* § 1079A, at 94 n. 6 (3d ed. 1967)); *Chase Manhattan Bank v. Nissho Pacific Corp.*, 22 A.D.2d 215, 221 (1964) (quoting *Standard Casing Co. v. California Casing Co.,* 233 N.Y. 413, 416 (1922))( "The general rule is that, upon a sale f.o.b. the point of shipment, title passes from the seller at the moment of delivery to the carrier, and the subject of the sale is thereafter at the buyer's risk."); *Sara Corp. v. Sainty Intern. America Inc*., 05 Civ. 2944 (JCF), 2008 WL 2944862, *7 (S.D.N.Y. Aug. 1, 2008) (same); *Eastern Tanning Co., Inc. v. Tannerie Du Languedoc*, No. 88 Civ 2566, 1989 WL 119438, *2 (E.D.N.Y. Oct. 3, 1989).

Second, the testimony is consistent with shipping contracts where the buyer assumes risk of loss after the goods are delivered to the carrier.  Arslan testified, "till we ship it, we were at the edge of the knife, but once we ship it out, it was over, our stress was over, our risk was over . . . and the business went that way for many years." (Tr. 134.)  The testimony also confirms that Private Label was generally responsible for shipping costs.  Dente testified, albeit reluctantly and somewhat evasively, that "all things being equal and goods being on time," it was Private Label's responsibility, through its freight forwarder, to arrange for shipping.  (Tr. 43-44.)  Dente further testified, however, that "when Atateks was running late, it became Atateks' responsibility to help facilitate those shipments through our forwarder and at times to prepay freight."[12] (Tr.

---

[11] Although the purchase orders purport to hold Atateks liable for "resultant claims(s) . . . due to shipment delays" and "any causes pertaining to shipments," such matters are distinct from shipping costs themselves.

[12] When asked who paid freight when goods were marked "FOB," Dente testified that the freight expenses were determined on a "case-by-case basis. There were times when Atateks prepaid freight, paid freight after-the-fact, after the goods arrived. We may have paid the freight on their behalf." (Tr. 69.)

44.) The documentary evidence corroborates that when Atateks' production was behind schedule the manufacturer did in fact prepay for freight, including more expensive air freight. (See PX-8 at 100-105  (waybills for air freight "prepaid" for shipments of garments in the "racerback" style in August 2006)). Neither the documents nor the testimony, however, establishes that the Freight Charge-Backs were customary in the parties' course of dealing or that Atateks agreed to accept them as compensation for late deliveries.

Third, the documentary evidence does not support that Atateks was responsible for freight charges with respect to the individual purchase orders for which the Freight Charge-Backs were issued.[13] For example, Private Label's Debit No. 1649 is a Freight Charge-Back for ocean freight charges in the amount of $13,282 for four purchase orders related to the "merona lace program."  (PX-4 at 23.)  Each of the purchase orders are dated October 19, 2006 and specify a price code of "IQ FOB." The invoices for these purchase orders are dated November 6, 2006, specify "FOB Haifa" and "freight collect."  (DX-A-41-A, DX-A-42-A, DX-A-43-A, DX-A-44-A.)  The bill of lading for the shipment is dated November 15, 2006, and also specifies that "freight [is] payable at [the] destination."  (PX-8 at 147.)[14]

Finally, for several additional reasons I find suspect the Freight Charge-Backs issued under Private Label Debit Notes 1771 and 1772, which relate to the cancelled racerback garments and rouched garments, respectively, and total $45,785.77.  First, Debit Note 1771 does not specify any purchase orders, but simply refers to the style of garment for which Target cancelled its order for 75,000 units.  Second, it is clear from the bills of lading (including waybills for air freight) that some of the freight for this order—portions of which Atateks admits

---

[13] The Freight Charge-Backs relate to orders for three general categories of garments: (1) those in a program of lace-trimmed garments produced and shipped in the fourth quarter of 2006, the "merona lace program"; (2) garments in the rouched style that Private Label attempted to cancel but agreed to take into its warehouse for potential resale, purportedly at Atateks' risk; and (3) garments in the racerback style that Private Label attempted to cancel for late delivery.

[14] The documentary evidence related to Private Label Debit Numbers 1630, 1631, and 1655 which also relate to the "merona lace program" are substantially similar. (See, e.g., PX-4 at 12, 13, 27; DX-A-37-B, DX-A-38-B, DX-A-39-B, DX-A-40-B.)   Debit Number 1656 relates to a freight charge-back for the rouched garments that were cancelled. The related Atateks invoice also specifies that the goods were FOB Haifa and the bill of lading specifies that "freight [is] payable at [the] destination." (PX-8 at 158.)

to delivering late—was prepaid by Atateks which is consistent with the testimony.[15]  Third, these significant Freight Charge-Backs were issued in July 2007, when the instant dispute was heading towards litigation, but the shipping invoices used to support them are dated between August 2006 and October 2006.  Unlike the charge-backs for defective merchandise or new store discounts, Freight Charge-Backs are not dependent on Target's accounting and Private Label offers no credible explanation for the delay. Debit Note No. 1772 is similarly problematic.[16]

Consequently, I find that the Freight Charge-Backs are not substantiated by the evidence and the sum of $199,758.68 will be added to Defendants' accounting.

### d.  *Charge-Back for Royalty Payment to Target.*

Plaintiffs object to a charge-back of $805.53 for royalty charges from Target related to the sell-off of the cancelled racerback and rouched garments.  Target invoices substantiate the charge-back, but the record is entirely devoid of evidence that Atateks agreed to accept it. However, the royalties are a cost of the sale of the cancelled garments:  Atateks sold the racerback garments and Private Label sold the rouched garments.  Accordingly, Atateks is liable for the royalty payments attributable to sale of the racerback garments ($500.00) and Private Label is responsible for those attributable to sale of the rouched garments ($305.53).  The sum of $305.53 will be added to Defendants' accounting.

### e.  *Charge-Back for Floor-Ready Items.*

Finally, Plaintiffs object to a charge-back in the amount of $15,637.50 set forth in Private Label's Debit No. 1653, for goods that Target claimed had been improperly packaged.  An email dated December 4, 2006, from Target to Private Label stated the garments were incorrectly packaged, and that "if [Private Label] feel[s] this violation is incorrect, meaning previous approval was given to ship this way," Private Label should document such approval.

Plaintiffs contend that because the email does not establish that Target determined in the final analysis that it would charge the amount owed, the charge-back should be disregarded. Plaintiffs further contend that the "considerable chargeback was never produced during the parties' document exchange" and was "first presented to Plaintiffs less than 12 hours before trial

---

[15] *See*, *e.g.*, PX-8 at 106 (commercial invoice dated 9/2/06 for PO#34202 (8712 pieces) FOB Jordan showing prepaid freight on Quatar Airways); PX-8 at 108 (commercial invoice dated 9/5/06 for PO#34202 (4,896 pieces) FOB Jordan showing prepaid freight on Qatar Airways).

[16] Debit Note No. 1772 is a Freight Charge-Back in the amount of $24,300.77 for freight costs related to the cancelled rouched garments.  Although the freight invoices date to November and December of 2006, the charge-back was not issued until July 26, 2007.

and some 400 pages into an un-paginated exhibit." (Pls.' Mem. at 14.)  However, Private Label Invoice No. 1653 is included in Plaintiffs' Trial Exhibit 4—only the email was provided on the eve of trial. Plaintiffs thus could have questioned Ms. Dente about this charge-back at trial, but elected not to.  Moreover, the terms of the purchase orders state that Atateks will be liable for claims pertaining to shipments, a category into which claims of improper packaging would fall. Accordingly, the $15,637.50 charge-back for Invoice No. 1653 will not be eliminated from the final accounting.

3.  Racerback Claims.

On September 29, 2006, after the garments had been shipped from the Middle East, Dente sent an email to Basul attempting to cancel orders for 75,000 garments in the "racerback" style with a total contract price of $310,627.80.  The racerback garments were ultimately sold in the secondary market by an affiliate of Atateks for $104,706.00.  Atateks contends that Private Label had no right to cancel the purchase orders because the racerback garments had already been accepted and shipped, and consequently asserts a breach of contract claim for the difference between the contract price and the resale price, or $205,921.80.  Private Label, for its part, contends that Atateks was responsible for the severe delays in shipping the racerback garments that led Target to cancel their order.  Private Label further contends that at the October 2006 meeting in New York the parties agreed that Attateks would sell the racerback garments in the secondary market and accept whatever price was received in full satisfaction of the amounts owed by Private Label under the purchase orders.  For the reasons that follow, Platintiffs fail to establish that Defendants are liable for the Racerback Claims.

The racerback garments had already been shipped when Dente attempted to cancel the order for them and Private Label took title to the goods at the port of departure, Haifa, Israel. (*See* PX-8 at 116 (bill of lading dated 9.25.06); Tr. 57.)   Production and sale of the racerback garments was converted to a warehouse basis to facilitate the timely delivery of the goods[17] and Dente testified that when business was done on a warehouse basis, Private Label's forwarder took possession of the goods at the port.  (Dente Decl. 23.)  This is consistent with the purchase

---

[17] Notwithstanding Defendants' claims in their post-trial brief that the racerback garments were produced and sold on a direct line of credit basis, in his opening remarks at trial Defendants' counsel stated that this case "involves completely the category of warehouse goods" and that the direct letter of credit business is "not involved in this case at all." (Tr. 8.)  Dente also testified that it was her contention that all of the transactions at issue in this litigation were conducted on a warehouse basis. (Tr. 42.)

orders and invoices that specified "FOB Haifa." (See, e.g. DX-A-31-A, B; Tr. 68-69.) Nothing in the record suggests that the parties intended to vary the general rule that title passes upon the seller's delivery of the goods to the port of shipment. Although her testimony was somewhat ambiguous, at trial Dente appeared to acknowledge that Private Label had title to the racerback garments before they were resold to a third party. (Tr. 86.)

Having accepted the garments, Dente's purported cancellation of the purchase orders for them was ineffective. Private Label attempted to revoke its acceptance of the racerback garments on the basis of their late delivery in alleged breach of the time for delivery established by the purchase orders. But because Private Label knew of the alleged non-conformity (i.e. the deliveries allegedly outside of the times specified in the purchase orders), Private Label cannot establish the prerequisites to effective revocation after acceptance: namely, that the goods were accepted without discovery of the alleged non-conformity. N.Y. U.C.C. §2-608(1); *EOI Electronics, Inc. v. Xebec*, 785 F.32d 391, 396 (2d Cir. 1986.) Consequently, Private Label's attempt to revoke its earlier acceptance by "considering" certain purchase orders as "cancelled" was ineffective.[18]

Ultimately, the Racerback Claims turn on the terms of the agreement reached in New York in October 2006. Dente and Corchado each testified that at the meeting, Arslan agreed that Atateks would sell off the racerback garments and keep the proceeds as full payment for those goods. In contrast, Arslan offered somewhat ambiguous testimony that Private Label sought assistance from Morera, a U.S. affiliate of Atateks that specialized in secondary-market sales, to sell of the racerback garments for Private Label's own account. (Tr. 135-136.) Emails exchanged between Corchado and Arslan in January 2007 support Atateks' contentions. Private

---

[18] By accepting the racerback garments, however, Private Label did not necessarily waive a breach of contract claim for the late delivery. "Under New York law, '[t]hough a buyer of a commodity may accept delivery of the commodity after the stipulated date, he may still retain his right of action for damages caused by delay.'" *Trafigura Beheer B.V. (Amsterdam) v. South Caribbean Trading Ltd.*, 7 Misc.3d 1010(A), 801 N.Y.S.2d 243 (N.Y.Sup. 2004) (quoting *Beacon Plastic & Metal Prods., Inc. v. Corn Prods. Co.,* 57 Misc.2d 634, 637 (App Term, 1st Dept 1968)); *Zamoiski Co. v. Tenavision, Inc.*, No. 84 Civ. 3231 (BN), 1986 WL 10274, *3 (S.D.N.Y. Sept. 9, 1986) ("[A]cceptance of the goods does not itself waive or bar defendant's remedy of recovering damages resulting from any breach of contract by plaintiff predicated on late delivery.")

Label bargained for a higher price for the racerback garments, which suggests that they owned them and sought to minimize their exposure to Atateks under the purchase orders.[19]  (PX-57.)

On the other hand, Arslan acknowledged that Atateks' affiliate Morera sold off the racerback garments and credited the resale price to Private Label's "open account."[20]  Although Arslan's testimony is ambiguous as to whether Atateks sold the garments in satisfaction of Private Label's obligation to pay the contract price (as Private Label contends) or simply as a favor to Private Label (as Atateks now contends), Arslan acknowledged that Atateks was at least partly responsible for the late deliveries and that the parties did agree in October 2006 that at least some of the cancelled goods would be sold by Atateks' "New York office"—presumably, its affiliate Morera.[21]  That the racerback garments were in fact resold in such a manner provides a modicum of corroboration for Private Label's version of the October 2006 Agreement.[22]  Furthermore, Arslan's ambiguous, if not inconsistent, testimony with respect to disposition of the racerback garments may be harmonized with the clearer testimony of Dente and Corchado if the racerback garments were the "cancelled" garments that Atateks agreed to "take care of." (Tr. 132.)

Although, as discussed below, Defendants fail to meet their burden of proof to establish a counterclaim for breach of contract with respect to the late delivery of the racerback garments, my conclusion here finds reinforcement in equity.  Arslan acknowledged that Atateks was at

---

[19] Corchado wrote, "this price is really low[;] is there any way that you can get more for these goods[?]" (PX-57.)  Profit maximizing is also consistent with Private Label's obligations to mitigate damages: assuming that Private Label recognized its attempted revocation of acceptance was invalid, Private Label would have an obligation to mitigate its damages by reselling the goods at the highest price available.

[20] Arslan testified that "we had taken some goods from their warehouse, we picked it up with our own people and sold it into the secondary market on behalf of them and that amount was something around $100,000 I guess. We had an open account.  We credited their account on that amount. . . ." (Tr. 155.)

[21] Arslan testified as follows: "We had a meeting with Christine Dente, and the ones which they bought, which means the warehouse orders were bought by Private Label Sourcing would be in their possession, and some parts were cancelled, I don't recall how much it was, and we would take care of those goods by our side, our office, we had a New York office." (Tr. 132.)

[22] Of course, it is equally possible that Private Label's version of the agreement is a *post hoc* fabrication. However, on a record as thin as the one before me, and in light of Arslan's testimony that (a) Atateks agreed to sell *some* portion of the cancelled goods in satisfaction of Private Label's purchase order obligations, and (b) Atateks was at least partially responsible for the late deliveries, I find that the consistency between the true manner in which the racerback garments were sold and Defendants' account of the October 2006 Agreement provides some corroborating support for Defendants' version of the agreement.

least partially responsible for the late delivery of the racerback garments, and although far from conclusive, the documentary evidence supports both the manufacturers' culpability and Defendants' contention that late deliveries led Target to cancel its orders.  The garments were sold at a price endorsed by Arslan and obtained by Atateks' affiliate and that price was credited to Private Label's open account.  Although Atateks did not receive the full contract price for the late-delivered garments, it did not come up empty-handed either.  For the foregoing reasons, I conclude that Plaintiffs have failed to meet their burden to establish that Defendants are liable for the contract price for the racerback garments.  Accordingly, no adjustment to Defendants' accounting will be made for these claims.

4.  Rouched Claims.

Dente's email dated September 29, 2006, also sought to cancel an additional seven purchase orders for more than 62,400 garments in the "rouched style" after Target cancelled its order for those goods.  (PX-35.)  Private Label's purported cancellation of the purchase orders with a total contract price of $280,836 gives rise to another breach of contract claim. However, the Rouched garments had not been shipped when Dente purported to cancel the orders for them and Dente acknowledged that they were not late, though previous shipments for garments in the same style had been shipped late.

The emails between Target and Private Label that lead up to Dente's purported cancellation contemplate that Private Label would convert the purchase orders for the rouched garments from a direct line of credit basis to a warehouse basis, complete manufacture of the garments, and hold the garments in Private Label's warehouse for sale to Target if Target elected to restock the product after sales data was reviewed in late October.  (PX-44.)  Both Dente and Corchado expressed optimism that Target would ultimately have a need for the product. (PX-35, 44; Tr. 54.)[23]

In her September 29, 2006 email, Dente describes the arrangement with Target but appears to add a new term: Target will allow Private Label to bring the rouched garments into Private Label's warehouse "at the factory liability."  (PX-35.)  Dente's email goes on to explain that Atateks will be allowed to ship the goods to Private Label on consignment but Private Label

---

[23] There is some evidence that Target may have used delays and quality problems as a pretext for canceling its orders for the garments when in fact the orders were cancelled because the garments were not selling as well as the Target had expected.

cannot pay for the goods unless and until "[T]arget sees sales and potentially they will take the units in."  (PX-35.)  Dente thus attempts to shift to Atateks the full balance of the risk that Target will decline to restock the rouched garments.  However, no other evidence supports the view that Target determined that the potential losses should be borne by the manufacturer or the wholesaler and it strikes me as highly implausible that they would care.  Dente's September 29, 2006 email also confirms that she knew it was too late to cancel the purchase orders:  she used this fact in her attempt to convince Target not to cancel its orders for the garments.[24] (PX-35; see also Tr. 53.)

Target ultimately elected not to restock the rouched garments and in January 2007 they were sold to Levinson International for $78,000.  Defendants contend that at the October 2006 meeting, Atateks agreed to permit Private Label to sell off the rouched goods for whatever price could be obtained in full satisfaction of Private Label's liability to Atateks.  Atateks vigorously disputes this account.  Arslan testified "we had no agreement, never, ever, agreeing that Christine Dente can sell them off at the secondary market at whatever price she wants. It never happened." (Tr. 132.)  I find Atateks' account of the October 2006 agreement with respect to the rouched garments more plausible and credible.  The rouched garments were in mid-production when Target cancelled its order.  When the parties met in New York in October, the rouched garments had not yet arrived and Target could not have reviewed the sales data that would guide its decision to restock the goods.  When sale of the goods to Target was still a possibility, I find it highly implausible that the parties would have agreed to permit Private Label to sell the rouched garments in the secondary market at whatever price could be obtained to cover its liability to Atateks for those goods.

The purchase orders and invoices for the rouched garments establish a contract price of $280,836 and Defendants acknowledge that they have made no payment for those goods. Consequently, I find that Plaintiffs have established Defendants' breach of contract liability for the Rouched Claims and Defendants are liable to Plaintiffs for the contract price of the Rouched garments, $280,836.  Because Defendants' accounting already includes $78,000 for the Rouched garments, an additional $202,836 will be added to Defendants' accounting.

---

[24] Dente wrote, "Target did not want to hear that we could not cancel these purchase orders." (PX-35.)

5.  <u>March 22, 2006 Invoice.</u>

The final topic that Defendants contend was addressed at the October 2006 meeting concerned garments in the rouched style that were the subject of an Atateks invoice dated March 22, 2006.   Defendants contend that at the meeting in New York the parties agreed to split the $139,639.20 invoice equally between Atateks, Private Label, and Basul. Atateks proffers both the invoice and a bill of lading that on its face shows the goods were shipped on March 31, 2006. (PX-8 at 92.)   The alleged three-way split of the March 22, 2006, invoice is not mentioned in Dente's trial declaration.  Corchado testified that the three-way split was agreed to as soon as the purchase order was confirmed.  (Tr. 170.)  But Defendants argue in their brief that the agreement was reached at the October 2006 meeting in New York.  Defendants supply no credible evidence that suggests that Target cancelled its order for the goods that were the subject of the March 22, 2006 invoice or that explains why the parties would have agreed to share responsibility for the invoice that was issued six months earlier.  Arslan did testify that he recalled an agreement to split costs three ways, but that it pertained to charge-backs and not a six- figure invoice.  (Tr. 150-52.)

Plaintiffs establish their breach of contract claim by presenting the purchase order, the invoice, and the bill of lading, and Defendants have failed to supply credible evidence that the parties agreed to vary Private Label's obligation to pay the contract price for those goods. Consequently, Defendants are liable to Plaintiffs for the full amount of the March 22, 2006 invoice, $139,639.20.  Because Defendants' accounting credits Atateks with one third of the payments due under the March 22, 2006 invoice, only $93,090.20 will be added to Defendants' accounting.

6.  <u>Amounts Paid to Basul.</u>

Plaintiffs' last objection to Defendants' accounting concerns three wire transfers to Basul made between December 2006 and July 2007 that total $116,940.14 and which Private Label seeks to charge to Atateks.  One entry in Defendants' accounting, a December 20, 2006 wire transfer of $22,350.87 bears the notation "on behalf of Atateks not paying commissions," but otherwise the accounting contains no explanation of the charges. (See DX-A.)  Private Label's bank statement from December 2006 confirms that two of the transfers were in fact made to Basul, but no evidence, documentary or testimonial explains why Atateks should be held liable for payments to Basul, who was Private Label's agent.

Defendants contend that Plaintiffs' argument in its post-trial brief does not satisfy the preponderance of the evidence standard because Plaintiffs offer no evidence to counter the accounting, the accuracy of which was vouched for under oath by Dente.  Yet Defendants not only elsewhere admit to inaccuracies and omissions in their own accounting, but also misunderstand the application of the burden of proof with respect to this claim.  The purchase orders and invoices produced by both parties establish that Private Label is liable to Atateks for payment for certain goods, obligations that Private Label has admittedly not satisfied.  Private Label attempts to reduce the amounts it owes Atateks by, in this instance, subtracting the amount of the wire transfers to Basul.  However, to support its contention that its obligation to Atateks should be reduced in this fashion, Private Label offers nothing other than evidence that the wire transfers were in fact made.  Absent some evidence that Atateks acquired an obligation to pay Private Label's agent, three lines in the accounting prepared as a trial exhibit and bank statements showing the transfers were made are insufficient to shift liability for these payments to the Plaintiffs.  Accordingly, the $116,940.14 in unsubstantiated payments to Basul will be added back into Defendants' accounting.

7.  Summary of Breach of Contract Claims.

In summary, I find that Private Label is liable to the Plaintiffs for breach of contract in the amount of $1,201,415.39.  As a consequence of the foregoing discussion, the "starting point" of Defendants' revised accounting, $573,179.47, must be adjusted upwards by (i) $215,369.58 for the Charge-Back Claims; (ii) $202,836.00 for the Rouched Claims; (iii) $93,090.20 for the March 22, 2006 Invoice Claims; and (v) $116,940.14 for the Basul Claims.

**C.  Alter Ego Theory.**

Plaintiffs contend that Second Skin was the alter ego of Private Label because Second Skin, through its sole owner Dente, "dominated Private Label, forcing it to subsidize the operations of Second Skin and to require the payment of kickbacks to Ms. Dente through Second Skin." (Pls.' Mem. at 29.)  Specifically, Plaintiffs contend that Private Label transferred $306,085 to Second Skin as alleged "commissions" to Dente but the payments were in fact fraudulent "kickbacks" to Dente.[25]

"It is well settled that New York courts are reluctant to disregard the corporate entity." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989).  Consequently, before the

---

[25] These transfers give rise to Plaintiffs' fraudulent conveyance claims addressed *infra*.

corporate veil will be pierced, it must be shown that (1) the alleged alter ego exercised complete domination over the corporation with respect to the transactions at issue; and (2) that this domination was used to commit a "fraud or wrong" against the plaintiff, which resulted in plaintiff's injury. *Morris v. N.Y. State Dept. of Taxation & Finance,* 82 N.Y.2d 135, 140 (1993); *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.1988), *cert. denied,* 488 U.S. 852 (1988).  However, "[b]ecause the concept is equitable in nature, the decision to pierce the corporate veil is not 'reduced to definitive rules' but will 'necessarily depend on the attendant facts and equities.'" *Balmer v. 1716 Realty LLC,* No. 05 Civ. 839 (NG), 2008 WL 2047888, 4 (E.D.N.Y. May 9, 2008) (quoting *Morris,* 82 N.Y.2d at 141).

1. <u>Complete Domination.</u>

Courts in this Circuit consider the following factors to determine whether a defendant entity was dominated by another:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).  This list of factors is not exhaustive, "rather alter ego liability should be imposed 'when doing so would achieve an equitable result.'" *Leykis v. NYP Holdings, Inc*., 899 F.Supp. 986, 992 (E.D.N.Y. 1995) (quoting *William Wrigley, Jr. Co.,* 890 F.2d at 601)).  Each of the foregoing factors that apply to the facts of this case is addressed in turn.

a. <u>*Absence of Corporate Formalities.*</u>

In discovery, Defendants stated that they possessed no documents that showed who served as officers and directors of the Defendant corporations from 2002 to 2008.  (PX-20.)  From this admission flows the reasonable conclusion that neither Private Label nor Second Skin adhered to the corporate formalities that are "part and parcel" of a separate corporate existence. *Wm. Passalacqua Builders*, 933 F.2d at 139.  In their post-trial brief Defendants contend that the

Plaintiffs' argument on this score is "simply wrong" and point to Dente's trial testimony that Private Label and Second Skin maintained "separate books and records" and filed separate tax returns.  (Defts.' Mem. at 64; Dente Decl. ¶48; Tr. 100.)  Although the two entities kept their books sufficiently separate to permit them to file separate tax returns, Defendants provide no evidence that any other corporate formalities, such as electing directors, appointing officers, holding annual meetings, or acting by corporate resolution, were maintained. Consequently, I find that the failure to maintain requisite corporate formalities is some evidence that Private Label and Second Skin were intertwined entities.

> b. _Inadequate Capitalization._

The evidence presented at trial clearly establishes that during the relevant time periods Private Label's liabilities exceed its assets and that the company was thus inadequately capitalized.  Private Label's accountant, John Huber, stated in his trial declaration that Private Label met the "accounting" definition of insolvency because its liabilities exceeded its assets and cash flow.  (Decl. of John Huber, dated July 24, 2008 ("Huber Decl.") at ¶3.)  Although Huber and Defendants emphasize that as a practical matter Private Label remains in business and has not succumbed to its "technical insolvency," the evidence is clear that the amount by which Private Label's liabilities exceeded its assets increased from less than $120,000 in 2003 to nearly $2 million in 2006.  (Huber Decl. ¶4.)  Regardless of whether Private Label was able to continue in business, Private Label's own accountant confirmed that during the relevant time period the company was not only inadequately capitalized, but it was also insolvent.[26]  _See Balmer_, 2008 WL 2047888, *5 (defendant corporation was insolvent and therefore inadequately capitalized).

> c. _Personal Use of Corporate Funds._

Siphoning of corporate funds by the dominating entity or shareholder is another factor that courts will consider to determine if piercing the corporate veil is warranted.  _William Wrigley Jr. Co._, 890 F.2d at 601.  Here, Arslan testified that Dente directed Atateks to increase

---

[26] Defendants contend that Huber's declaration does not establish Private Label's "legal 'insolvency,'" apparently because Private Label has managed to continue in business despite being in a "financial state of technical accounting insolvency." (Defts.' Mem. at 58.)  The import of such an assertion is not clear and, in any event, the legal definitions of insolvency under both the federal Bankruptcy Code and the New York Debtor and Creditor Law are precisely that which Defendants disparagingly characterize as the "technical accounting" definition. 11 U.S.C. § 101(32) (defining insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property");  N.Y. Debtor and Creditor Law § 271 ("A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.")

the prices it charged to Private Label to build in a "commission" that would be paid directly to Second Skin.  (Arslan Decl. ¶43.)   I find Arslan's testimony credible.[27]  Thus, the increased prices paid by Private Label and diverted to Second Skin constitute corporate funds that were siphoned off by Dente, the dominant shareholder of Private Label.  Even if Atateks did not raise its prices, the commissions paid by Atateks to Second Skin for the business opportunities with Target should have been paid to and retained by Private Label, the true intermediary.

I find Dente's explanation as to why Second Skin began to charge a "commission" for her role in the relationship between Target and Atateks neither coherent nor credible.  (*See* Tr. 32, 34.)  When Dente was asked why Second Skin began, in 2005, to charge for a "relationship" that had been ongoing since 2002, Dente stated that in 2005 there was a "change in the whole business dynamics," namely that Dente's partner Allen expressed an interest in selling his shares because he was sick and Dente and Atateks discussed an increased emphasis on the seamless garment business.  (Tr. 34.)  Dente also testified that she started Second Skin because she recognized an opportunity to expand the seamless business.  (Tr. 90.) This explanation may shed light on why Dente, in her personal capacity, may have wanted to move the business in a new direction and form a new corporate entity, but it fails to address, let alone explain, what Private Label gained from having its existing clients pay commissions to a separate entity owned by Dente even as its clients continued to conduct business through Private Label.  Finding Dente's testimony on this point less than credible, I conclude that, through Second Skin, Dente made personal use of Private Label's corporate funds and business opportunities.

       *d.*   <u>*Overlap in Ownership, Officers, Directors and Personnel.*</u>

The overlap in ownership, management, and personnel between Private Label and Second Skin is also clear.   First, Dente is fifty-percent-owner of Private Label, and one-hundred-percent-owner of Second Skin.  (Tr. 28.)  Second, although the record is devoid of documentation as to who served as officers and directors of the two companies, the testimony is clear that Dente operated and managed both companies.  For example, Dente negotiated with both Atateks and Target on Private Label's behalf and testified that, with respect to Second Skin, she "[was] the business."  (Tr. 100.)

Third, there was substantial, if not complete, overlap between the personnel of Private Label and Second Skin.  Corchado, who was employed by Private Label and the main point of

---

[27] As a former employee of Atateks, any stake that Arslan holds in this Court's ruling is less direct than that held by Dente.

contact between Basul and Atateks, simultaneously did work for Second Skin for which she was allegedly paid as a consultant. (Tr. 27-28.)  Corchado became a Second Skin employee in December 2007, but continued to work from Private Label's office and make use of Private Label's business equipment and resources.

> e.   *Common Office Space and Business Equipment.*

Second Skin's use of Private Label's office space and business equipment further suggests that Second Skin exerted domination over Private Label. Dente acknowledged that Second Skin does not rent its own offices, that Corchado uses a desk at Private Label's offices to conduct her work for Second Skin, and that Second Skin does not compensate Private Label for the use of the office space. (Tr. 29.)  Dente testified that Second Skin received mail at Dente's home address and at Private Label's office. (Tr. 31.)  Dente further acknowledged that Second Skin does not have its own telephone line and that from time to time Corchado uses Private Label's phone line to make calls pertaining to Second Skin's business.  (Tr. 29.)  Dente testified that Second Skin does not own any office equipment, desks, or photocopiers. (Tr. 30.)

As an example of the extent of the overlap, Dente acknowledged that in July 2006, Corchado sent Atateks a series of charge-backs on Debit Notes that erroneously bore Second Skin's name and requested payment to Second Skin.  (See Tr. 39; PX-23.)  Although I have no reason not to credit Dente's explanation that the error was the result of an innocent mistake by a summer intern, the mistake is indicative of the overlap between the two businesses.    Indeed, Corchado sent the requests for payment to Second Skin from her Private Label email account.

> f.   *Exercise of Business Discretion.*

Defendants make much of the fact that Dente's co-owner Jetwell directed Private Label's business strategy away from seamless garments and was responsible for financing the business. (See Defts.' Mem. at 64-65; Dente Decl. ¶5-6.)  However, Dente's control of Private Label's business during the relevant time period is undeniably clear from the record.  Dente negotiated with Target in an attempt to avoid cancellation of certain goods and then attempted to dictate the terms by which that loss would be foisted upon Atateks.  Dente negotiated with Atateks before and after the October 2006 meeting.  Even if Dente's co-owner had discretion or control over some aspects of Private Label's business, it is clear that Dente exercised nearly unbridled discretion over the aspects of Private Label's business at issue here.

g. *Arm's-Length Dealing.*

As discussed above, a preponderance of the credible evidence reveals that Dente made use of her control of Private Label to divert corporate funds and business opportunities to Second Skin. But even in the absence of such a scheme, Dente's own testimony confirms that dealings between Private Label and Second Skin were far from "arm's-length."   Dente testified that in 2005 and 2006 one hundred percent of Second Skin's revenue came from commissions paid by garment manufacturers who sold their products to Private Label.  (Tr. 36-37.)  But there is no economically credible explanation for Private Label agreeing for its customers to pay commissions to an "arm's-length" entity without receiving something of value in return.  I do not credit Dente's account of the alleged "value" she offered (i.e. maintenance of an existing tri-partite business relationship) and thus conclude that Private Label and Second Skin did not conduct business at "arm's-length."   Defendants' conclusory argument that Private Label and Second Skin "do not deal with each other, as they are in separate lines of business" misses the mark entirely. (Defts. Mem. at 66.)

h. *Independent or Joint Profit Centers.*

Finally, Dente's testimony that one hundred percent of the revenue earned by Second Skin in 2005 and 2006 was generated from commissions earned from Private Label's clients suggests that the entities were joint, rather than independent, profit centers.

In sum, in arguing against a finding that Second Skin is not the alter ego of Private Label, Defendants rely almost exclusively on conclusory and self-serving testimony such as Dente's statement that "Second Skin has been, and continues to be, a wholly separate entity from Private Label." (Dente Decl. ¶48.)  In contrast, Plaintiffs elicited testimony and offer documentary evidence that provides factual substantiation for at least seven of the ten factors used to assess corporate domination.  Consequently, I conclude that Dente and Second Skin so dominated Private Label's business dealings that if Second Skin used its domination to commit a wrong that injured Plaintiffs, Second Skin must be considered Private Label's alter ego.

2.   Use of Domination to Commit a Wrong.

"While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required." *Morris*, 82 N.Y.2d at 141-142 (internal citation omitted).  "A plaintiff may be considered injured when a company is rendered unable to

26

pay the claims pending against it by third parties because of another company or individual's domination of the business." *Balmer*, 2008 WL 2047888, *6 (citing *Austin Powder Co. v. McCullough*, 216 A.D. 825, 827 (N.Y. App. Div. 1995)).

Here, Second Skin's domination of Private Label led to the diversion of at least $306,000 in "commission" payments that either (a) were indirectly paid by Private Label as a result of manufacturers raising their prices to effectuate the "kickback" scheme to which Arslan testified; or (b) at the least, funds that should have been retained by Private Label, the true intermediary between Atateks and Target.[28]  This, in turn, exacerbates Private Label's insolvency, rendering it less able to pay its creditors including Atateks, to whom Private Label acknowledges that it owes a debt of at least $560,000.

Defendants argue that adding Second Skin's profits—$77,000 in 2005 and $19,420 in 2006—to Private Label's balance sheet would not cure its insolvency. But this argument also misses the mark.  The question is not whether but for the alter ego's domination, the dominated company would be in sound financial health.  Rather, the injury caused by Second Skin's domination—and the one that warrants exercise of this Court's equitable powers to pierce Private Label's corporate veil—is that the diverted funds are unavailable to satisfy Private Label's liability to the Plaintiffs unless and until the veil is pierced.  For the foregoing reasons, I conclude that Second Skin is the alter ego of Private Label and therefore jointly liable to the Plaintiffs for the amount of the judgment that will be entered on the basis of this Opinion.

**D. Fraudulent Transfer.**

1. Constructive Fraudulent Transfer.

Plaintiffs further allege that the $306,085 in commission payments to Second Skin constitute constructively fraudulent transfers in violation of New York Debtor and Creditor Law §273.  That statute provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  N.Y. Debtor and Creditor Law § 273.  Because "the creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been

---

[28] I have no reason not to credit Arslan's testimony as to the existence of a kickback scheme.  However, I note the alternative to show that even if Arslan's testimony that Dente directed manufacturers to increase their prices to fund the commissions were discredited, the commission payments are funds that were diverted from their proper recipient, Private Label.

available to satisfy the judgment had there been no conveyance," *Capital Distribution Services, Limited  v. Ducor Express Airlines, Inc.*, 440 F.Supp. 2d 195, 204 (E.D.N.Y. 2006), and since I have already found Second Skin to be an alter ego of Private Label, holding Private Label liable for fraudulent transfers will not add to Defendants' liability to Plaintiffs.  Nevertheless, I address the merits of Plaintiffs' claim.

The occurrence of a transfer or conveyance is, of course, a prerequisite to a finding of liability under the statute, and "the burden of proving both insolvency and the lack of fair consideration is upon the party challenging the conveyance."  *American Inv. Bank, N.A. v. Marine Midland Bank, N.A.*  191 A.D.2d 690, 691-692 (2d Dep't 1993).  The first question is thus whether the commission payments made by Atateks and Private Label's other customers directly to Second Skin constitute a "conveyance" within the meaning of the statute.  The statute defines "conveyance" to include "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance."  N.Y. Debtor and Creditor Law § 270.  Here, the commission payments represent intangible property akin to a corporate opportunity:  Private Label's customers were willing to pay additional sums to maintain their business with Target, which was conducted through Private Label.  By directing Private Label's customers to make such payments to Second Skin directly, Dente diverted those payments away from Private Label.  Whereas Private Label may have a fiduciary duty claim against Dente for usurpation of a corporate opportunity, Dente's actions to cause Private Label to forego the benefit of the commission payments by diverting them to Second Skin resulted in a conveyance within the meaning of the New York Debtor and Creditor Law.

Second, Private Label was insolvent at the time of the conveyances.  Defendants misread the statute, interpreting it to require that the payment at issue be the *cause* of the transferor's insolvency.  The statute, however, applies to one "who *is* insolvent *or will be* rendered insolvent by the transfer." *Capital Distribution Services*, 440 F.Supp. 2d at 204 (emphasis added).  Defendants also contend that Private Label was not insolvent at the time the commissions were paid, relying on their accountant's testimony that the company was not "legally insolvent" because it was still in business.  (Defts. Mem. at 58.)  But the testimony of Defendants' accountant in fact confirmed that that Private Label *met* the statutory definition of insolvency because its assets exceeded its liabilities during the relevant years. *See* N.Y. Debtor and Creditor Law § 271 ("A person is insolvent when the present fair salable value of his assets is less than

28

the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.")

Third, I find consideration lacking for the conveyances of the commissions. When made as fair consideration for the rendering of valuable services, an insolvent company's payment of commissions is not a fraudulent transfer. *See, e.g., Balaber-Strauss v. Lawrence*, 264 B.R. 303, 307-08 (S.D.N.Y. 2001). This is because satisfaction of a pre-existing debt qualifies as fair consideration. *Capital Distribution Services*, 440 F.Supp. 2d at 207. However, "[o]ne exception has been recognized by the New York courts to the rule that the repayment of an antecedent debt constitutes fair consideration: where 'the transferee is an officer, director, or major shareholder of the transferor.'" *In re: Sharp International Corp.*, 403 F.3d 43, 54 (2d Cir. 2005); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 -635 (2d Cir. 1995) (payments of pre-existing obligations to corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration) (citing *Farm Stores, Inc. v. School Feeding Corp.,* 102 A.D.2d 249 (2d Dep't 1984), *aff'd,* 64 N.Y.2d 1065 (1985); *Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178 (2d Dep't 1978)).

Here, Dente is both an officer and major shareholder of Private Label who caused the insolvent Private Label to convey to Second Skin the right to receive commission payments that totaled $306,085. This represents a constructively fraudulent transfer in violation of New York Debtor and Creditor Law §273 and an independent basis for the Plaintiffs to seek recovery of that amount from Second Skin.

2.   Actual Fraudulent Transfer.

Section 276 of New York's Debtor and Creditor law addresses actual, as opposed to constructive, fraud and does not require proof of unfair consideration or insolvency. *Wall Street Associates v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999). As a consequence of the difficulty of proving actual intent to hinder, delay or defraud creditors, courts will consider "badges of fraud" which are "circumstances that accompany fraudulent transfers so commonly that their presence gives rise to an inference of intent." *Capital Distribution Services*, 440 F.Supp. 2d at 204 (citing *Steinberg v. Levine*, 6 A.D. 3d 620, 621 (2d Dep't 2004)). Such "badges of fraud" include a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance. *Wall Street Associates*, 257 A.D.2d at 529

(citing *Pen Pak Corp. v. LaSalle National Bank of Chicago,* 240 A.D.2d 384, 386 (2d Dep't 1997); *see also, Steinberg*, 6 A.D. 3d at 621.

Here, although some of the "badges of fraud" apply to Dente's acts to cause diversion of commission payments from Private Label to Second Skin, I do not find that Private Label acted with actual intent to defraud or hinder creditors.  On the one hand, overlap in ownership and control of the two entities shows the close relationship between Private Label and Second Skin and Dente's day-to-day management of Private Label suggests that she knew the extent of the company's insolvency.  However, the several commission payments, though questionable, were not the type of extraordinary conveyance that betrays a clear intent to avoid a creditor's claim. In contrast to, for example, a conveyance made on the same day the transferor is served with a complaint seeking the transferred funds, *see Capital Distribution Services*, 440 F.Supp. 2d at 205, here the commissions were paid over the course of a year and by more than one customer. Moreover, Private Label did not retain ownership or control of the funds after the conveyance, and although I am dubious about the value of the services Dente provided to justify the commission payments, my finding of an absence of fair consideration in the constructive fraudulent transfer context hinged on the exception for transfers to corporate officers, directors, or major shareholders.   Consequently, I find that Plaintiffs have failed to establish that Private Label acted with actual fraudulent intent in violation of Debtor and Creditor Law §276.

**E.  Counterclaims.**

Defendants assert two counterclaims.  First, Defendants allege that Plaintiffs "failed to meet their obligations under [the] purchase orders in that they failed to manufacture certain goods by the dates set forth in the purchase orders," which the Court construes as a claim for breach of contract. (Defts.' Answer to Am. Compl. ("Answer") ¶56.)   Second, Defendants characterize as their "main" counterclaim that which seeks recovery for substantial damage to Private Label's relationship with Target alleged to have resulted from "the late deliveries, canceled orders, defective goods, and returned merchandise caused by Plaintiffs' breaches." (Answer ¶ 61.)  In alleging their second counterclaim, Defendants do not specify what obligations Plaintiffs is alleged to have breached.  Because the parties had no master contract, Defendants ostensibly refer to the obligations created by the purchase orders.  In their post-trial brief, Defendants argue that Private Label lost its business to supply seamless apparel to Target as a result of problems in Atateks' Jordanian factory, namely, late deliveries, quality control issues, and Atateks' alleged failing of a Target factory audit for labor violations.  (Defts.' Mem.

at 70-74.)  Consequently, Defendants' second counterclaim is slightly more than a mere prayer for consequential damages adjunct to their first counterclaim for late deliveries and I address each counterclaim in turn.

1.  Breach of Contract: Late Deliveries.

        Defendants' pursuit of their first counterclaim for late deliveries is half-hearted at best: their post-trial briefing places exclusive emphasis on their "main" counterclaim for lost business with Target.  Upon review of the record, the only potentially viable claims for breach of a specific obligation to make timely delivery concern the rouched and racerback garments discussed above.  Ultimately, however, Defendants fail to establish that Plaintiffs are liable for breaching the purchase orders by virtue of the late deliveries.

        a.  *Counterclaim for Late Delivery of Racerback Garments.*

        Defendants assert a counterclaim for breach of contract based on the late delivery of the racerback garments, maintaining that Private Label would have earned a profit of $67,011.84 had the goods been delivered on time and resold to Target as planned.  This claim falls short, however, because through its conduct Private Label waived the right to enforce strictly the delivery term once Target cancelled its order for those goods.

        Contractual rights may be waived if they are knowingly, voluntarily, and intentionally abandoned.  *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Management, L.P.*  7 N.Y.3d 96, 104 (2006) (citing *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 184 (1982)).  Abandonment "'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.'" *Id.*  (quoting *General Motors Acceptance Corp. v. Clifton-Fine Cent. School Dist.,* 85 N.Y.2d 232, 236 (1995).  "A party may be deemed to have waived the right to timely performance, even where the parties have agreed that time is of the essence, by accepting performance after expiration of the time limit." *Franklin Pavkov Const. Co. v. Ultra Roof, Inc.,* 51 F.Supp.2d 204, 217 (N.D.N.Y. 1999).  Furthermore, once such a waiver has occurred, the time-is-of-the-essence provision of the contract may not be unilaterally reinstated: it is improper for a party who has waived its right to timely performance to attempt suddenly to cancel the contract without first notifying its counterparty that time is of the essence and re-setting the time for performance within a reasonable time by "clear, distinct, and unequivocal notice." *Moray v. DBAG, Inc.*, 305 A.D.2d 472, 473 (2d Dep't 2003).

        The racerback garments were not shipped until mid-September, though the purchase orders originally specified they were to be shipped in mid-July.  (*See, e.g.,*DX-A-31-B.)

However, Private Label was intimately involved in both coordinating Atateks' production cycle and a "collaborative effort" to expedite shipping of the goods to meet Target's requirements. Arslan testified that, through daily or weekly communications, Private Label employees "were managing the capacity" within Atateks' factory that had been reserved for Private Label, giving instructions about the order in which garments should be produced. (Tr. 127.) Private Label agreed to comply with Target's requested changes to the orders for the racerback garments without seeking Atateks' prior approval, and such changes contributed to production delays. (PX-56; Tr. 125.) Private Label also collaborated with Atateks to coordinate delivery of the goods, converting the transaction from a direct-line-of-credit basis to a warehouse basis and arranging for some of the goods to be shipped by air instead of by sea. (Tr. 45; PX-44.) Private Label knew that production of the racerback garments was delayed and worked directly with Atateks in attempts to deliver the goods within Target's timeline for "in-store delivery." The delivery terms of the purchase orders were thus in constant flux and, as discussed above, Private Label accepted the goods under the terms of the FOB contracts by approving their shipment. Private Label only sought to enforce strictly the delivery date specified by the written purchase order after Target cancelled its order for the goods. At that time it was too late: by accepting late delivery of the garments, Private Label waived its right to timely performance and to enforce strictly the delivery terms of the purchase orders. *Moray*, 305 A.D.2d at 473; *Franklin Pavkov*, 51 F.Supp.2d at 217. Consequently, Defendants cannot now sustain a claim for damages.

       *b.* *Counterclaim for Late Delivery of Rouched Garments.*

       Defendants's claim for breach of contract with respect to the alleged late delivery of garments in the rouched style also fails. Although Dente claimed in her September 29, 2006, email that Target cancelled the rouched garments for late deliveries, this was a *prospective* cancellation of garments that had not yet been delivered based on *previous* late deliveries of goods in the same style. (PX-35; Tr. 52-53.) Dente's email notes that the "initial delivery for this program for the [O]ctober new store shipment" shipped late but neither Target nor Private Label purported to cancel that first shipment of garments. Rather, according to Dente, Target used the late delivery of the first shipment as justification for canceling seven purchase orders for an additional 62,000 units of the garments in that style. But even if the first shipment was in fact late, Private Label waived its right to sue by accepting that shipment without objection; Target's later cancellation of the subsequent order did not give Private Label the right to retroactively object to the late delivery of the first order. *Moray*, 305 A.D.2d at 473.

2.   Consequential Damages for Lost Profits.

      Defendants "main" counterclaim seeks to hold Atateks liable for Private Label's loss of its business with Target.   Private Label contends that it earned approximately $1 million in annual profits from its business with Target in 2005 and 2006, but nothing in 2007 after the dissolution of the parties' business relationship.   The counterclaim falls short, however, because Defendants fail to meet the high standard required to recoup lost profits.

      Lost profits are a form of consequential damages.   "In New York, a party is entitled to recover this form of lost profits only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties."   *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (citing *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261 (1986)).   Of course, as prerequisite to any award of damages a party must establish the breach of a contractual obligation.

      Defendants fail to establish that they are entitled to lost profits because they do not provide "objective proof of the amount of that loss." *Toltec Fabrics, Inc. v. August Inc.*  29 F.3d 778, 781 (2d Cir. 1994) (citing *Kenford,* 67 N.Y.2d at 261).   Since the lost profits theory requires that the loss be reasonably certain in amount, "an award cannot stand if based on little more than guesswork."   *Id.* (internal quotation marks omitted).   Here, Defendants' claim for lost profits is entirely too speculative to be sustained.

      Finally, the Defendant's claim for lost profits fails because it could not have been "fairly within the contemplation of the parties" when entering into individual purchase-order contracts that breach of a delivery or quality term of a single purchase order would subject Atateks to millions of dollars in lost-profit damages. *Tractebel,* 487 F.3d at 109.   The parties had no master contract and could cease doing business with one another at any time.   Consequently, they would have had no reason to believe that breach of the terms of a single purchase order would lead to liability for consequential damages for loss of an entire line of business.   For the foregoing reasons, Defendants fail to establish that they are entitled to damages for lost profits.

   **F.   Interest.**

      New York law governs the substantive issues in this diversity action, including the availability of prejudgment interest. *Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999); *Campbell ex rel. Campbell v. Metropolitan Property and Cas. Ins. Co.*,  239 F.3d 179,

186 (2d Cir. 2001). Pursuant to N.Y. C.P.L.R. §5001, prejudgment interest on a sum awarded for a breach of contract is recoverable by right. N.Y. Civ. Prac. L. & R. § 5001(a); *Bessemer Trust Co., N.A. v. Branin*, 544 F.Supp.2d 385, 392 (S.D.N.Y. 2008) (citing *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993)). "New York law does not permit the trial court to exercise any discretion where a party is entitled to such interest as a matter of right." *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.* 352 F.3d 599, 603 (2d Cir. 2003). Such interest must be computed from the "earliest ascertainable date the cause of action existed," except where damages were incurred at various times interest may be incurred "upon all of the damages from a single reasonable intermediate date." N.Y. Civ. Prac. L. & R. § 5001(b). New York law requires that this interest shall be nine percent unless otherwise provided by statute. *See* N.Y. Civ. Prac. L. & R. 5004; *Bessemer Trust Co.*, 544 F.Supp.2d at 392-393.

The last invoice for which Plaintiffs seek to recover payment is dated November 19, 2006. *See* PX-8; DX-A-57. Dente testified that Plaintiffs required invoices be paid within sixty to ninety days and the evidence shows that the parties were still in discussions concerning disposition of the cancelled garments in January 2007.[29] Consequently, I find that interest of 9% per annum on Plaintiff's $1,201,415.39 breach of contract award shall accrue from February 19, 2007, the date that is ninety days from Atateks' last invoice.[30] The sum of $253,580.94 is added to the award for prejudgment interest.

## CONCLUSION

For the foregoing reasons, Defendants are jointly and severally liable to Plaintiffs for breach of contract damages in the amount of $1,454,996.33, inclusive of interest. The Clerk of Court is directed to enter a judgment in accordance with this Opinion and close this case and remove it from my docket.

SO ORDERED
New York, New York
June 11, 2009

U.S.D.J.

---

[29] Although Private Label issued charge-backs to Atateks as late as July 2007, the alleged charges related to purchase orders that predated December 2006 and, in any event, I have largely found such charge-backs incredible.

[30] My findings that Private Label is liable for constructive fraudulent transfer and that Second Skin is the alter ego of Private Label merely permit Plaintiffs to seek recovery from Second Skin and thus no independent award of interest is warranted with respect to these claims.

34